1

2                                    Narrative of Facts

3

4          Plaintiff, Gregory Marlor, endured a grueling twenty-eight months defending charges that

5    law enforcement established without probable cause, that every citizen has the right to be free from

6    unreasonable search and seizures; more specifically, the exit order unlawfully extended his

7    detention. State's dismissal was predicated on the fact the Court suppressed the evidence, "On

8    reconsideration, the Court finds suppression is warranted." Not only was suppression warranted

9    concluding the Plaintiff's motion to reconsider hearing held on February 23, March 2, and April 15,

10   of 2021; the Courts granted the Plaintiff's prior Motion to Suppress in a hearing held on September

11   23, 2020. These results are not indicative to what two individually motivated sheriffs' deputies

12   collectively spawned. The Defendants' conspiracy is influential, knowledgeable, and founded by law

13   enforcement and available resources. After failing to extract their results in a pre-textual stop of the

14   Plaintiff, the conspirators gathered and pulled resources to find a location of familiarity, location of

15   opportunity with the property-business owner on vacation that allowed access for the Defendants

16   and the Plaintiff, and to complete their collusion the Defendants' recruited a subject struggling

17   judicially to entice the Plaintiff. The Defendants' consequences inflicted by their constitutional

18   violations may be unforeseen but nonetheless are liable for all damages and harms. The Plaintiff's

19   release was the reality of new barriers from old and new physical and psychological ailments and

20   disabilities, some he will burden the rest of his life. The malicious prosecution may have ended

21   when the State officially dismissed the charges against the Plaintiff on June 9, 2021. However, while

22   suffering from the injuries and hardships enacted by Defendants' reckless acts and shuffling

23   thorough a colluded puzzle to hold the Defendants accountable, the Plaintiff realizes that the legal

24   officials were not only shielding law enforcements illegal actions but were influencing potential

25   representatives in a lawsuit.

1

26

27          While under the color of law, Boise County Sheriff's Office spawned a plan to unlawfully

28    arrest the Plaintiff by calling Ada County Sheriff's k9 deputies, and in collusion, planned, executed,

29    and failed in a pre-textual stop to arrest the Plaintiff. During and after, the Defendants failed to

30    investigate the Plaintiff's complaints, his longtime friend was drugging him. This is due to his friend

31    signing up to be a confidential informant. Even after utilizing 911 text messaging so his friend was

32    unaware, he had called for help, she blamed it on his panic attacks. The Plaintiff asked the

33    paramedic if he was showing signs of his well-known panic attacks, and the paramedic said no. The

34    plan to unlawfully arrest succeeded with the aid of several deputies, dispatchers, detectives, and

35    confidential informants; ultimately, the malicious prosecution ended with the State's dismissal. Ada

36    County prosecutor's office supplied the name of an informant who was struggling judicially in

37    Canyon and Ada County, to Ada County Sheriff's k9 unit and detectives, to entice the Plaintiff to a

38    chosen location where seven Ada County Sheriff's deputies and dispatcher staged the scene,

39    unlawfully proffered the Plaintiff was burglarizing a business, unlawfully had him exit the car,

40    allegedly find methamphetamines and paraphernalia, unlawfully arrest him and take him to jail,

41    fabricate their reports, and created a colluded puzzle that the Plaintiff pieces together over the next

42    four years while fighting Long COVID.

43

44          Through the summer and into the fall of 2023, the Plaintiff was unveiling significant

45    components and participants of the Defendant's collusion that had been elusive but critical in

46    concluding all the Defendants and their enacted injuries. By the end of 2023, all parties and injuries

47    have been identified. The Defendants' causing the Plaintiff's injuries include defense attorneys, Ada

48    County sheriff's legal officials, a judge, Idaho State Police detective, Ada County Sheriff's lieutenants,

49    detectives, sergeants, patrol deputies, property deputies, jail deputies, dispatchers, prosecutors,

50    and Ada County Jail medical nurses, one doctor, LPNs, RNs, and owner and employee of a private

51    company; also, Boise County Sheriff's sergeants, deputies, and a private property owner who

52    colluded with Boise County Sheriff's Office.

53

54

55

56

57

58    *Boise County Sheriff's Office & Ada County Sheriff's Office*

59    *Conspire to Unlawfully Arrest the Plaintiff*

60

61    The collusion initiates on January 13, 2019, when Boise County Sheriffs conspire in efforts

62    to somehow get the Plaintiff to move out of Boise County and or have him arrested on drugs;

63    essentially extracting the same results. Boise County John Doe makes a call to Ada County Sheriff's

64    K9 team; Sergeant Piccola and trainee Deputy Kastler, to assist in a pre-textual stop. He conveys an

65    opportunity to deploy a k9 during the only legality to interact with the Plaintiff, failure to display

66    current registration tags. Even after the Defendants knew the Plaintiff was legal the collusion

67    continued by unleashing unlawful tactics and uniting under creed that the Plaintiff traffics in drugs

68    and "leaves late at night picks up a load of meth or whatever." Sergeant Piccola and Deputy Kastler

69    assembled a team to assist in the Plaintiff's pre-textual stop and include Ada County Sheriff's

70    Deputies Neill, Garcia, Hazer, and Dispatcher Goodin. The collusion would not have been successful

71    without the crucial aid of Dispatcher Goodin conducting and recording data into CAD, so the IDR

72    (Incident Detail Report), portrays the stop and arrest as lawful.

73

74    The Plaintiff requested the IDR for January 13, 2019, from his defense attorney, Jonathan

75    Baldauf, and he received two IDRs but one was given to him by mistake; however, the disposition

3

76   was identical: Written/Oral), WRN-Warning. The Plaintiff's seizure included five deputies and a

77   duration total [54:37] and the identical seizure had one deputy with a total duration of [04:67]. The

78   Defendants were deliberate in their planning and went to great lengths to deploy their plan without

79   revealing the true goal, and while operating under partial anonymity, harmoniously to unlawfully

80   arrest the Plaintiff, under the color of law. The Defendants succeeded in fabricating evidence but

81   failed in execution and consequently left a damming IDR that one can scrutinize and assert that the

82   incident was illegal from onset. Ada County Sheriff's Legal approves a fabricated IDR and withholds

83   the Activity portion of the report. The Plaintiff requested OBVs (Officer Body Video), and the IDR to

84   include Activity portion in the QUERY, so missing information would be included in the IDR for the

85   night of January 13; he was told, "That information has been purged." Even without the Activity

86   portion of the report, the IDR contains a fabricated caller, reason for the call, messages, and a

87   change in assignment of primary that skews the system and creates invalid data.

88

89        When a dispatcher initiates a report by entering data into CAD all entries and additions to

90   those entries are recorded in the Edit Section displayed at the end of the Incident Detail Report.

91   Data from assigned units also filter in and depending on how a QUERY is run; data will be pulled to

92   produce the IDR. The Plaintiff concedes his knowledge on the CAD software utilized by Ada County

93   Sheriff's Office is very limited, but his knowledge of similar software and hardware utilized by his

94   last employer is advanced and technical, and like CAD dispatches first responders, the software he

95   utilized dispatched trucks in the oilfield; triggers to start retaining data, data stored, and a QUERY

96   ran organizes said data into an end report.

97

98        Dispatcher Goodin logs the Problem, "K9- Request For A K-9 Unit" and inadvertently

99   exposes the collusion and to conceal the identity of the caller she fabricates evidence and inputs

100  "Caller Name: boise county dispatch." Boise County Sheriff's Office is K9 free and the reason for

101    calling Ada County Sheriff's for k9 assistance in the Plaintiff's pre-textual stop, to locate drugs. The

102    IDR reads as if Boise County Deputy John Doe is on the phone with Boise County Dispatch and the

103    messages originate from their CAD; or Boise County dispatch is relaying the messages and

104    Dispatcher Goodin is typing the message in CAD. However, if Dispatcher Goodin is entering the

105    messages into CAD, it would be logged in the "Edit Log" section of the IDR. Boise County

106    Dispatcher's CAD is not connected in a way where message originate from Boise County or its units.

107    Boise County Sheriff's Deputy John Doe is following the Plaintiff, so a safe assumption he is on the

108    phone with K-91 and Sergeant Piccola and Deputy Kastler are in essence, fabricating evidence. The

109    origin of these messages could be one of the reasons why the "Activity" portion of IDR contains no

110    data. IDR also has K-91 as the primary unit and "Location Type:" "Roadway Hwy Alley" with the

111    "Cross Street: btwn AVIMOR RD and BOISE COUNTY LINE."  That is not the location of S-44, the

112    Plaintiff first sees S-44 stopped at a green light why he is waiting for his to turn green at Lighthouse

113    Chevron. The location of K-91 would also be given in the Activity portion of IDR. Some information

114    is intricately linked and still be available if a QUERY included Activity. The IDR does not contain

115    arrival times, and this might also be relevant in the IDR including Activity data; nonetheless, it

116    shows intent not to disclose relevant information. The Defendants were intentional in their

117    planning and execution and included deception and a willingness to assist another department in

118    fabricating and or withholding evidence; thus, revealing a goal-orientated commitment that to

119    exposes a mentality that accepts misconduct and disregards written Policies and Procedures at Ada

120    County Sheriff's office.

121

122

| | Unit | Primary | Assigned | Disposition | Enroute | Arrived |
|---|---|---|---|---|---|---|
| 123 | | | | | | |
| 124 | K91 | Y | 21:40:53 | | 21:40:53 | ? |
| 125 | S44 | N | 21:44:09 | Written/Oral),WRN-Warning | 21:44:09 | ? |

126

127

128    Dispatcher Goodin enters the caller into CAD as "boise county" at [21:38:10] and assigns

129    unit K-91 as the primary at [21:40:53]. However, in the Comments section of the IDR on line 1 at

130    [21:40:06] under Communication, it has a message that reads as if Boise County Dispatch is

131    relaying messages from Deputy John Doe that is following the Plaintiff into Ada County. The

132    message starts, "********** is requesting a k9 ...", and it proffers that the message is being relayed

133    by Boise County Dispatch and they want the person fallowing the Plaintiff to remain unknown.

134    Sentence syntax, IDR structure, and future misconduct disclose the origin of the messages; K-91,

135    Sergeant Piccola and trainee Deputy Kastler. They are fabricated to portray a different dialog than it

136    is and are on the phone with Deputy John Doe. The messages are not in the Edit Section of the IDR.

137    Meaning, Dispatcher Goodin did not enter that data into CAD.

138

139    Time                    Comments

140    21:40:06                [1]**********requesting a k9 unit for a traffic stop --- have

141    not attempted stop yet but would like a k9 heading their way now.

142    [2]will call back with the finals top

143    [3]approaching county line

144    [4]switching to VAC

145    [5]just now passing into count

146    [21]Secondary Location for S44: HWY55 /EFLOATING HWY 55

147    Edit

148    Caller_Name    boise county

149

150        This is a direct fabrication of evidence and brings to light the Defendant's meticulous

151    planning in deception, willingness to assist another department in fabricating evidence to make

152    unlawful arrest look lawful and disregard the Plaintiff's God given rights and liberties that are in the

153    Constitution. Further, the planning and execution is to produce an IDR that depicts the stop as

154    lawful and concealing the willing participants. When the IDR contains problematic deficiencies,

155    other departments sign on to assist in furthering the collusion and concealing their wanton,

156    malicious, and egregious actions that were indifferent to the Plaintiff's constitutional rights and

157    liberties, and possible consequences enacted upon him.

158

159        The IDR depicts the Plaintiff's information was ran and confirmed twice before initiating the

160    pre-textual stop and Deputy Neill did not request the Plaintiff's information, and it most likely

161    automatically defaulted to him; downloading once he became primary, twenty-one minutes later a

162    disposition is logged. The collusion of the Plaintiff's pre-textual stop was illegal and the illegal acts

163    grew as the team individually carried out their part of the plan. Deputy Neill communicated the

164    reason for the stop and the Plaintiff supplied current registration, proof of insurance, and

165    temporary Utah driver's license. The Plaintiff informed Deputy Neill that he received his

166    registration in the mail earlier in the day but due to his disability, he was unable to place the

167    stickers on the plates. Deputy Neill instructed him to stay in the vehicle and returned to his unit to

168    run the Plaintiff's information. IDR has K9-1 arriving forty-five seconds before Deputy Neill receives

169    the Plaintiff's information.  Eight minutes into the stop, Deputy Neill knew the Plaintiff was legal

170    and instead of issuing a warning and ending the stop, he unlawfully orders the Plaintiff out of his

171    vehicle for a perimeter dog sniff. Deputy Piccola and Deputy Kastler deploy a K-9 and fabricate

172    evidence, part of the Defendants' plan. During the incident eleven days later, when the Plaintiff is

173    arrested, Deputy Kastler has this discussion with Deputy Livas:

174

175        Livas: What you got what you got?

176        Kastler: So drive by saw this this you know, one dude standing out here, closed business,

177        come here, they are waiting for some girl name TJ.

178        Livas: Mm..Hmm...

179        Kastler: We stopped, we didn't personally stop him, he was the one, I don't know if you were

180        working last week when a, Boise was following him from a, Horseshoe Bend.

181        Livas: Uh-huh

182        Kastler: You don't know, apparently, he comes from Horseshoe Bend, comes at night, picks

183        up a load of meth or whatever, he's known to a traffic.

184        Livas: He does all kinds of stuff doesn't he?

185        Kastler: We stopped him, we got called up there.

186        Livas: Wer..a.littl..do.g..

187        Kastler: That's his dog.

188        Livas: Oh..

189        Kastler: So the Boise guy called us last week for the a K9, he followed him all the way down

190        to a 55, they stopped him, we got there and searched him but the dog didn't "hit" on

191        anything.

192

193

194        Deputy Neill knew the Plaintiff was legal and was not wanted; doing so extended the

195   seizure. Further, the Plaintiff witnesses Deputy Piccola fabricate evidence by giving a slight hand

196   signal and the K9 sat down, Piccola reporting this as a positive hit for drugs and establishing

197   probable cause to search the car. Deputy Kastler's statement eleven days later affirms Deputy

198   Piccola fabricated evidence when he stated, "...the dog didn't "hit" on anything." The only two

199   deputies not searching Plaintiff's car were Deputy Neil and Boise County Deputy John Doe. Deputy

8

200     Kastler was in training and stationed about 10' from the car while his training supervisor was

201     running the K9; after the fabricated positive hit, he joined Deputies Deputy Garcia, Deputy Hazer,

202     and his trainer Sergeant Piccola in the illegal search. The illegal search produced two altered

203     drinking straws and when Sergeant Piccola asked the Plaintiff about them, he replied, "I use them to

204     pick my teeth, test them if you want." Sergeant Piccola answered, "I'm not into scraping straws" and

205     communicated in a way that the Plaintiff felt animosity driven. With an empty net and a chip on his

206     shoulder the Defendants devised and formulated a new plan; Deputy Piccola spearheading the

207     collusion and his motivation is retaliatory and advancement driven. Before Deputy Neil releases the

208     Plaintiff, he berated him on bringing illegal drugs into the county in his car with a person that he

209     had not even seen for a year, and that they were keeping an eye out for him and his car.  When he

210     said, "Brandon" the Plaintiff's knows immediately who is responsible and ignited the night's events

211     with disinformation, Vanessa.

212

213        The Defendants recruited an informant fighting charges out of Ada County from March 5,

214     2018 to October 8, 2020 and Canyon County September 28, 2018 to October 22, 2020. According to

215     iCourt, Taeserae Cavaness or "Taz" had been in and out of jail several times on ROR, bond, pretrial

216     services, and prior to contacting the Plaintiff on January 21, 2019; released from jail on a cash bond

217     of "$25.00" out of Ada County and released to pretrial services out of Canyon County on December

218     28, 2018. To entice the Plaintiff to a desired location the Defendants utilized his good nature and

219     willingness to help against him. Taz's first attempt to bait the Plaintiff failed but success was found

220     the second time by saying her sister was stranded without electricity or heat and needed a ride.

221

222                 **The Plaintiff Arrives as Defendants are Waiting**

223

224        Upon the Plaintiff's arrival, the Defendants began a choreographed stripping of his rights

225    and liberties while "Under the Color of Law." This included staging the scene, fabricating evidence,

226    appearing or arriving at the incident location in harmony with CAD for IDR, ensuring their OBV's

227    were in accordance with their individual responsibility and or position; all to further their interests

228    while continuing and advancing a lawful façade. Taz sent the Plaintiff to the most Southwest corner

229    of the parking lot, past the road that directly leads back to a Motor Home with "electricity", and

230    located his position the furthest distance away from the owner's residential property, the only

231    occupied resident on the West side of Cloverdale until after the canal. If the Plaintiff had been on a

232    true mission to save Taz's sister, he would have been instructed to pull into the driveway of the

233    house with no electricity and not Aloha Gardens were it was lawful for the Defendants to proceed

234    under a lawful façade. As the circumstances were, there was a motor home located on the property

235    and removes the Defendants' ulterior motive to expand the stop into a burglary investigation in

236    efforts to unlawfully arrest the Plaintiff; then who is to say that TJ would not have been located in or

237    visiting the residence living in the motor home. As the Defendants' state, the property owner was

238    contacted and confirmed someone rented a space in the back of his property but does not know

239    anyone named TJ. However, the property owner's knowledge of the renters' visitors is limited so to

240    submit that the property owner was called and did not know anyone by the name of TJ; does not

241    justify expanding the investigation into a potential burglary investigation.

242

243        The Plaintiff and his passenger arrived at Aloha Gardens and immediately K-91 pulled

244    behind them, he had honked a couple of times and let his dog out. At [02:27] Deputy Kastler's OBV

245    turns on and catches the Plaintiff's dog by the driver's door after he had just been let out of the car,

246    Deputy Kastler arrives and questions what they were doing at the closed business at this late hour,

247    and the Plaintiff reports he was here to pick up a friend's sister; a person named TJ. Deputy Kastler

248    has a conversation with Osterhout regarding why they were at Aloha Gardens and how long they

249    had been there before he pulled in, Kastler OBV at [46:00]:

250

251            Kastler: Why are you over here in this area?

252            Osterhout: Uh, I thought this was the way to Horseshoe Bend. I am not from here.

253            Kastler: Okay.

254            Osterhout: But uh, like I tellin'ya. His phone rang and that he said that he, one of his friends

255            wanted us to rescue her sister and some other girl there's no heat.

256            Kastler: How long were you guys sitting out here?

257            Osterhout: Two seconds.

258            Kastler: When I pulled up how long were you guys out here for?

259            Osterhout: Two seconds, I mean we just pulled in here.

260

261            Deputy Kastler would have questioned Osterhout if he would have been out of the car as he

262    communicates to Deputy Livas. Deputy Livas arrives while Deputy Kastler is in his vehicle and is

263    wanting to know what is going on and Deputy Kastler fabricates evidence by telling her "So drive by

264    saw this this you know, one dude standing out here, closed business, come here, they're waiting for

265    some girl name TJ.

266

267            His statement lays the foundation for the Defendants' collusion of a choreographed charade

268    for the stop and eventual unlawful arrest of the Plaintiff. While Deputy Kastler is in his vehicle

269    running the passenger's information, Deputy Livas asked how long the two had been parked there

270    and they both repeated the same story; they had just parked, and the Plaintiff honked twice and let

271    his dog out and that no one had been out of the car. Deputy Livas had just been informed that,

272    "...one dude standing out here..." and yet she fails to question them on no one being out of the car.

273  After Deputy Kastler runs the Plaintiff's information but has the wrong spelling of Osterhout's

274  name, he gets out of unit K-91 and immediately the picture gets snowy, and he covers up his

275  camera. Someone was coming into the camera's view and he covered it with his glove. These actions

276  and the camera quality mirror Sergeant Piccola's actions and picture quality when he covers up his

277  camera. After Deputy Kastler removes his glove from covering up the camera and he arrives at the

278  passenger window and asks the Plaintiff, "So you're, you're not here meeting the girl, like you didn't

279  drop the girl off and she's back here.." and the Plaintiff replies no and asks Deputy Kastler if he

280  wants to read the texts verbatim and he declines. After Deputy Kastler receives the correct spelling

281  of Osterhout's last name and confirms his birth date, he leaves. The Plaintiff continues to validate

282  their presents by reading Taz's text. [Livas's OBV 13:19-15:02] The following exchange occurred:

283

284       Plaintiff: 'Aloha Nursery 2993 South Cloverdale. Send me the numbers, so I can have her

285  call' "Me or whatever. She says' 'She doesn't have a phone, I tried. She has no Wi-Fi, and she's

286  expecting me to save her. So just pull in, pull up when you get there holler out the window, that Taz

287  sent TJ' "That's exactly what she said."

288

289       Livas: Okay, it it's not that red barn right there is it, or is it?

290       Plaintiff: In a camper, she's in the camper behind the place with no heat or power.

291       Livas: Behind the place with no heat or power?

292       Plaintiff: Yeah, yeah, that place right here. It's behind there with no heat, no heat or

293  whatever

294       Livas: Hmm, I don't think there's a camper back there.

295       Plaintiff: There's a camper right there [unintelligible] are they looking for the camper are

296  they?

297       Livas: I can't see anything from here from here except that, that red building.

298    Livas: Hey what are you reaching for down there?

299    Plaintiff: My flashlight.

300    Livas: No hands up! Keep'm up for me! I'm not going to tell you again, okay? That made me

301    super nervous, enough to make me reach for my gun. Keep your hand up on your lap! I don't

302    know you guys, and I don't know what you got, so don't do it again.

303    Plaintiff: Yes Ma'am.

304

305    Because of the outhouse and the angle of the car, the Plaintiff could not see the "red

306    building" that Deputy Livas was referring to, so out of frustration and wanting to shine his light on

307    the house with no light, the Plaintiff reached for his flashlight and Deputy Livas reacted by reaching

308    for her gun. The Defendants have rendered the Plaintiff in a situation that portrayed him as a

309    criminal committing a felony, and an innocent act, like the Plaintiff reaching for his flashlight, could

310    have easily escalated and had an unforeseen-negative ending. Soon after the reach, Deputy Kastler

311    returns and is informed about the reach and shines his flashlight on the Plaintiff's floorboard and he

312    says, "You got one of them straws again". The Plaintiff replies, "I use them to pick my teeth." Deputy

313    Kastler's OBV [15:52] the Plaintiff is irritably explaining to Deputy Levis that he did not pull in the

314    back, he left his lights on, and Deputy Kastler interjects and Deputy Kastler and the Plaintiff have

315    this conversation:

316

317    Kastler: The the issue we have right here, like I tried telling you earlier. Is you're parked in

318    front of a closed business at night, its midnight, all right.

319    Plaintiff: We're not near the buildings. We're not out of the car.

320    Kastler: You're on private property. You're at a closed facility, right.

321    Plaintiff: And I got permission to be here.

322    Kastler: By, the prop..

323         Plaintiff: By TJ's sister.

324         Kastler: Bright but the property owner?

325         Plaintiff: I don't know if she owns the property, I don't know.

326         Kastler: Then how do you have permission if it's here?

327         Plaintiff: It's behind the house.

328         Kastler: Okay. Well she doesn't own this property.

329         Plaintiff: I don't, I don't know what she owns sir.

330         Kastler: Okay, just hang tight all right?

331         Plaintiff: Yeah

332         Kastler: We'll get to the bottom of it, and.

333         Plaintiff: Get to the bottom of what?

334         Kastler: Okay, hang tight.

335

336         This conversation ended at [Livas OBV 16:10], and Deputy Kastler has no reasonable

337  suspicion to further the detention and makes it apparent that they had no reason for the initial stop

338  in the first place. Deputy Kastler remembers the stop from 11 days prior, "You got one of them

339  straws again." At the first suppression hearing Deputy Kastler testified that he did not recognize the

340  Plaintiff or remembered he was on crutches. The Plaintiff's driver's license he gave to Deputy

341  Kastler was expired, the report that came back through NCIC his license is expired, yet Deputy

342  Kastler did not pursue him driving on an invalid license, because he already knew everything about

343  the Plaintiff. The Plaintiff reminded Deputy Kastler that he had pulled him over just days prior and

344  Deputy Kastler dismisses the Plaintiff. Deputy Kastler's objective is to stall and proceed as if he is

345  diligently performing his job until Sergeant Piccola can advance the collusion forward by finding an

346  open shop door; including all the deputies arriving to camouflage the actors that will not contribute

347  OBVs or do reports. Several times the Plaintiff and Osterhout take the stand that no one was out of

14

348    the car. Deputy Piccola also fabricates someone being outside of the car in his report. "I observed as

349    the passenger door was open and there was a male standing outside of the car." At the hearing on

350    the Motion to Reconsider Deputy Kastler was asked why his OBV did not show someone was out of

351    the car and his answer was he did not know. Deputy Piccola was asked the same question, and his

352    response was they had to turn around. Yet in his report he states, "We turned into the parking lot

353    and contacted the subjects." Deputy Kastler also testifies that the Plaintiff's car was parked at an

354    odd angle with his headlights pointing towards the open door. These statements are to boaster and

355    add credibility to Deputy Kastler's testimony while implicating the Plaintiff in a crime where

356    Defendants entrapped him and unlawfully arrested him.

357

358           From the onset of initial contact with the Plaintiff, the Defendants play out their plan in

359    concert. Both Sergeant Piccola and Deputy Kastler document in their reports that they can see a

360    door open when they are initially talking to the Plaintiff and Osterhout. Deputy Kastler writes,

361    "While speaking with both subjects, we could see an outbuilding approximately thirty-five (35)

362    yards from our location, located on the business property with its front door partially open."

363    Deputy Kastler also testified, "Defendant was parked at an odd angle and his headlights were

364    shining on an outbuilding on the property with a partially open door." Deputy Kastler asks the

365    Plaintiff to shut his car off by pretending he could not hear what Osterhout said, and his goal was to

366    have the car lights off and hide the misconduct that was happening. Sergeant Piccola is on the

367    passenger side of the car and in his report, he writes, "While Deputy Kastler was speaking to the

368    occupants, I observed an open door on a shop nearby." When watching his video, one can see the

369    shop door, but it is glass and you cannot tell if the door is open. However, he leaves his post and

370    Deputy Livas takes over his position. Even though Deputy Livas takes over Sergeant Piccola's

371    position, she does not communicate seeing a door open in her report, and it is only after Sergeant

372    Piccola's radio chatter of the open door, before she reports it to the Plaintiff. Further, Sergeant

373   Piccola does not report on an open door until after a subject is seen before and after he covers up

374   his OBV. The shop having an open door, guy standing outside of the car, the passenger standing

375   outside with his door open, the car being parked at an odd angel with the lights shining at an open

376   door, the property owner being contacted, the infamous straw on the driver's floorboard, are all

377   interjected into Deputy Kastler and Sergeant Piccola's reports because the stop and arrest of the

378   Plaintiff; even with the colluded planning, lacked reasonable suspicion until after an unlawful exit

379   order and Deputy Porter allegedly finds drugs.

380

381       Sergeant Piccola's position is between the back corner of the storefront and the shop. He

382   shines his flashlight from the shop to the back of the storefront repeatedly, back, and forth, back

383   and forth, numerous times; too many times, he is stalling. Sergeant Piccola asks for another unit at

384   [08:44] and is holding his position between the back of the storefront and the shop, which he will

385   soon report, having a partially opened door. At [09:11] a figure appears by the shop just before he

386   covers his OBV with his glove and the figure is still present at [09:14], when he removes it, and the

387   figure has no flashlight on. Sergeant Piccola's OBV catches a flash of K-97's headlights at [09:28], as

388   he started to back up from the storefront and out of view. Sergeant Piccola then turns towards the

389   parking lot and his OBV at [09:43], has a clear shot of K-97's front and backup lights as Deputy

390   Lowry is finishing backing up; he is ignorant of what his OBV had just captured and fabricates more

391   evidence when he radios, "Whoever is pulling up, can you pull your car straight in the back?"

392

393       Sergeant Piccola mutes his video for most of the incident and instructs others to turn off

394   their sound and Ada County Sheriff's Policy states, "If a deputy chooses to deactivate a device, the

395   reason will be documented on the device prior to turning off or muting the recorder." Sergeant

396   Piccola's OBV's picture is intermittently snowy through the first part of the incident; however, at

397   [08:32] as he starts to move towards the shop, there is an increase in visibility and the clarity is at

16

398  its worse during the period, before and after, Sergeant Piccola covers up his OBV, as the figure

399  appears by the shop door. As Deputy Lowry is departing from the storefront, slowly the clarity

400  clears, and by the time he arrives in the back and shins his light on the shop with the open door, the

401  clarity is clear; it is evident, as with Deputy Kastler's video, the video has been altered in an attempt

402  to cover up the misconduct. When Sergeant Piccola is walking in the parking lot, he radios dispatch

403  to see if there is an RP and then says he is going to see if there is an alarm company on the building.

404  He shines his flashlight on a camera mounted on the side of the storefront and immediately after, he

405  lights up a sign in the front window that says, "24 HOUR VIDEO SERVAILANCE." This discredits and

406  invalidates the Defendants' proffered investigation and probable cause and arrest of the Plaintiff. It

407  further portrays their collusion, especially knowing that the property owner testifies law

408  enforcement never contacted him, as Deputy Kastler stated in his report. If there were a true

409  investigation into a burglary, it would have been resolved by contacting the property owner;

410  however, by not obtaining the video evidence, it was destroyed and unobtainable by the Plaintiff.

411  With the knowledge there is 24 HOUR VIDEO SERVAILANCE Sergeant Piccola moved forward with

412  the collusion to unlawfully arrest the Plaintiff.

413

414         Deputies' assignment determined location and location determined OBV's status, on or off.

415  Deputy Lowry's assignment was ensuring the door to shop was opened to advance the Defendants'

416  collusion of expanding the Plaintiff's seizure into a burglary investigation, while maintaining a

417  lawful seizure. Both deputies are ignorant of the fact that a law enforcement's silhouette was just

418  captured by Sergeant Piccola's OBV and one's imagination does not have to fully engage to

419  extrapolate the words on the back of his jacket; "Ada County Sheriff's." Even though Deputy Lowry

420  is already on location, Sergeant Piccola and Dispatcher Homsher stay in character and Sergeant

421  Piccola requests another code-one and Dispatcher Homsher dispatches K-97. The IDR reflects K-97

422  reporting from an address Dispatcher Homsher built in CAD, when system should automatically

423    report a vehicles location address. Deputy Livas obscures the occupants view by continuing to shin

424    the flashlight into the car and positioning herself so her back remains towards the parking lot and

425    her OBV remains goal orientated. Deputy Kastler finishes running Osterhout's information and once

426    he has sight on K-97 leaving the front of the parking lot, he turns and settles back into his seat and

427    runs the Plaintiff's plates again; all the Defendants hold true to their assignment. It is not

428    coincidental that Deputy Hessing's OBV is off until right before unlawfully ordering the Plaintiff to

429    exit for a dog sniff, and like Deputy Lowry; Sergeant Bones does not have his OBV engaged. The IDR

430    shows K-97 Assigned at [09:03] and Arrived at [09:25]; and Deputy Lowry at [09:27] drove from

431    the storefront to the back between the backside of the storefront and the shop ending at [10:36],

432    and now the shop has an open door. Deputy Lowry's assignment for the night was to assist, or open

433    the door, and that included him not having his OBV on; thus, no report is submitted. Once he aided

434    in opening the door and enabled the seizure to be expanded into a burglary investigation, him

435    arriving in the back and shining his spotlight on the door, his mission concluded; K-97 is a k9 unit

436    and had a dog. At [10:28], Sergeant Piccola radios to Deputy Lowry telling him to drive around and

437    come back to where he is and then says, "...and then we'll go back and get those guys out of the car."

438    The problem with the timing of this statement and Sergeant Piccola testimony at the hearing on the

439    Motion to Reconsider, is the Plaintiff had not reached for his flashlight yet and was the reason he

440    proffered for the exit order was due to furtive movements. Sergeant Piccola proffers the door is

441    open, yet already tells another deputy that he is going to get the Plaintiff out of the car, then

442    searches the property and the last thing they do is enter the shop with the open door. Deputy Porter

443    is the only deputy that has not made it to the arrest site and that happens to be, the deputy that

444    alleges he finds methamphetamines. When Sergeant Piccola and Deputy Kastler arrive back at the

445    vehicle, Sergeant Piccola says something to Deputy Kastler but because his OBV is still muted one

446    cannot hear the conversation. Sergeant Bones was by the passenger back door of the car, but

447    Sergeant Piccola says something to him, and he takes over his position, making it four deputies, one

448    at each door. Sergeant Bones, Deputy Kastler, and Deputy Lowery are waiting about ten feet away

449    and there is a reason Sergeant Piccola directs Sergeant Bones away and has Deputy Kastler hold

450    back; up to this point Sergeant Piccola has had a reason why he has directed everyone to their

451    specific position, including the status of every deputy's OBV.

452

453                    **Exit Order, "We're going to run dog around the car real quick."**

454

455            The Defendant's collusion was winding down and all that is left to complete their mission is

456    to have the Plaintiff get out of the car; they want access to the inside of his car. Detective Hessing

457    arrived at [17:58] and positioned himself at the Plaintiff's open window but does not start his OBV

458    until [32:06], just before the Plaintiff gets out of the car and he does not fill out a report. Detective

459    Hessing does not enter the miles into the system like Deputy Livas, communicates that they had

460    some thefts at this "very location", giving the undertone he was involved with the investigation

461    three months earlier; thus, giving him integrate knowledge of the buildings, property owner, and

462    has access to the Plaintiff's only reason for his presents, Taz.  In addition, he may have knowledge of

463    the property owner is on vacation and the reason for a detective at the seizure and stationed at the

464    Plaintiff's side of the car.  Deputy Porter, the seventh deputy at the incident, was dispatched [28:36]

465    and arrived [28:37] and is stationed directly behind Detective Hessing. Detective Hessing directs

466    the Plaintiff to get out of the car so, "They can figure out what's going on." However, when

467    instructed to exit the car the Plaintiff resists and demands to know why they want to get into his

468    car. Thus far, the Plaintiff had not been given a lawful command and was adamant that there was no

469    reason for any of this and that he had not been out of the car, but Detective Hessing kept pressing

470    the issue. His commands were not lawful, everyone was silent, the Plaintiff had been stopped for

471    over thirty minutes, any questions could have, and should have been asked by now, but law

472    enforcement wants access to the interior to the car; and thus, forces Detective Hessing to ad lib and

                                                    19

473 says, "We're going to run dog around the car real quick." After adhering to a lawful command, the

474 Plaintiff took three steps away from the car and Deputy Porter allegedly finds methamphetamines

475 on the driver's seat.

476

477       Deputy Porter is dispatched at [28:36] and arrived at [28:37], and the first to leave, [47:44];

478 the only deputy that night to state why his status of his OBV is changing, "Encounter over." Unlike

479 Deputy Piccola whom wrote "None" under attachments, Deputy Porter's is blank; he submitted his

480 written report six months later, review of his OBV would have been imperative in writing his

481 narrative. Nevertheless, those two OBV's were critical for the Plaintiff and were purposely withheld,

482 and without their disclosure, the State not only unlawfully arrested and maliciously prosecuted the

483 Plaintiff, the Defendants' falsely imprisoned and extended the Plaintiff's unlawful jail time, where he

484 contracted COVID twice and was subjected to cruel and unusual punishment by Judge Hippler

485 disregarding his medical documentation and not releasing the Plaintiff when Jail Medical, on several

486 occasions, recommended his release.

487

488       Deputy Kastler is taking pictures of the incident\evidence, and he arrives at the open

489 passenger door and yells out, "Has anyone seen the tinfoil?" This is because the tinfoil was collected

490 and placed in an evidence envelope. No one answers him and Sergeant Piccola's OBV at [52:18], he

491 directs him to the driver's side door, and at [53:02] you can see Sergeant Piccola with the camera in

492 his hand so he can fabricate the pictures of the tinfoil once it is placed back under the seat. At

493 [53:58] his OBV catches the tinfoil under the seat, at [54:17] he has it in his hand above the car, at

494 [54:26] you can see Deputy Livas take the evidence envelope off the top of the car; and from Deputy

495 Livas's OBV at [54:32], Sergeant Piccola places it back in the envelope. In Deputy Kastler's report he

496 states, "I took photos of the car and items located." The photos of evidence and their timestamps

497 were changed, fabricated to align with the collusion and even though they know the straw on the

498  floorboard is not drug related it is used to bolster their reports. Deputy Kastler returns to the front

499  of the car and asks Deputy Piccola if the straw on the driver's side floorboard is one from the prior

500  stop, Sergeant Piccola says, "No they were short like this." The straw on the floorboard is long and

501  as the Plaintiff stated, "used to pick his teeth." However, on the evidence sheet, Deputy Kastler logs

502  the straw Deputy Piccola showed him as a straw he thinks was with the tinfoil, the straw found in

503  Osterhout's hooded sweatshirt pocket, and the straw that was on the driver's side floorboard, as

504  evidence collected at the location; there is only one straw that makes is to the lab and is tested. This

505  is because he never saw the tinfoil until pictures were taken at an unknown location. The picture of

506  a straw, the straw from Osterhout's pocket, is the same straw and the only straw collected and sent

507  to the lab for testing. What Deputy Kastler writes in his report about the straw on the driver's

508  floorboard is to add validity to his probable cause stop and arrest; lack of probable cause as he

509  knew the straw was not drug related. Other concerning factors are Deputy Livas's picture of the

510  tinfoil on 01/24/2019 at [00:35] and her next picture without the tinfoil underneath the passenger

511  seat on 01/24/2019 at [04:22]. The picture without the tinfoil at the incident site timestamps with

512  the rest of her pictures but is in vast contrast with her first picture that was taken at the incident

513  site where the Plaintiff was arrested; the only picture she took, and the other picture is fabricated.

514  In addition, when reviewing her OBV, it confirms she only takes one picture at the incident site and

515  goes as far as to tell Sergeant Piccola she took "a" picture of the tinfoil. That picture is produced by

516  either Deputy Kastler or Sergeant Piccola and when it is downloaded it timestamps with the rest of

517  her pictures. The pictures of the salt and marijuana are taken at [04:22] on 1/24/19 but end up on

518  the evidence sheet that Deputy Kastler turned in at [01:35] on 1/24/19.  Meaning, the alleged

519  methamphetamine Deputy Porter claims to have found is tainted because it was not turned in until

520  most likely just after Sergeant Bones approves Deputy Kastler's written report at [01:29]; on

521  January 25, 2019.

522

523  The Plaintiff's phone was confiscated by arresting officer Deputy Kastler and placed in a

524  faraday bag; the evidence was collectively documented and then dropped into Ada County Sheriff's

525  night drop box as Deputy Kastler logs at [01:35] on 1/24/2019. The data dump revealed some odd

526  time stamps and when the Defense questioned Deputy Kastler where they traveled after leaving the

527  location of arrest; Deputy Kastler's testament is that he and Sergeant Piccola left the location of

528  arrest and traveled to Ada County Jail and processed the evidence into the evidence room. The

529  Defendants' testified that they left the arrest site, drove straight to the jail, took the pictures of

530  evidence, and submitted them to the evidence room. The IDR can be manipulated and/or it does not

531  show every stop a vehicle has made. For instance, the IDR has [01:19:39] K-91 Enroute 2nd Loc

532  7200 W BARRISTER DR, and at [03:14:05] K-91 Arrived 2nd Loc DISPATCH, 945 E PINE AVE. With

533  the period only being five minutes from the incident site to when the pictures are taken, it is highly

534  unlikely that K-91 traveled to Barrister as Deputy Kastler testified; especially, considering it took

535  S-53 and S-31 over ten minutes to travel from the incident site to Ada County Jail. As stated, Deputy

536  Kastler writes the date "1/24/19" with time of "135" he logged the Evidence Sheet into the night

537  drop box; also on the Evidence Sheet is suspected salt and marijuana that Deputy Livas's pictures

538  have a time stamp of 1/24/2019 at [04:22].

539

540                                    **PROBABLE CAUSE OF THE STOP AND ARREST**

541

542  On page 4 of the Plaintiff's Discover under the heading "Probable Cause" Deputy Kastler

543  writes, "During the investigation, both occupants were asked to exit the vehicle." However, he

544  testified at the motion to reconsider hearing that he never heard any conversation as to why the

545  Plaintiff was asked to get out of the car. Deputy Kastler testifies that he was 10 to 15 feet away from

546  the vehicle when the Plaintiff exited the car making it hard for him to know any of the information

547  without talking to another deputy.  Deputy Kastler's "PROBABLE CAUSE OF THE STOP AND

22

548  ARREST" has nothing to do with probable cause but when examining it for content several

549  concerning factors surface. The page begins by informing the deputy of content needed:

550

551      Note: You must include the source of all the information that you provide below. Include

552  both what you observed and what you learned from someone else, identifying that person.

553

554      Deputy Kastler fails to state who asked the Defendants to get out of the car, why they were

555  asked to get out of the car, and approximately 30 minutes had elapsed from time of the initial stop

556  until exit order. He also fails to state what was being investigated and who found the supposed

557  methamphetamine, and then claims; "Marlor immediately denied the substance to be his." After

558  Deputy Porter called out that he had found "meth", he said one word, "Where?" Deputy Kastler also

559  claims, "A short piece of straw commonly used for ingesting narcotics, was located near the driver

560  seat on the floorboard." He also logs, "A piece of tinfoil containing burnt residue and straw was

561  located on the floor next to the passenger side seat where Osterhout was sitting." Last he stated, "A

562  lighter and a straw commonly used to inhale narcotics was found in Osterhout's front hoodie

563  pocket." This is all after the Plaintiff being asked to exit the car.

564

565

566      Deputy Kastler's report also states, "The owner of the property (Dennis Cabera) was

567  contacted by phone. He stated he leases an area of the back property, to an individual, but doesn't

568  know anyone by the name of T.J." At the Motion to Suppress hearing held on September 23, 2019

569  Deputy Kastler testified, at some point during the investigation he called the owner of the property

570  who confirmed that he rented out a trailer on the property but did not know anyone by the name of

571  TJ. However, at the hearing to reconsider, Deputy Kastler "clarifies" someone else called the

572  property owner, but he cannot remember who it was. Also, Sergeant Piccola testifies that the

573   property owner was called but he was not sure when or who made the call. The Court states in the

574   Decision and Order on Motion to Reconsider:

575

576   *At the initial suppression hearing, Deputy Kastler denied that the exit order—or any other*

577   *part of the investigation up until the exit order—was drug related. Rather, he stated that they asked*

578   *Defendant to step out of the car because: "Basically because the information that he provided with him*

579   *not knowing who was there or know of anyone of that nature, that person's name, the time of night,*

580   *we wanted to identify him and pull him out of the vehicle." The Court interpreted Deputy Kastler's*

581   *statement "with him not knowing who was there or know of anyone of that nature, the person's name."*

582   *to mean the owner of the property, who allegedly told officers he did not know anyone named TJ.*

583

584

585   "Deputy Kastler denied that the exit order—or any other part of the investigation up until

586   the exit order—was drug related." This is because the Defendants do not want the two incidents

587   related, "dog did not hit on anything", and the Defendants' plan was gain access to the Plaintiff's car

588   after expanding his seizure into a burglary investigation. Deputy Kastler testifies that seven

589   deputies are dispatched to the Plaintiff's incident, including a sergeant and a detective. A Motion to

590   Suppress hearing was held on September 23, 2021 and out of the seven deputies to respond, only

591   three deputies had video of the incident; Deputy Kastler, Deputy Livas, and Detective Hessing;

592   Detective Hessing's video was not engaged until seconds before the Plaintiff was illegally ordered

593   out of the car. Where a deputy declares an OBV under "Attachments," Deputy Porter leaves it blank,

594   even though he filled out his report six months after the Plaintiff's arrest. Further and more

595   detrimental to the Plaintiff, Sergeant Piccola who is supervising and training Deputy Kastler writes

596   "none." This is a direct correlation of fabricating and withholding evidence and suppressing the true

597   narrative of the Defendants' collusion. Sergeant Bones approves Deputy Kastler and Sergeant

24

598    Piccola's reports at [01:29] on 1/25/2019; he was at and assisted in the unlawful arrest of the

599    Plaintiff, even with all of the discrepancies, omissions, and problems within Deputy Kastler's

600    "PROBABLE CAUSE OF THE STOP AND ARREST." Sergeant Bones knows, as all the deputies should

601    know, a dog sniff would not be permissible thirty minutes into the stop unless backed up by

602    reasonable suspicion, supporting the continued detention; yet, Sergeant Bones not only did not stop

603    the illegal exit order, but he also assisted in it. Deputy Porter not declaring his OBV is because it

604    records there is nothing on the seat and there is no methamphetamine until his hand comes up.

605    Another reason he does not declare his OBV is because of the exit order given by Deputy Hessing;

606    his OBV doesn't start until after the exit order. All the deputies at the incident site are aware and

607    involved with the Plaintiff's unlawful detainment, seizure, investigation, planting and fabrication of

608    evidence, conspiratorially to withhold exculpatory evidence to the Plaintiff's prejudice, and then

609    maintain a long conspiratorially, law enforcement-based cover-up, with the aid of data retention

610    and legal officials, legal officials inside and outside Ada County Sheriff's Office.

611

612                                **Plaintiff's Discovery and Evidence Log**

613

614        The Plaintiff should have received a copy of the Evidence Log prior to bonding out on

615    January 24, 2019, and he believes that the Evidence Sheet found on page 23 of the Discovery in Ada

616    County Sheriff's Office Supplemental Report is that copy. He also believes it should be located in the

617    Ada County Sheriff's Office General Report section of Discovery where the pictures are placed.

618    Further, an original copy of the Evidence Sheet is found on page 118 amongst pages 117-122; pages

619    supplied to Baldauf stemming from a Second Supplemental Discovery Request that included a chain

620    of evidence. Also located in the file obtained from Baldauf is pages 85, 86, and 87. These pages are

621    also not included in the Plaintiff's Discovery. The missing pages, the way they are labeled, the data

622    included, when the pages were given to the Baldauf, why the missing pages were not disclosed to

25

623    the Plaintiff, and why the State withheld exculpatory evidence; is apparent once he discovers them

624    and is able to study the data.

625

626        Page 118 is a copy of the original Evidence Sheet and contains handwritten notes at the top

627    that may give the locker or other identifying information or reference another log sheet that

628    contains a timestamp of when the property room received it. When he picked up his phone, he

629    informed the property deputy that the inventory sheet contains evidence that was not discovered

630    until after the deputy had logged it into evidence. He said, you need to talk to the prosecutor

631    because no one is looking at our side." Meaning the prosecutor knew the date it was logged into

632    evidence was fabricated and questions the validity of all the evidence from the night of the

633    Plaintiff's arrest, making it invalid. Further, The Evidence Sheet lists the bath salt and marijuana

634    that Deputy Livas is taking pictures of at [4:22] on 01/24/2019 and invalidates Deputy Kastler's

635    entries, "Date: 1-24-19, Time: 0135" found on page 23 and contradicts his testimony at the hearing

636    to reconsider that they left the arrest site and drove straight to the Jail. A more fitting scenario is

637    Deputies Kastler and Sergeant Piccola leave the incident area and travel to a closer destination

638    where they take the pictures of suspected methamphetamine and tinfoil and then arrive at dispatch

639    in Meridian where Deputy Kastler submits data for Ada County Sheriff's Office General Report and

640    has it approved by Sergeant Savage on January 24, at [03:42]. Deputy Livas testified she gave the

641    evidence found on Osterhout to Sergeant Piccola and submitted it as evidence. However, it was not

642    until after writing their reports on 1/25/2019 and approved by no other than Sergeant Bones at

643    [01:29], that the evidence is turned into the evidence room, and placing the evidence sheet log with

644    the reports found in the Supplemental Reports section of the Plaintiff's Discovery. Meaning, along

645    with the fabricated pictures, the alleged methamphetamines that Deputy Porter claims he found of

646    the Plaintiff's seat, various untruthful statements made by both Deputy Kastler and Sergeant Piccola

647    in the Plaintiff's Discovery, and the purged testimony at the hearings; one can only summarize that

648    all the evidence the Plaintiff was prosecuted for over 28 months, made it to the Evidence Room at

649    0135 as Deputy Kastler logged; albeit, on the 25th.

650

651            These missing pages implicate the Defendants' misconduct and reasoning the State

652    withheld exculpatory evidence from the Plaintiff. Page118 is "Video Redaction Points" but does not

653    contain a department or any information as to who performed the redaction, procedures taken, and

654    also contains a file, "File Name: 19-000792AC.wav • No redacts", that does not include origin,

655    identifying name, or contents. Another reason why these pages were omitted and does not contain

656    an identifying person is because Sergeant Piccola and Deputy Porter's OBV's were uploaded into the

657    system and personal was cognoscente of the missing OBVs; therefore, they did not want to be

658    implicated in misconduct. The Plaintiff also believes the State was very aware of the OBVs because

659    on the page right above the deputy's dialogue of their report depicts, "* Has Video * Has PPI *".

660    Right below where Sergeant Piccola writes "none" under Attachments, it has Disposition, and he

661    writes, "Route to the Prosecutor". Also included in the file from Baldauf is page 116, and that page is

662    included in the Plaintiff's Discovery, albeit it is the very last page and Deputy Porter left his blank

663    where it asks for Attachments.

664

665

666            Pages 118 & 119 are the original Property Invoice and a combined and unsigned Property

667    Tracking and Disposition sheet, in essence, chain of evidence. Again, these pages were supplied

668    because the Plaintiff discovered missing OBVs and a Second Supplemental Discovery Request was

669    submitted. Items checked out and the dates are 2, 3, 7, 1, and 5; missing 4 and 6. The Property

670    Invoice has 4 as Straw / Lighter, Passenger Hoodie Pocket – Randall Osterhout and 6 as 1.89 g TPW

671    Marijuana, Pants Pocket, Randall Osterhout. As previously stated, the straw that was on the

672    Plaintiff's driver floorboard was too big and never logged on the Property sheet even though

Deputy Kastler states in his "Probable Cause" that, "A short piece of straw commonly used for ingesting narcotics, was located near the driver seat on the floorboard." He makes that statement but testifies at the Hearing to Suppress that the straw did not open the scope to a drug investigation. Deputy Kastler logs the unknown straw that Sergeant Piccola showed him and that leaves the straw that Osterhout had in his "Hoodie" pocket as the one sent to the lab. Pages 24 & 84 are identical with page 84 being the original Evidence Processing Request Form and nowhere does it state straw on the form however Deputy Kastler writes, "3 Foil W/Brown Burnt Residue – Presumptive Test", what it tested presumptive for is unknown. He also writes, "1 CLR Ziplock Baggie – Latent Prints" and according to the Property Tracking it has 1 listed as Date Out 2/19/19 to Lab and Date In 2/26/19 however missing page 85 is Latent Fingerprint Processing Report Item # 1, Description of Item, clear plastic bag, with the Conclusion, No ridge detail present, and the date of the report March 5, 2019. The reason for this page being omitted and exculpatory, is because there being no fingerprints on the baggie of methamphetamines, that was found directly after the Plaintiff was removed from the car, would be enough for a jury to find reasonable doubt; especially knowing that the officer who claimed to find the alleged evidence, was wearing gloves. At some point after the Plaintiff's Discovery included pages 85, 86, and 87, they were removed from the Discovery and pages 117, 118, and 119 were omitted. The Plaintiff also believes there is also one more page missing from his Discovery and that is a log of when Property received the evidence. The pages being omitted from the Plaintiff's Discovery, and the data on those pages, show a direct correlation of willing individuals in different departments, shielding and contributing to the widespread misconduct at Ada County Sheriff's Office.

**The Plaintiff's iPhone and Data Dump**

697       The last pages of the Discovery are Detective Montoya's Summary Narrative of a data

698   extract performed on the Plaintiff's phone; approved February 2, 2021. He testifies that he was only

699   able to extract a partial data dump from the Plaintiff's phone and can ascertain law enforcement did

700   not illegally access the phone. He was never questioned about why he was only able to get a partial

701   data dump or give a reason why he did not try to perform another extract. What the Plaintiff finds

702   troubling is if Detective Montoya received only a partial data dump from the extraction, how was he

703   able to testify that the iPhone was never accessed by law enforcement. In fact, the first introduction

704   to Ada County Sheriff's illegal access and entry into a phone was when he turned himself into jail on

705   February 12, 2020. He had to ask the booking deputy for an iPhone charger because his phone was

706   dead, and he needed to retrieve some phone numbers. He was able to get enough of a charge to

707   retrieve the numbers and after bonding out; he needed to use his phone but remembered it was

708   dead. He went to the information desk and asked if they had an iPhone charger, and they obliged.

709   He plugged his phone in and noticed it was at fifty percent, the exact amount needed to do a data

710   dump as per Detective Montoya. In September, four months after the Plaintiff was released, he was

711   able to obtain his phone from his arrest. He picked it up from the Ada County Sheriff's Evidence

712   Room and it was at 50% battery life and was still in airplane mode; it worked fine. The Plaintiff

713   went to Messenger to look at the messages Taz had sent him on the night of his arrest, and they

714   were still there but he finds indisputable evidence that his phone was accessed while in the

715   Defendants' possession; the reason the Plaintiff was never supplied the full data dump. Sergeant

716   Piccola testified that the phone was placed in Airplane mode, and then put in a faraday bag. Officer

717   Montoya confirms it was in Airplane mode when he got it out and when he places it back in the

718   faraday bag. However, when the Plaintiff reviews the messages, he discovers the phone is still in

719   Airplane mode but notices that the messages from Taz updated to January 31, 2019, seven days

720   after his arrest. This is only possible if the phone was accessed, taken off airplane mode, and

721   updated by connecting it to the internet. No one logged the phone out and the only time the phone

722  is logged out is when Detective Montoya checked it out. This discredits Detective Montoya's

723  testament at the hearing and brings to light that any evidence at Ada County Sheriff's Office was and

724  is not secure, that at any time evidence was and can be compromised. Someone was in the Plaintiff's

725  phone, and no one logged it out on January 31, 2019, when it updated.

726

727        At no point is there a test done on the suspected methamphetamine, bath salt, or tinfoil on

728  anyone's OBV or pictures taken of a test. The only time one can see the suspected meth is just after

729  Deputy Porter picks up what looks to be a small baggie but one cannot see anything but the top of

730  the baggie and again you see a white outline on the top of the car but cannot see the contents. The

731  methamphetamines cannot be seen on the seat prior to Deputy Porter having it in his hand while

732  coming up nor from Deputy Livas's OBV, until again, Deputy Porter's hand is coming up from the

733  seat. More important is what is not listed on the probable cause for stop and arrest, and that are the

734  bath salt and marijuana. That is because none of the suspected evidence, including the salt and

735  marijuana, was dropped into the drop box until or after Deputy Livas takes photos of suspected salt

736  and marijuana at [04:22]; marijuana seemed to disappear after the photos and never made it to the

737  lab. Deputy Kastler declares he tested everything when he fills out the Evidence Processing

738  Request, but the baggie of methamphetamines is the only presumptive test that was presumptive

739  for anything. Foil was presumptive for what and brown powder was presumptive for what? Deputy

740  Kastler's knowledge on presumptive tests is obviously obscured because the only substance that is

741  presumptive was suspected methamphetamines.

742

743        Suspected meth – Presumptive Test

744        Foil W/Brown Burnt Residue – Presumptive Test

745        CLR Zipper Baggie 1.75g TPW brown Powder – Presumptive test

746

747    The last person to arrive and the first person to depart is Deputy Porter and he does not

748    declare his OBV as an attachment after writing his report. There is no one standing behind him and

749    Deputy Livas's OBV you can see his hand going down towards the seat and then when it comes back

750    into view he has the suspected baggy of methamphetamine. The suspected methamphetamine is

751    never visible on the seat or prior to Deputy Porter having it in his hand. In Deputy Livas's report she

752    writes, "I observed a small plastic baggy on his seat that was underneath him." Watching her OBV

753    Osterhout blocks her line of site, and the center console shades the light from her flashlight of the

754    suspected meth; she does not call out or shine her flashlight towards the bag of suspected

755    methamphetamine until Deputy Porter reaches and comes up with the baggie in hand. Deputy Livas

756    and Sergeant Piccola are on the passenger side and Deputy Porter and Detective Hessing are on the

757    driver's side, and that leaves Sergeant Bones, Deputy Lowry, and Deputy Kastler standing beside

758    K-91; and are oblivious as to who and why the Plaintiff is ordered out of his car. All that Deputy

759    Kastler writes is, "During the investigation, both occupants were asked to exit the vehicle." Nothing

760    before, nothing in over thirty minutes gave any deputy that night, reasonable suspicion, or for that

761    matter, probable cause to arrest the Plaintiff. That is, until after the seven Defendants', under false

762    pretenses, successfully enticed the Plaintiff to their controlled environment, stage the scene, and

763    fabricate evidence to fallow a narrative that allowed them to unlawfully remove the Plaintiff from

764    his haven, then allegedly discover an illegal substance and arrest him. As the Defendants process

765    their collusion's results, more evidence is fabricated to include the tinfoil under the passenger seat,

766    pictures and timestamps, evidence sheet, and written reports that embellish and boaster an arrest

767    without probable cause.

768

769                    **Boise County Sheriff's Office, Landlord, and Horseshoe Bend**

770

31

771    The Plaintiff moved to Horseshoe Bend in July 2017 and rented out a space for his motor

772    home. He had no issues with his landlord JD and loved living in a quiet small town. Everything was

773    great until January 24, 2019, when Ada County Sheriff's Office illegally arrested and charged him

774    with a felony. Up until January 13, 2019, the only contact with Boise County Sheriff's Office was

775    twice, a year before he had a couple over, Brandon and Vanessa, and he had asked them to leave

776    and wanted to report it to the Sheriff's Office in case they were still around; they were and were

777    told to leave the area. The next time there was some miss communication and his power was shut

778    off. He was in the Boise area and was not sure if power had been restored and called Boise County

779    Dispatch and asked them if they could assist and let him know if his lights were on. After Dispatch

780    contacted a deputy dispatch relayed a message saying he was going to have to call family or a friend

781    because that is not something they were going to do. The Plaintiff was thinking that is exactly what

782    they are supposed to do for a member of the community; he knew there were issues with Boise

783    County Sheriff's Office.

784

785    In June 2018, JD texted wanting to know if he could get a hold of the Plaintiff's friend to help

786    him out. When the Plaintiff knew he was talking about Brandon and Vanessa, he warned him that

787    they are not very good people and that he would best to not have any contact with them.

788    Unbeknownst to the Plaintiff they had somehow got in with the neighbor and he saw Vanessa and

789    she said she had moved in with him. Not long after the neighbor asked him if he had seen them and

790    after saying no, he said they had stolen a bunch of items. JD informed him that he had trespassed

791    Vanessa from the property. Venessa moved from one neighbor's place to the next but JD kept calling

792    or texting wanting to know if she was staying with him. The Plaintiff takes an RX and one of the side

793    effects is panic attacks and they are so bad sometimes he calls 911 and after the first couple of times

794    they knew the process and would show up and take his vitals and his panic attack would subside;

795    however, there were a few times that they were so bad and his vitals were bad enough that Life

796    Flight flew him to the hospital, or even had the ambulance drive him all the way down to Eagle. The

797    Plaintiff made payments that went directly to the person who did the billing for the city ambulance

798    services. He had an occurrence maybe once every three months and mostly at night; the biggest

799    reason him and his dog would leave late at night.

800

801         February 1st, JD stopped by to pick up rent and said a deputy had said he had picked up drug

802    charges. He told JD that he was fighting them and assured him they would be dropped; drug charges

803    were an automatic eviction. JD started calling saying the neighbors heard him fighting late at night,

804    or loud music and shutting doors in the middle of the night. The Plaintiff did not have traffic or for

805    that matter very few visitors and paid his rent a month early because there are no banking services

806    in Horseshoe Bend and it had caused him to be late a few times. He was always accusing him for

807    having Vanessa around and she may stop by every once and would help him but he did not trust her

808    and Brandon was not allowed in his placed anymore after calling the sheriff's office. Another

809    instance his friend of over thirty-four years, Ekco, was over and JD showed up with a Boise County

810    Sheriff's deputy and was thinking Mike was there.  JD had a problem with Mike because the

811    neighbor had called saying he spun out on the dirt road; he was Ecko's friend so he was only there

812    one time and that was because he was getting help with his sewer system. So, when JD showed up

813    with a deputy it was out of character and as soon as he saw it was Ekco, he just said I thought Mike

814    was here and the deputy left.

815

816         Around March or April of 2019, he was over at Ekco's place, and she had left somewhere but

817    he started feeling weird and he called a friend that lived two houses down. When he got there the

818    Plaintiff was in the bathroom and his eyes were the opposite of dilated, they were, and he just kept

819    telling his friend he did not feel right. The Plaintiff started having these episodes where he was

820    about to lose consciousness and the only time this happened was when his long-time friend was

33

821 around, Ekco. He stopped eating food or drinking around her, but he kept having the episodes and

822 even confronted her about it and she would blame it on his panic attacks. During one of these

823 episodes he thought he was going to lose consciousness and had called 911 and paramedics and

824 Boise County Sheriff's deputies arrived and he remembers Ekco confirming he had called 911 and

825 that she had made some noise and left for a minute before they arrived; but when he explained how

826 he felt and something was said to her she said, "panic attacks." The next time it happened the

827 Plaintiff remembered they had implemented texting in the area so he text that he had been drugged

828 and had enough time to get into the bathroom and was laying on the floor and started feeling better,

829 but he struggled with motor control; had a hard time with speaking but recovery was fast. The

830 deputy arrived and the Plaintiff would try to explain that suddenly, he would start to lose focus and

831 it would seem like he starting to lose consciousness.  The deputy got rude and said something that

832 the ambulance was in Garden Valley and the Plaintiff told him to leave. The only time he had these

833 episodes was when Ekco was around, and he noticed that if he got out of his motor home or away

834 from that area and got fresh air it would subside and he felt that whatever it was it had to be

835 odorless and in a gas form; she would act like nothing and whatever was going on was in the

836 Plaintiff's head. When at a doctor's appointment, and after being gassed twice earlier that day, he

837 told the doctor that his roommate was drugging him, and he wanted tested. The doctor took a UA

838 sample and later that night it happened again but the paramedics showed up this time and when

839 trying to communicate what was going on he looked at the paramedic and said, "Are these the

840 symptoms I have when I'm having a panic attack?", and the paramedic answered with a simple,

841 "No." The paramedics left and the Plaintiff explained to Deputy John Doe that he had taken a UA at

842 his doctor's appointment and the deputy said, "If there is something that comes back then we can

843 do something about it."  Deputy John Doe then asked how his charges for the possession going, and

844 the Plaintiff looked at him, and answered, "They got dropped." And laughed saying, "I'm fighting

845 them." The deputy then said, "I'm the one that followed you down from Horseshoe Bend that night."

34

846    The Plaintiff did not say anything, and it did not really add up at the time. The next day he talked to

847    Boise County Sheriff's Sergeant John Doe and after explaining that it is not in food or liquid that it

848    had to be a gas the sergeant replied, "The only way to test for anesthesia or similar gases is a hair

849    follicle sample." Meaning, she had picked a drug that would not evaluate with a UA and as the

850    Plaintiff found out, his medical doctor did know how to write an order for that kind of test. The

851    Plaintiff's belief is that must come from law enforcement.

852

853        He had some issues with his sewer and as always Vanessa was around one of the neighbors,

854    so she had been helping him install a new toilet. She borrowed his car and went to get some

855    supplies and never came back. She ended up leaving his car at Home Depot and when he was finally

856    able to get his car, the parts in it, and was fixing the problem, all the screws were loose and figured

857    out Vanessa had been sabotaging the repair job just so he would keep her around. He then noticed

858    some charges on his debit card, called, cancelled his card, and did a report with the sheriff's office

859    but he knew they were not going to help him. When she had been kicked out of the neighbor's place,

860    she packed all her stuff in boxes around the front of his motor home. JD had one of his helpers come

861    fix his plumbing and put a hundred dollars in his Jockey box to pay the handyperson. That night was

862    the Fourth of July 2019 and Vanessa had stopped by and picked up a couple loads with the neighbor

863    and got back after dark and the Plaintiff wakes up and is immediately struck with what he thought

864    was gas and went out the front door yelling that he had been drugged and the paramedics showed

865    up and Vanessa had taken off when she saw JD. JD was not happy, and neither was the Plaintiff so

866    when Vanessa came knocking at his door around midnight, he would not let her in and then the

867    deputy showed up and said all of her stuff is here, so you have to let her stay here. When JD showed

868    up the next morning, and gave the Plaintiff an eviction notices and told Vanessa, "You are

869    trespassed and how come every time I see you an ambulance is around?" That was the last time he

870    had seen her and when he got up to go shopping around midnight and got into his car his

871    sunglasses and the hundred dollars were gone. He waited over an hour for the sheriff to show up

872    and left for shopping after he was done with his report. It was two in the morning when he got back

873    and after pulling in the he saw that his driver's side door was open, and a piece of insulation was

874    hanging out so he call 911 and told dispatch that someone had broken into his motor home. The

875    Plaintiff informed dispatch that he did not know if someone was inside, and dispatch instructed him

876    to keep the phone to his ear and go in and see if someone was inside his motor home. Once inside it

877    dawned on him that if someone was still inside the dispatcher on the phone was literally powerless.

878    Boise County Sheriff's was not looking after the Plaintiff's wellbeing, and he heard nothing back

879    about the charges on his debit card. A few weeks later the Plaintiff received a call from Canyon

880    County Pretrial Services and asked if Vanessa was around and that she had called in on this number

881    and had not been able to reach her. The Plaintiff gave her the only number she had for Vanessa but

882    had not really talked to her since she had left his car in the Home Depot parking lot; except telling

883    her she was not going to stay here and nothing after the deputy said that he had to allow her to stay

884    there.

885

886            Towards the Fall of 2019 JD decided that he wanted to move the Plaintiff up on the hill and

887    said it was because the Plaintiff's sewer was leaking, and he had someone interested in that slot. His

888    crew tore off his siding that his friend had fabricated, installed, and painted before the move. About

889    a month or two later his neighbor's young kid got killed and the suspect had rolled across his still

890    empty spot. When Ecko and the Plaintiff left the next day there were about five detectives

891    processing the scene and they all glared with animosity, it was not one it was all five; the Plaintiff

892    wondered where the hate was coming from?  Was it because he had just moved and if not, the

893    perpetrator would have been knocking on his door? JD and the accusations kept getting worse.

894    After the move JD called and said the neighbor was complaining about all the noise and he informed

895    JD that nobody was home, so he did not know why the neighbor was complaining.  About 9:30 PM

896    the Plaintiff had another friend take his key and grab the money he had left. She could not get the

897    deadbolt to unlock, and she yelled for Ekco to unlock the door.  Apparently, she was holding the

898    deadbolt from being unlocked, was not answering her phone, and her dogs were inside barking.

899    Without saying a word, the Plaintiff got out of the car and picked up a tool at the bottom of the

900    stairs, slid it up the door and took the molding off holding the small window. He put his hand in to

901    unlock the door and struck Ekco on the other side of the blanket who was holding the deadbolt.

902    Other than his friend yelling for Ekco to unlock the door, there was nothing for any neighbors to

903    report to anyone. The neighbor called JD, and he called the police; the Plaintiff passed the officer

904    with his emergency lights engaged on the outskirts of town. He went to the residents and left his

905    card but there had not been anything unlawful taking place. If there had been Ekco or the neighbor

906    would have called the police.

907

908         In June 2019, the Plaintiff went up to Spokane Washington to earn his Piloting License for

909    flagging wide loads and construction roadwork. He was in the process of starting another business

910    and had left his dog with a friend because he had back problems; he passed while Ekco and him

911    were traveling up to his certification classes.  The Plaintiff did not have the resources to get the

912    medical care the dog needed, and they had been inseparable since he got Lucky in 2012. In-

913    September his mother and father had purchased a new Dachshund and on December 21 his dog ran

914    away while visiting a friend in Boise. Long hours of searching produced no leads and no Lucky

915    Junior. The Plaintiff was scheduled for Court on the 22nd of December; however, after laying down

916    to nap the last thing he remembered was telling Ekco he did not feel good, twice. The next thing he

917    knows is Ekco woke him up and said it was 4:00 PM; he had missed court. He called David Lorello

918    and left a message and his bondsmen; Angela asks him how he could have missed court? His family,

919    a few close friends, Angela, and JD explained that Ekco was drugging him. This time she had put

920    something into his food with the intentions of him missing court and having a warrant issued; he

921  would not be calling 911 if he had a warrant. A few days later he texted 911 and when the deputy

922  showed up he helped him out to his car with a backpack and he left. Sometime during the Summer

923  Ekco picked up a possession charge and later was released from jail with no charges and her only

924  explanation was that a guy in a suit showed up and had her released; thinking it was because she

925  was illegally searched while riding as a passenger with some friends. A month later the Plaintiff was

926  leaving and when he opened the front door Ekco was talking to a man on the porch and his partner

927  was in the car; two detectives. Ekco claimed that they were looking for a Mexican lady with this

928  address and the Plaintiff wanted to know why they were not asking him the questions instead of

929  her, she did not know.

930

931      The Plaintiff had been fighting his charges and not missed a court date and it was almost

932  exactly eleven months since he had been arrested and charged. His paid attorney had been charged

933  with a DUI, had double booked a court date, and the second time he missed court the Plaintiff was

934  told by Judge Hippler that they tried his office and his cell; he's not in the building so we are going

935  to have to reschedule.  The next court date the Plaintiff had to waive his rights to a speedy trial and

936  after Mitchell Aguilar walked out of Judge Hippler's Chambers and was passing he says to the

937  Plaintiff, "They'll take good care of you." The Plaintiff was now relying on a public defender and all

938  he would say was you have to turn yourself in so we can take care of the warrant. He wrote a letter

939  to Judge Hippler explaining what happened, but it did not do any good. He called and talked to BCSO

940  Sergeant John Doe and explained he had a warrant, and he wanted to somehow catch Ekco trying to

941  gas him, but all the sergeant would say was that we are going to have to arrest you on the warrant.

942  Before he turned himself into the jail, he went online to Ask.com and had this conversation with a

943  Medical Doctor.

944

945 • the-good-doctor: certain anesthetics like benzodiazepines can show up in a test

946   other ones like you suggested like GHB would not.

947 • Plaintiff: its in a gas form so what would that be?

948 • the-good-doctor: that would be something like nitrous oxide that wouldn't show up

949 • Plaintiff: as twisted as this sounds i think I'm being given this drug. almost like the

950   date rape drug but she isn't putting into anything. its got to be in the air I'm

951   breathing. no smell or taste I start getting real dizzy, motor functions start

952   diminishing, and a few times I've almost lost conscientiousness! You said this is

953   most nitrous oxide. how would it come or dispensed?

954 • the-good-doctor: it comers in a tank like an oxygen or helium tank

955 • Plaintiff: say in an open room, the affects would depend on the concentration and or

956   how much a person takes in?

957 • the-good-doctor: correct

958 • Plaintiff: no taste or smell? recovery is pretty fast with some difficulty with motor

959   skills and speech?

960 • the-good-doctor: yes

961 • Plaintiff: last questions, in your opinion can these symptoms be confused with the

962   symptoms of a panic attack?

963 • the-good-doctor: No I don't think so panic attack usually causes shortness of breath,

964   chest pain and a feeling of doom

965 • Plaintiff: perfect!

966

967      BCSO Sergeants John Doe 1 & 2 consciously and deliberately refused to investigate Marlor's

968 best friend even though the Plaintiff utilized, on several occasions, 911 texting to ask for help. When

969 he had a panic attack, he did not communicate anything other than he needed an ambulance. When

970    he was being drugged, he called the police. They would not investigate Ekco because she had signed

971    up to be a confidential informant. The sergeants knew he had sought help by having his doctor drug

972    test him, but the sergeant informed the Plaintiff that it was the wrong kind of test for a gas like

973    anesthesia. Boise County Sheriff's Office conspired with JD to get him to move out of Horseshoe

974    Bend. He had no problems with JD until after he was arrested and charged for drugs. Ada County

975    Sheriff's Office searched his car illegally and then Deputy Neill started berating him about Brandon

976    and him bringing drugs into the county and they'd be watching out for his car. None of it made

977    sense until almost two years later when he was in Ada County Jail and was reviewing Deputy

978    Kastler's OBV and explain about getting a call from BCSO for an assist with a k9 for a stop. Even

979    then the Plaintiff did not fully comprehend what had taken place until his Long Covid had subsided

980    and was able to assess everything; Deputy Kastler's OBV, IDR for January 13, 2019; and remember

981    the berating Deputy Neill gave him and mentioned Brandon, Vanessa's boyfriend that he had not

982    had any contact with for almost a year.

983

984

985                                    **The Judicial Process and Law Enforcement**

986

987            As the Plaintiff assess the judiciary process, the legal officials who are practicing and

988    licensed by the State of Idaho, who had subjected him from start to conclusion of the State's charges

989    that originated out of law enforcement's collusion and were without probable cause; he is in

990    complete astonishment. Further, in how the legal officials conducted themselves ethically and

991    morally while meeting their duty to uphold the legal process is not acceptable, including Judge

992    Hippler. Law enforcement, attorneys from both legal sides, and the judiciary process were

993    deliberately indifferent to the Plaintiff's constitutional rights and liberties in regard to his arrest,

994    judicial process, and his health. Legal officials' decisions to shield law enforcement's misconduct

40

995    while subjecting the Plaintiff to incarceration in efforts to extract a guilty plea could have easily

996    taken his life. While a sheriff takes an oath to defend the Constitution, an attorney is self-governing

997    but held to fallow "IDAHO RULES OF PROFESSIONAL CONDUCT." In the PREAMBLE it states, "While

998    it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's

999    duty to uphold legal process." There was no challenge of rectitude or duty to uphold the legal

1000    process throughout the Plaintiff's case, in fact, just the opposite!

1001

1002    On face value Jonathan Baldauf, the Plaintiff's defense attorney, succeeded by the State

1003    dismissing the charges and his client was released from Ada County Jail. Judge Hippler's judicial

1004    duties are sound by ruling to suppressing the evidence from the Defendant's motions to reconsider

1005    hearing and motion to suppress hearing held eight months prior. The DA, Anthony Clinger,

1006    prosecuted the Plaintiff based on the information provided in Deputy Kastler's "Probable Cause for

1007    the Stop and Arrest", including that the Defendants' information in the Plaintiff's Discovery is in its

1008    entirety, true, and lawful. Idaho State Bar's lawyer referral system, a public service that gives public

1009    access to Idaho's pool of lawyers, successfully referred the Plaintiff three lawyers. The Judicial

1010    Process ensured the Plaintiff's rights were followed by granting the Plaintiff a public defender both,

1011    prior to him retaining a private attorney and after his attorney recused himself. However,

1012    individuals licensed by the Idaho State Bar to practice law and judicial officials subjected the

1013    Plaintiff to a process that were not in concert with law enforcement's goal to establish and make an

1014    unlawful arrest and maliciously prosecute in obtaining an unlawful conviction; but in a sense,

1015    mirrored the deprivation of his rights, privileges, or immunities secured by the constitution and

1016    laws. Law enforcement maliciously prosecuted the Plaintiff to gain an unlawful conviction; those

1017    officials of law subjected the Plaintiff to a process that contributed, shielded, and or forwarded law

1018    enforcements wanted outcome. Moreover, law officials subjected the Plaintiff to an environment

1019    that could have ended his life, even after medical staff and Dr. Clive recommended his release or

1020    transfer to jail administration and Judge Hippler.

1021

1022          The State prosecuted the Plaintiff based on the information the Defendants' provided in

1023    Deputy Kastler's "Probable Cause for the Stop and Arrest"; further, that the information is in its

1024    entirety, true, and lawful. The Plaintiff's defense keyed in on the Defendants' information in his

1025    Discovery to vacate the State's charges by invalidating the Defendants' stop and arrest; ultimately

1026    ending his prosecution by the Court suppressing the evidence, "exit order unlawfully extended his

1027    detention." What is confusing is the fact that the State was willing to prosecute the Plaintiff on

1028    Deputy Kastler's Probable Cause for the Stop and Arrest. It contained no probable cause or reason

1029    why the Plaintiff and Mr. Osterhout were asked to get out of the car. It did not contain the deputy

1030    who asked them to get out of the car or mention the burglary investigation, who found the alleged

1031    methamphetamine, someone being out the car, and not one word of bath salt and marijuana. The

1032    reason why the probable cause for arrest does not contain pertinent information found in the

1033    Defendants' reports is because once it was realized how fundamentally unsound and legally

1034    insufficient the unlawful arrest of the Plaintiff transpired; evidence is fabricated in their written

1035    reports to boaster and give substance to the probable cause for the Plaintiff's unlawful and

1036    unwarranted arrest; further, exculpatory evidence is withheld from the Plaintiff and include OBVs

1037    and pages omitted from the Plaintiff's Discovery.

1038

1039          At some point Sergeant Piccola witnesses his choreographed charade play out on his OBV

1040    and becomes cognoscente it recorded a deputy by the shop before and after he covered up his OBV

1041    with his glove. He is no longer ignorant of the fact his video captures K-97 lights as he leaves the

1042    storefront parking lot and again as he is still driving backwards as he fabricates evidence and says,

1043    "Whoever is pulling up…" His video revives his memory of the moment he shines his flashlight on

1044    the camera mounted on the side of the business storefront, and if he has forgotten or if the camera

1045    did not refresh his memory, then the sign on the storefront window will; it states, "24 HOUR VIDEO

1046    SERVAILANCE." The sign communicates the night's events have been digitally captured and would

1047    not only clear the Plaintiff of any wrongdoing, but makes it abundantly clear the Defendants' actions

1048    were conspiratorially contrived to unlawfully arrest the Plaintiff; thus, leading Sergeant Piccola to

1049    write "none" under attachments before forwarding his report to the prosecutor. All the Defendants'

1050    actions were deliberate, willful, wanton, oppressive, malicious, fraudulent, and unconscionable.

1051    Moreover, Sergeant Piccola is in a supervisor position and is successfully training Deputy Kastler to

1052    succeed in unlawfully conducting the law in Ada County as a public servant, under the color of law.

1053    The unlawfulness does not end with the three deputies in the k9 units; Sergeant Piccola, Deputies

1054    Kastler and Lowry; not even with Sergeant Bones, Deputies Livas and Porter, or a perceivable

1055    ending with the lone detective; Detective Hessing. No end in sight of unlawfulness with Ada County

1056    Sheriff's dispatchers, legal team, data retention, or for that matter with the legal officials defending

1057    or prosecuting in Ada County, to include judicial officials; or with Ada County Sheriff's Office

1058    Internal Affairs department, specifically Detective Chip Morgan, who disregards the Plaintiff's

1059    compliant and shields fellow deputies by following unwritten policies and allow for advancement of

1060    the k9 supervisor, now Sergeant Piccola. He is now able to guide and direct several deputies on how

1061    to successfully fabricate evidence, lie in reports, and commit perjury on the paths to unlawfully and

1062    without probable cause get a conviction. Sergeant Piccola can train his subordinates to collude with

1063    neighboring sheriff's office and the state police, and if all else fails, stage a cover-up where the DA

1064    and Judge help collude one's endeavors.

1065

1066        Ada County Sheriff's Office and their employees have become so complacent fabricating

1067    evidence, staging and controlling unwarranted arrests, training new sheriffs how to employ their

1068    unlawful tactics, sergeants signing off on their reports without questioning the validity of the

1069    content, different departments shielding and covering for each other; that it is second nature and

1070    not given another thought when citizens' constitutional rights and liberties are trampled on. The

1071    Defendants are so confident in their team members and a successful history of process that will

1072    eventually lead the defendant pleading guilty; that they carry themselves as indestructible and their

1073    misconduct is blatantly obvious. An individual that falls prey to Ada County Sheriff's unlawfulness,

1074    are thrust into the judicial system for prosecution where the judicial officers, State's DAs, and legal

1075    officials to defend, are all licensed by the State and are willing to sign on to ensure a collusion

1076    remains intact. This conduct filters down to support agencies and businesses to produce

1077    establishments that operate with an above-the-law mentality and or they cannot do anything wrong

1078    because they answer to the Courts; agencies such as Averhealth and Idaho Ankle Monitoring.

1079

1080                   **Idaho Ankle Monitoring and Pretrial Release/Bond**

1081

1082        The Plaintiff had trouble charging the ankle monitor and was reassured by Angela that they

1083    would work through it; however, it was his responsibility to drive down from Horseshoe Bend and

1084    even though she had seemed understanding and reasonable, Nancy, Angela's mother and owner,

1085    acted as she was dictatorial, and the Plaintiff was one of her subjects. This is prevalent in the way

1086    she ran the business and the interactions with her employees and her clients; critical and relevant

1087    data was filtered so as not to upset Nancy, and consequently to the Plaintiff, he was being violated

1088    without doing anything wrong. Angela knew that the Plaintiff was not messing with the chargers,

1089    and it had to be the RV outlets, yet Nancy submitted the violations to the Courts. More, he had

1090    missed another UA because he tested and was being treated for streptococcus and was taking a

1091    regiment of pills when Angela told him, that if he did not make it down to change out the ankle

1092    monitor, that Nancy was going to send a violation to the courts. He woke up and read her message

1093    and when he arrived in Boise and messaged Angela; she replied that she was in Nampa and would

1094    have to meet with him the next day. The Plaintiff was mentally stressed and overwhelmed with the

1095    ankle monitor not charging, Nancy threatening to violate over something he had no control over,

1096    continually having to travel into COVID-19 hot zone during home isolation and contracting the

1097    deadly disease, being able produce for a UA; and financially stressed and operating in the red with

1098    depleted resources from paying a lawyer that withdrew as council, a bondsman, ankle monitoring,

1099    UA's; the fuel for almost seventy mile round trip runs to Boise to change GPS units, chargers, take

1100    UA's, and attend court; and he was physically suffering from his arthritis, streptococcus, and a new

1101    back injury where the doctor ordered home convalescence, with referrals to an orthopedic surgeon

1102    and neurologist that he gave to the Courts .

1103

1104        Two days prior to a text message to Angela dated April 7, the Plaintiff had contacted his

1105    public defender due to all the issues he was facing, and Lorello communicated that there would not

1106    be any Court for two months and he was going to have to work things out with his landlord and

1107    Idaho Ankle Monitoring. Not only was he having issues with Idaho Ankle Monitoring he was being

1108    evicted because of the issues stemming from being charged with drugs. The Plaintiff's landlord

1109    informed him; a Boise County Sheriff's deputy told him that he had been charged with drugs.

1110    Another time he told him, "The only reason you moved up here was because there are no cops." He

1111    lived in Horseshoe Bend from July 2017 until he was incarcerated in June 2020. The Plaintiff was

1112    constantly defending baseless accusations and while in jail, he lost everything he owned to his

1113    landlord, JD. The Plaintiff kept almost all messages between Idaho Ankle Monitoring and himself

1114    and they reflect not only was the Plaintiff complying; he was going over and beyond trying to figure

1115    out why the GPS unit was not charging:

1116

1117        Thur, Mar 26,

1118          Angela: Hi, Greg this is Angela with Idaho monitoring I need to swap out you device

1119          tomorrow in the office any time before noon what time works good for you?

1120

1121          Plaintiff: I don't have enough gas to go down gain unless I have to take a ua!

1122

1123          Angela: Okay well just keep your device fully charged please and next time you come to UA

1124          will you txt me so that we can get it swapped out thanks

1125

1126          Plaintiff: Charged it all all night and as soon as I unplug it it goes red blinking! I think

1127          someone should be able to come swap it out! This is the second time It's gone bad and and I

1128          think it's time to start crediting days off my bill for when it's not working! I pretty much got

1129          called a lier and threatened to get violated yesterday and I didn't appreciate it. Especially

1130          when I called and reported it to you before anyone even called me!

1131

1132          Angela: Ok. This isn't Nancy this is Angela. I think you talked to Nancy and not me.

1133

1134          Plaintiff: But yes of course if I have to UA I will. I called you and told you it wasn't working

1135          and not long after Nancy called me! I know who I talked to but that doesn't change anything.

1136

1137          Fri, Mar 27, 12:51 PM

1138          Plaintiff: No UAs today

1139

1140          Angela: Okay

1141

1142          Sat, Mar 28

1143    Plaintiff: Heads up I'm on my way down but I do have early signs of a cold. Runny nose, itchy

1144    eyes and only time I have allergies when I go to jail.

1145

1146    Angela: Okay I'll meet you at......what time.....area? .....bring both chagers please.

1147

1148    Plaintiff: I'm here

1149

1150    Sun, Mar 29, 6:46

1151    Angela: Please charge your battery soon. Thanks.

1152

1153    Plaintiff: It's been charging for the last hour.

1154

1155    Angela: Okay sounds good. Thank you

1156

1157    Plaintiff: Yup

1158

1159    Thu, Apr 2, 9:49 AM

1160    Plaintiff: Angela I'm coming down and can bring both chargers! Can you please help me with

1161    a charger. By chance did you charge the one I brought back to see what was wrong with it?

1162

1163    Angela: Hi Greg. I did charge the last one you had and it charged up just fine. I will be at the

1164    office by 11:00 if you want to bring in the chargers I can test the chargers as well and give you a

1165    new one. What time do you want to come by the office?

1166

1167    Plaintiff: I'm not sure but we'll say by 1 ish! For the life of me I can't figure4 out what's going

1168    on! The only thing can figure is that. These chargers are both bad! I did exactly what you

1169    told me and I never say a solid green light! I even tried the first charger again!

1170

1171    Angela: Ok. We will get it figured out. I know it's extremely frustrating but I will help you go

1172    thought it with you. Just shoot me a txt when you're on your way so that I know you're

1173    coming. I've had a lot of jail installs lately and want to be sure I'm in the office when you

1174    arive.

1175

1176    Plaintiff: Okay will do.

1177

1178    Thu, Apr 2, 5:12 PM

1179    Plaintiff: Angela I just made it down and an urgent care! I had something to eat around noon

1180    and it was all I could do to make it back to my bed! Slept until 4:30 and drove down!

1181    Anyway you could take the charger home and I could meet you in the same place I brought

1182    both chargers.

1183

1184    Angela: What time are you able to meet me?

1185

1186    Plaintiff: I was just going to get out of the car but if you want to meet real quick I'll wait until

1187    we're done

1188    Plaintiff: Whatever is easiest for you..../

1189    Plaintiff: What did you decide?

1190

1191    Angela: I'm still at work for at least another hour You want to come by the office?

1192

1193    Plaintiff: I already came into instant care sorry! I'm really not doing well! I'll text you as

1194    soon as I'm done here and see what you want to do........:

1195

1196    Angela: Okay

1197    Angela: I'm leaving my office now and heading home for the evening.

1198

1199    Plaintiff: I just got done can you meet behind Jackson agian

1200

1201    Angela: Sure I can be there in about 15mins

1202

1203    Plaintiff: Okay the green blinking light came on at 9:00 so It's almost been 21/2 hours and

1204    no solid blinking light! What should I do?

1205

1206    Angela: Keep it plugged in a bit longer. It was completely dead so it needs to charge maybe

1207    another hour or so I imagine. It's takes an hour and a half to charge it daily, so I think

1208    charging it now for three hours will fully charge the battery back up to normal. Remember

1209    to charge it for 1.5 to 2 hrs every day. Okay!

1210

1211    Plaintiff: That's not a problem I don't even go anywhere!

1212

1213    Angela: I know but you gotta charge it for a minimum of 90 mins every day for it to work.

1214    Hope that makes sense.

1215

1216    Plaintiff: Not expecting a return txt but just disconnected, three full hours of charging and
1217    never got a solid green light, and goes straight to blinking red! Yeah I can't figure out what
1218    the crap is going on! Shoot me a txt tomorrow and let me know if those other two chargers
1219    worked, please!

1220

1221    Angela: I wonder if it's your RV out

1222

1223

1224    Plaintiff: When it was charging or after it was charged! I was just wondering if all the time
1225    I've been charging it if you saw it?

1226

1227    Angela: I'm not at home at the moment but when I get back I'' take a look. And yes every
1228    time it's charged we definitely saw it.

1229

1230    Angela: But to answer your question yes we can tell if it's plugged in charging or not. I'll let
1231    you know when I get home and look at it.

1232

1233    Plaintiff: Not sure what to do Angela to resolve this! I was able to talk to my lawyer and told
1234    him the difficulties we were going through and he said I'd have to work through it with you
1235    guys! I told him you mom wants to violate me and he said that they are not going to hold
1236    court for a couple of months.

1237

1238    Angela: But in the mean time if you are getting a green blinking light then yes it's back
1239    online if you have a solid green light then yes it's back online if you have solid green light
1240    then it's full charged And is also back online.

1241

1242    Plaintiff: The main reason I was wondering is because it must have not been charging at all

1243    because your mom kept telling I had to go outside! And if this corrects it it should come

1244    online!

1245

1246    Angela: It is online it's online so it's working but because it was so dead I would continue to

1247    charge it as long as you can until it goes solid green. I know it's the pain in the ass but

1248    because it's been dead for so long it can take several hours.

1249

1250    Plaintiff: Well I just unplugged it and it went from blinking green to blinking red! I

1251    automatically plugged in back in and now it won't change from blinking red to green!

1252

1253    Angela: I don't see it on our server either so it's not working correctly. When I checked it

1254    said low batter. But that report was from the 29th. So my mistake. If you come to Boise

1255    tomorrow I will need to change it out completely, not unless you can charge it from a

1256    different plug in which I know you can't do I will ask Nancy what we should do. I think no

1257    matter what it has to be charged from a house plug in. the inverter isn't doing the job. And

1258    I'm out of ideas. I'll keep brain storming.

1259    I kno this is a pain and it's been difficult. But if we could just get something that could

1260    charge it you would be good. Do you by chance have a generator that has an outlet.

1261

1262    Plaintiff: The one I have is hooked into the RV and goes through the RV! ...it's been a couple

1263    years and ...it wasn't good. Your mom sent me a txt telling me the battery isn't charged and

1264    I'm not going to reply. To be honest I'm done stressing over it! I've bad enough health

1265    problems as it is and with the corona virus and worrying about it and going to UAs and

1266      dealing with fetching thing Ive about had enough with the whole thing. When I talked to my

1267      lawyer yesterday he's saying nothing with the courts for two months!

1268

1269      -Mon, Apr 6, 3:47

1270      Angela: I need to swap your GPS out at least to get one that's fully charged for now it's been

1271      too long and Nancy has to do a violation if I don't get it swapped out today which I

1272      understand because we haven't been able to get this charged so either I switch it out or we

1273      do it violation sorry there's nothing more I can do

1274

1275      -Mon, Apr 6, 6:20

1276      Plaintiff: Sorry I just woke up I've been sicker then a dog with this strep! I can try to get in t

1277      by shower and drive down I guess! I'm just not sure I've got enough time For cure curfew to

1278      make it back up I wish you would've called

1279

1280      -Mon, Apr 6, 7:55

1281      Plaintiff: I'm here

1282

1283      Angela: I'm in Nampa. I can't meet you till tomorrow. Either at my office or after 6pm

1284

1285      -Tue, Apr 7, 5:03

1286      Plaintiff: I guess after 6 PM works fine I just got down here at the UA so give me a call.

1287

1288      Angela: If you need a new GPS I have to do it tomorrow at the office because we just closed.

1289      We need to get it set next time you come UA will do it then. Give me at least an hour's heads

1290      up when you're able to come into the office.

1291

1292    Sat, Apr 11, 11:37 AM

1293    Angela: Hi Greg. If you come to Boise today I can meet you anytime before 7pm. We can

1294    meet at the gas station. Bring your GPS charge too please. Thank you hope your doing

1295    better.

1296

1297    Plaintiff: I'm not in fact doing much worse! I fell back words and him my back on my chair

1298    and really f'd my back up! Haven't been out of bed for almost two days.....couldn't get to any

1299    pain relief or water so stopped taking my medication. Finally got a frienld up here to help

1300    with my dog and something to eat! Had another friend on the way up to take me to urgent

1301    care but after a couple hours and a few txt I called and asked her where she was at! She told

1302    me her car went into the shop with radiator problems....she said she sent me a txt! She'd

1303    said in her txt that her car was over heating and it was shot out of there! Nothing more

1304    nothing less! So I'd been waiting all that evening for nothing! Got to the point where I could

1305    make it out and open the door for lucky so he could go in and out but not much more! Going

1306    to try to make it out to my car and go to urgent care again here in a little while but not

1307    promising anything. If I do I can't come back up because I can't take care of my dog or

1308    myself!

1309

1310

1311

1312    According to iCourt on April 3, Community Monitoring Averhealth and on April 7, Nancy

1313    Cladis with Idaho Ankle Monitoring had both "Verified Application of Pretrial Community

1314    Monitoring." Also, on iCourt, April 8, a "Motion to Revoke and Increase Bond" and because of Covid,

1315    Courts had been vacated. On Friday May 1st Mandated Home Isolation ended and according to

1316    iCourt under Miscellaneous and Comment, it states, "Notice Re: Zoom/WebEx hearings." On May 3rd

1317    the Courts held a revocation hearing by video court and warrants were issued. The Plaintiff's

1318    disability of incomplete paralysis of his lower extremities and the placement of the ankle monitor in

1319    conjunction with his gate caused a fall, severely injuring his back. He was unable to comply with the

1320    additional conditions of his bond, community monitoring.  After receiving imaging, the doctor

1321    ordered home convalescence, additional studies of his back, and referrals to an orthopedic back

1322    surgeon and neurologist. All the doctors were meeting virtually, and the Plaintiff was struggling

1323    trying to get his provider to confer with the doctor at Primary Health for the referrals. Angela with

1324    Idaho Ankle Monitoring had missed a couple of appointments and stopped trying to find a solution

1325    with the electrical outlets in the Plaintiff's RV. With Covid home isolation mandates, orders for

1326    home convalescence, being bedridden due to his new painful back injury, the only communication

1327    from David Lorello was "No Court for a couple months," and his ankle monitor would not charge; he

1328    knew he had better retain a new lawyer. The first lawyer he called said he had a warrant for an FTA

1329    and was not complying with Community Monitoring, and that this is not a murder charge, get some

1330    money together and see me. When the Plaintiff contacted Lorello, he said he communicated to the

1331    Court, that the Plaintiff had not been notified of the proceedings, twice; even with that information,

1332    Judge Hippler revoked his bond and issued a warrant. He asked Lorello why he did not call him and

1333    at least let him know he had a warrant, he replied, "I'm not your f****ing secretary" and hung up;

1334    the Plaintiff and friend stared at each other and speechless.

1335

1336        The Plaintiff gave documentation ordering home convalescence, additional studies of his

1337    back, and referrals to an orthopedic back surgeon and neurologist, to Idaho Ankle Monitoring. The

1338    Plaintiff's bondsperson was in contact with him because of the warrants and the revocation of his

1339    bond; he had to turn himself in again. He asked his bondsperson to please be patient; he was in the

1340    process of getting medical documentation to Idaho Ankle Monitoring so they could get them to the

1341    Courts to get the warrant quashed. With no case manager the Plaintiff thought that Angela could get

1342    the documentation to the Courts, and he texted Angela on May 20; she replied in a text and said,

1343    "Nancy will review the information you emailed over. And will follow up with the courts and

1344    appropriate office." On May 27, the Plaintiff contacted the Court's clerk, she informed him there was

1345    still a warrant, and as far as she knew, there had not been any documentation submitted. The

1346    Plaintiff was able to email all medical documentation regarding his back injury to the clerk and she

1347    ensured him that his lawyer David Lorello, the DA Tony Clinger, and Judge Hippler would receive

1348    his medical documentation. iCourt shows the documentation was received on May 27, and Idaho

1349    Ankle Monitoring never submitted the documentation for the Plaintiff.

1350

1351        Judge Hippler, Anthony Clinger, David Lorello, acted intentionally and collectively to

1352    disregard the Plaintiff's serious health conditions and placed him in the direct path of a disease that

1353    would take the lives of millions and change the health of millions who became infected. March 25,

1354    2020 "ORDER TO SELF-ISOLATE" specifically states:

1355

1356        3. DIRECTING ALL BUSINESSES AND GOVERNMENTAL AGENCIES TO CEASE

1357    NONESSENTIAL OPERATIONS AT PHYSICAL LOCATIONS IN THE STATE OF IDAHO.

1358

1359        (ii)    For people with medical conditions, regardless of age, that put them at a higher risk

1360    of serious complications should they contract COVID-19, and other than healthcare workers and

1361    other essential providers, avoid leaving their homes to the extent possible; and

1362

1363        (iii)    For employers in the State of Idaho that do not provide essential business or

1364    government services, take all steps necessary for employees to work remotely from home to the

1365    extent possible.

1366

1367                              **Ada County Jail and Judicial System**

1368

1369        The Plaintiff turned himself in on June 5, 2019. He called the jail and informed them of his

1370    injury and Ada County deputies responded in the front of the jail, handcuffed him, placed him inside

1371    the squad car, and drove him to the carport. They told him "The handcuffs were not coming off until

1372    he was inside the building." With a deputy on each side and grabbing him underneath each arm and

1373    shoulder, they assisted him up, and at the same time pulling him outside the car, then twisted him

1374    around, and set him down into a wheelchair; consequently, exacerbating the injury to his back and

1375    rendering him in pain and bedridden.   He was in so much pain that he asked for a urinal because he

1376    could not get out of his bunk. The next day he was called for court, but his pain level was too high to

1377    get out of bed and the deputy reported this as a refusal to go to Court; it is noted in iCourt as,

1378    "Refused to come to court."

1379

1380        The Plaintiff remained in a wheelchair for 11 months and 1 day; released on ORO on May 4,

1381    2021. June 8, 2020, NP J. Conn approved his move into HSU but denied an extra mattress saying,

1382    "Jail Policy is you have to be over 65 two have two mattresses", and again he was told that on June

1383    17, when he complained that his back hurt and that he did not have any meat on his bones and it

1384    made him really uncomfortable to try to sleep; she again denied him a second mattress. On June 11,

1385    he signed a release form for his rheumatologist to release his records so he could get approval to

1386    take his RX that had been dropped off, was in his name, was being kept in the fridge, and he had

1387    been taking since 2014.

1388

1389        06-06 am Appointment Description 1. issue hot packs for his back. 2. Empty Urinal.

1390

1391    06-06 Appointment Description f/u pain management, back pain. States he cannot get out of

1392    bed. Using bedside urinal. Previous back injury before coming to jail causing pain.

1393

1394    06-11 Appointment Description Please follow up with patient, he is requesting to continue

1395    his Humira. Records requested from Rheumatologist on 6/8/20.

1396    6-23 CCHP, C., Hine, jail admin for release

1397    06-25 RN, Brewer, may be discharged to GP once fully advised of risks.

1398    07-07 sandles were denied

1399    08-04 requested Primary Heath records

1400    08-13 requested to move back to HSU COVID concerns

1401    08-14 Please notify the pt HSU is reserved for those who are acutely ill.

1402    08-21 skipped RX shot did not feel well

1403    8-23 first describes COVID symptoms.

1404    9-24 COVID TEST

1405    Brewer, RN,

1406    9-22  Bigford request release and get RX see about getting Humira at discounted price.

1407    10-01Patterson, RMA, CNA, recommends medical release

1408    10-01-20 Positive COVID test, do we lock down dorm 6 quarantine security

1409    10-20-20 Brewer, RN, inform the courts the Plaintiff needs to start RX that suppresses

1410    immune system

1411    10-20 Dr. Clive order Humira

1412    11-4 Conn, NP and Plaintiff discuss only medical equipment at jail has been donsted. Gets

1413    skew # so mom can order forearm crutches and discuss needed exercise.   Dr. Clive is never

1414    going to give referral until he sees imaging. Plaintiff informs her that he filled out release in

1415 June she look it up and never sent/received. Again denies extra mattress and blanket policy

1416 65 years or older; received that day.

1417 11-10 Dr. Clive gives "IRF- refer to neurologist and orthopedic surgeon due to nerve

1418 damage."

1419 12-15 messagage stating 30 supply gone "Do you want to order again? The cost is $10,577."

1420 12-22 appt with PA Heinrich at Spine Institute

1421 02-04 kite saying eyes, ears, taste, smell was being effected by my thyroid and pituitary

1422 gland and and am in a lot of discomfort.

1423 02-04 trying extra Cimetidine medication to alleviate symtons

1424 02-06 again communicating how sick he was

1425 02-09 finaly Please schedule the patient with neurology per Clive

1426 2-6 Clive said it would take a long long time mt get me into a neurologist!

1427 2-11 fell unconscious and landed on floor

1428 2-11 need shoes so I can exercise have lost all muscle tone

1429 03-01 received spinal injection at Idaho Spine Institute

1430 03-01 needed shot RX and message states he hadn't been taking his shots regularly. Any

1431 medication made his symptoms wose

1432 3-2 Pt. refusing appointment at Spine Institute of Idaho today

1433 03-19 Please meet with patient to assess need for special shoes, second mattress and

1434 forearm crutches. give more problem but doesn't expect medical to do anything.

1435

1436

1437  The wheelchair became the Plaintiff's permanent means of mobility and while being

1438 classified and housed in medical, he submitted documentation from his doctor that included home

1439 convalescence and referrals to an orthopedic back surgeon and neurologist; the same

1440    documentation he emailed Judge Hippler's clerk and supplied to Idaho Ankle Monitoring.  The

1441    printed copies were not sufficient, and the Plaintiff signed a release of information for Primary

1442    Health so Dr. Clive could review his records and start treatment. He also suffers from Rheumatoid

1443    Arthritis, has a RX for Humira injections to suppress the disease from attacking the body and

1444    therefore prevent pain, and manages the effects of the disease.  He had several injections dropped

1445    off; however, due to another medical release of information for his rheumatologist, medical policies,

1446    and government's mandates; his injections were inconsistent and were not given as prescribed.

1447    After going through the Humira RX that was brought to Ada County Jail, Dr. Clive applied to the

1448    Humira manufacturer because of the excessive cost for the drug. Saving Ada County Jail money was

1449    more important than getting the Plaintiff his medication he had been taking since 2014. The

1450    Plaintiff believes this is one of the driving forces for not seeking treatment for his symptoms at the

1451    Covid Clinic.

1452

1453        The Plaintiff was confined to medical HSU because he was in a wheelchair and suffered from

1454    arthritis. He grieved medical to be transferred into GP for several reasons. These reasons included

1455    the TVs and KIOSKs did not come on until after lunch, then off after dinner and off again at ten,

1456    maximum commissary was $20.00 a week with no caffeine, no hot water pots for cooking, electric

1457    razors, and other rules and procedures governing HSU that did not apply to GP. The Plaintiff wanted

1458    to be transferred to GP where he was treated like a person without a disability and was told to

1459    either remain safe with scaled down benefits or transfer to GP but assume the risk of exposure.

1460

1461        06-23-2020 12:09 pm Johnson, RN, S Appointment Description Please task admin to review

1462        pt's chart. It is my recommendation the pt be medically released/transferred out of Ada

1463        County Jail due to being high risk for COVID-19 complications as he has rheumatoid arthritis

1464

1465 06-25-2020 8:59 am Conn, NP, J Pt may be discharged to GP per classifications once he is

1466 fully informed of increased risk of possible exposure to COVID-19 and other communicable

1467 diseases due to his RA and GI diagnoses. Please document that patient was informed and

1468 assumed this risk. TY

1469

1470 06-25-2020 10:12 am - Brewer, RN, CCHP-RN, M : I directly discussed with GM the medical

1471 concerns over COVID outside of his current housing.

1472

1473 06-22-2020 9:51 am Appointment Description Bigford: St. Luke's Rheumatology records

1474 scanned & ready for review.

1475

1476 07-14-2020 9:31 am Appointment Description Bigford - St. Al's records scanned & ready for

1477 review.

1478

1479 Submitted Date: 07/30/20 16:14 GREGORY MARLOR

1480 Summary of Request and Symptoms: I have the documentation for the referrals for a

1481 neurologist and orthopedic back surgon for a fall that occurred just before Easter! I have

1482 numbness, ghost and back pains that Tylanol and Ibuprofen doesn't begin to address! My

1483 lawyer, Judge, and prosecutor have! I also signed a release so my doctor records could be

1484 released but have not recieved any communication from medical! Please address my back

1485 issues as soon as possible!

1486

1487

1488 07-30-2020 4:21 pm er IRF: Pt. states that he has numbness and pain in his back that IBU or

1489 Tylenol do not help with. Pt. is wanting to be seen by an orthopedic specialist.

1490

1491    08-14-2020 4:49 pm Pt. had #3 Humira pens brought in, but we are unable to use them

1492    because they were paid for by Medicaid. Pt. is concerned that he is not getting his Humira

1493    and states that he is past due for his next shot. What would you advise for the POC?

1494

1495    08-20-2020 1:27 pm Appointment Description Initial COVID test

1496

1497

1498    Due to his disabilities, the Plaintiff was given a choice to be housed in HSU where he did not

1499    receive accommodations that other inmates in GP enjoyed or assume the risk of contracting a

1500    deadly disease while housed in GP and treated like someone without a disability. His concerns of

1501    contracting the disease were rising with reports of the growing number of county inmates testing

1502    positive. Even though he would be subjected to HSU's slew of rules, his concerns of not wanting

1503    contract the deadly disease and die, outweighed HSU discriminatory rules for someone with a

1504    disability. The request he submitted to be housed in HSU was denied and medical ignored the fact

1505    he was taking an RX that suppressed his ability to fight off infections. Medical denying him a safer

1506    place in HSU where he was safer from contracting a deadly disease was indifferent; especially

1507    considering the inhibitor RX he was taking suppressed his immune system and contracting the

1508    disease could result in severe consequences to the Plaintiff's health and potentially cause death.

1509    When he requests the move back to HSU, medical assigns the request the lowest possible number,

1510    #5. What medical deems as important the Plaintiff's rates it on the other spectrum #1. It also

1511    contradicts what some medical staff is communicating to jail administration and their

1512    recommendations:

1513

1514     Submitted Date: 08/13/20 15:47 Name: GREGORY MARLOR I would like to discuss with

1515     medical the possibility of moving to HSU because of COVID-19

1516

1517     The Plaintiff started to notice strange symptoms that at first were no more than a mere

1518 nuisance but evolved, rendering him to endure symptoms that were debilitating and life changing.

1519 The Plaintiff was infected approximately two weeks prior to August 23, 2020, when he sent medical

1520 a message detailing his symptoms and communicating his concerns, he wrote:

1521

1522     Submitted Date: 08/23/20 16:30 Name: GREGORY MARLOR For the last few weeks I

1523 haven't felt very good! I've even went down to medical and had my vitles checked! Not too sure how

1524 to explain in but I feel the best in the morning but as the day progresses I start feeling more and

1525 more clammy! By the end of the day my ears are ringing andnmy vision is out of focus! Feels like I'm

1526 in a shell! Lind of worried about my health condition! I've even not taken any of my medication to

1527 see if it was related but to no avail

1528

1529

1530     Submitted Date: 09/01/20 22:08 Name: GREGORY MARLOR: Diarea, body aches, head ache,

1531     chills

1532

1533     09-02-2020 11:38 am - Bigford, NP, B. : If COVID results are positive he can be transferred

1534     to an appropriate housing unit with other positive inmates. If results negative, he can return

1535     to his current housing unit as he likely has some other viral URI. Pt has been trying in

1536     various ways to get back to HSU MH dorms. These kids have been symptoms could be the

1537     result of malingering.

1538

1539        Submitted Date: 09/02/20 17:23 Name: GREGORY MARLOR

1540        pulled out of 6 and moved to 8... no access to KOP and in a bad way.keep gettng denied

1541        medication.. if I have covid im taking an inhibitor, hada colaps lung, have spots on my lungs,

1542        along with other red flags that need to be addessed asap! keep getting denied basic reliefe

1543        remedies

1544

1545        09-04-2020 1:05 pm Appointment Description Send patient a communication form

1546        notifying them of negative results

1547

1548        Submitted Date:09/30/20 20 Name: GREGORY MARLOR: Need tested again for covid

1549

1550        Submitted Date: 09/30/20 05:30 Name: GREGORY MARLOR

1551        Because no one wants to be sent to the hole and isolated reports of symptoms of covid are

1552        not being reported! At least 13 people on the bottom tear have symptoms and another 4 to

1553        6 on top tear

1554

1555         Even though the test results were negative, the Plaintiff wanted to attribute his ghost

1556   symptoms to COVID. His frustration grew trying to communicate to medical symptoms that were

1557   new to him, hard to describe, and evolving. Medical staffs' predisposition of an institutional

1558   demeanor towards inmates and treating exaggerated ailments, the Plaintiff seeking treatment for

1559   his chronic ailments, trying to have his back evaluated for his new back injury, and coupled with the

1560   Plaintiff trying to communicate several different mysterious symptoms that were confusing and

1561   unknown to him; medical developed an obvious and undeniable negative and bias attitude towards

1562   him. This bias attitude shows when he attempts to move back into MHU to avoid contracting the

1563    disease and medical communicates that he has been trying various ways to move back into medical

1564    because he is lazy.

1565

1566        09-15-2020 3:51 pm Appointment Description per IRF - wants the ACJ to fill Humera

1567        Suffering from the affects of arthritis!

1568

1569        09-22-2020 10:52 am - Clive, MD, S. : please task admin to communicate with the

1570        judge/legal to see if a decision about his suspension can be made. If the patient is to remain

1571        in the jail, then we will need to start the process to see if we can get humira at discounted

1572        pricing.

1573

1574        09-23-2020 1:20 pm Appointment Change Note Pt. jury trial not set to start until 12/1/20.

1575        Will task Medical CM to look into discounted pricing options for Humira

1576

1577

1578        A hearing was held on September 23, 2020, where the Defendants perjured themselves by

1579    misremembering or omitting facts, withheld exculpatory evidence; and consequently, for the

1580    Plaintiff, the Court found that suppression was not warranted. After the Court's decision, the

1581    Plaintiff insisted on retaining an investigator to contradict Deputy Kastler's statement in his report

1582    that the property owner had been contacted the night of his arrest. The Plaintiff also wanted him to

1583    speak with "Taz" about the circumstances that sent him to the nursery, and to speak with "TJ" the

1584    sister of "Taz" who was in distress and needed a ride, his sole motivation sending him to Aloha

1585    Gardens. Mitchell Aguilar, the Plaintiff's first paid attorney, said he had tried to get a hold of Taz but

1586    he could not find her.

1587

1588        The Plaintiff's three-week stay four months prior was not long enough to form an opinion of

1589    Ada County Jail's medical staff. However, when there was an uprising in dorm 6 over new inmates

1590    arriving and the thoughts they had not gone through quarantine, a select few inmates took a stand,

1591    and it did not take long before deputies filled the dorm, and the inmates were taken to a more

1592    secure housing unit. The Plaintiff did not think one way or the other until three medical personnel,

1593    three sergeants, and two lieutenants entered Dorm 6 to convince the inmates of the procedures that

1594    had been implemented. The CDC set guidelines and mandates to prevent the spread and contraction

1595    of Covid and a 11-day quarantine had been implemented as a precautionary since before June. The

1596    problem was the Plaintiff spent 4 days in medical North and then transferred into HSU. The Plaintiff

1597    knew that Ada County Sheriff's Jail, medical and security was appealing to the masses and not

1598    truthful when stating everyone booked into the jail was quarantined.

1599

1600        In addition to Ada County Jail Medical treating his chronic conditions, a reinjured back, and

1601    trying to communicate symptoms from an unknown source that were evolving and worsening;

1602    especially after contracting COVID a second time, he was now subjected and labeled an inmate

1603    hypochondriac. NP Bigford implies he wants to go back to medical because he is lazy, "These

1604    symptoms could be the result of malingering." The Plaintiff contracted COVID shortly after asking to

1605    be moved back to HSU and by the time he was tested, the results came back negative or gave a false

1606    negative. He described his mystery symptoms in detail and at first were a constant and confusing

1607    nuisance but after being infected a second time the symptoms were more defined and intense.

1608    Starting in the morning and progressing throughout the day, some days worse and some not as bad,

1609    the symptoms were always persistent and constant; he was in distress and obviously miserable to

1610    everyone but the medical staff. Sometimes he would be in zombie state and be out in the middle of

1611    the dorm and start crying with confusion, frustration, fear, and overpowering and debilitating

1612   physical and mental symptoms. The Plaintiff was in a vicious cycle where he had no control and not

1613   only did the long COVID symptoms plague him for years to come; he developed PTSD.

1614

1615       10-01-2020 11:30 am - Bigford, NP, B. : Please task admin to review pt's chart. It is my

1616       recommendation the pt be medically released/transferred out of Ada County Jail due to

1617       being high risk (being on Humira) for COVID-19 complications

1618

1619       10-01-2020 11:30 am - Bigford, NP, B. : I had a very frank and lengthy discussion with the pt

1620       on notifying medical when symptoms start so as not spread COVID if he has it. Since

1621       symptoms started 5 days ago and these symptoms are similar to the ones in early

1622       September when he tested negative for COVID, I will hold off on rehousing the pt. I

1623       encouraged him to encourage others who are sick in his dorm to f/u with medical.

1624

1625       10-03-2020 8:13 am - Bigford, NP, B. : ***Bigford: Pt test results for COVID are POSITIV

1626

1627       10-03-2020 3:23 pm - Carranza, RN, B. : NOTED- Carranza, RN ***admin has been contacted

1628       regarding situation, Pt was moved to HSU dorm***

1629

1630

1631       When the Plaintiff's negative test results for Covid came back; his stress elevated with not

1632   knowing what was causing his troubling medical issues. The Plaintiff's health was declining and

1633   with normal vital signs or outward red flags, frustration resonated and with knowledge of medical

1634   and securities deception there was no trust.  To alleviate discomfort and manage his pain he

1635   submitted a medical request for an additional mattress and blanket and was denied and treated

1636   with high-dose, over-the-counter medications. He submitted a request for remedial solutions

1637    several times and even with his documentation for a new back injury, his incomplete paralysis for

1638    an old back injury, and confirmed rheumatoid arthritis, he was denied an extra mattress and

1639    blankets. Medical not issuing an extra mattress and blankets subjected the Plaintiff to needless pain

1640    and suffering for the eleven months of incarceration. He was told you had to be over the age of 65

1641    or have documented ailments. He submitted another request to medical in November for his back

1642    and RN Jane Doe informed the Plaintiff that Dr. Clive was not going to give him a referral for his

1643    back until they received the records from Primary Health. He informed the RN he signed a release

1644    back in June and she looked it up and no request had been submitted to Primary Health.

1645

1646        Submitted Date: 10/13/20 12:40 Name: GREGORY MARLOR Summary of Request and

1647        Symptoms: Medical neglect; I've been in ACJ for over 4 months and have given Dr. Clive and

1648        the rest of the medical staff here, medical referrals from an outside doctor which state I

1649        need to see an orthopedic surgeon and a neurologist! Not to mention the fact that I have

1650        released medical records to Dr. Clive which shows the study of my back & giving the reason

1651        for said referrals! Furthermore, you have my records from my rheumatologist that

1652        prescribed humara which I've taken since 2014 and I have received NOTHING! I've

1653        requested an extra mattress and blankets to alleviate the pain as a sort of secondary

1654        measure, but they have been denied! I requested to be moved to an area of high risk

1655        inmates to prevent contracting covid-19 and was denied. I have since contracted Covid. You

1656        have literally done nothing in regards to my medical problems. You need to do something

1657        immediately.

1658

1659        Reply: 10/15/20 10:22 Michael Brewer Do you want to see Dr. Clive to discuss this? O

1660        therwise this can be referred to the grievance system.

1661

1662

1663      10-15-2020 11:34 am Appointment Description The manufacturer of Humira (myAbbVie)

1664      does not offer assistance to incarcerated patients.

1665

1666

1667      10-20-2020 11:56 am - Clive, MD, S. : Please inform the court/judge for his hearing that the

1668      patient needs to be started on a medication that will suppress his immune system.

1669      Furthermore he has chronic issues with his back and healthcare needs that could be more

1670      easily managed out of a jail setting. It is our impression that he would be safest being

1671      released from jail if this is feasible and appropriate. If the patient is still in jail next week,

1672      please start HUMIRA 40MG/0.8- Inject 1 pen SC Q7 days X 4weeks

1673

1674      10-27-2020 10:44 am - Cummings, RN, A. : See form. pt tolerated blood draw. Pt also stated

1675      that he had court yesterday and did not get out so he would like to start Humira as

1676      discussed with Dr Clive. See sick call 10/20. Med room Nurse Dean has been informed to

1677      order medication.

1678

1679

1680      Appointment Description IRF- Pt is requesting Ortho and Neurologist Doctor appointment

1681      11-04-2020 11:09 am Note PC to Monica at PHMG - Garden City: Monica reports ROI was

1682      received and records were faxed same day (8/04/20). Monica will refax records. Confirmed

1683      HSU's fax number. Will task NP Conn when records are available

1684

1685      At the same visit, he requested forearm crutches, and she informed him that the jail would

1686 not purchase medical equipment, that all medical equipment was donated. The Plaintiff then

1687    requested a search for an online vender so his mother could purchase them and ship them to the

1688    Jail. The Plaintiff submitted several requests for shoes with no heals but they were denied and when

1689    he saw inmate workers wearing their personal shoes, he requested his shoes without the laces and

1690    was adamantly denied by RN Jane Doe, RN John Doe, Dr. Clive, and Sergeant John Doe.  The

1691    Plaintiff's disability only allowed him to utilize forearm crutches when in conjunction with flat-

1692    footed shoes. The Plaintiff was concerned because he was confined to a wheelchair and was

1693    experiencing muscle loss. He communicated his concerns saying if he did not receive shoes that

1694    allowed him to exercise his legs that he was going to be confined to a wheelchair the rest of his life.

1695    He requested and was denied flat heel shoes, his request for his personal shoes without laces was

1696    denied, his request for Velcro flat heeled shoes were denied, PA Jane Doe denied purchasing

1697    forearm crutches but approved mother sending in forearm crutches, and four months after having

1698    his forearm crutches at his bunk, Dr. Clive denied them. Dr. Clive's approach to addressing the

1699    Plaintiff's medical needs were to deny, deny, avoid, defer, lie, and then after the Plaintiff pointed out

1700    Dr. Clive's discriminatory denial of his medical forearm crutches he had at his bunk for over 5

1701    months, medical staff attended a visit to oversee the appointment and Dr. Clive conceded to the

1702    Plaintiff's cries to address his disability and his need for shoes and said, "We will have you

1703    evaluated by a physical therapist and follow their recommendations." The plaintiff never met with

1704    anyone concerning his disability of incomplete paralysis. For Dr. Clive to deny the Plaintiff basic

1705    medical need to address his physical disability shows his inability as a whole to deal with the

1706    Plaintiff's chronic and new medical needs. He was willing to submit to the Court and Jail

1707    Administration that it would be safer if the Plaintiff was released from ACJ but would not approve

1708    extra blankets, mattress, seek medical attention for his post-COVID symptoms, or approve his street

1709    shoes. However, if someone has a size 13 shoe and the jail cannot supply jail issues shoes then they

1710    make an acceptance for the inmate and he is issued his street shoes?  Further, Dr. Clive informed

1711    the administration and the courts their recommendations for release but it was not until October

1712  20, that he informs them of his RX and it suppressing his immune system. He says, "... patient needs

1713  to be started on a medication that will suppress his immune system." He was not going to be

1714  started, he had been taking it since 2014 and shows that there should have been a sense of urgency

1715  prior and after the Plaintiff contracting COVID and not coding his requests #5.

1716

1717      Please meet with patient to assess need for special shoes, second mattress and forearm

1718      crutches. Thank you. per IRF - I'm experiencing vision problems eyes

1719      open, closed, in both eyes! Circular blurry crystal like shape! Started out small and has

1720      grown but hasn't gone away like of has in the past! In the past its seemed

1721      to get lager and move from the left to the right! Very concerning but like my other problems

1722      I don't expect medical to do anything about It

1723

1724      12-17-2020 4:26 pm - Clive, MD, S. : Pt has completed 30 day supply of Humira. Do you

1725      want to order again? The cost is $10,577.

1726      12-17-2020 4:26 pm - Clive, MD, S. : yes, please provide him another month of Humira

1727      12-18-2020 2:15 am - Catherman, LPN, C. : Noted

1728

1729      02-01-2021 3:36 am - Leishman, RN, J. : Pt. reporting dizziness, tingling in fingers and pain

1730      in lower right leg. Clinical Notes: Pt. reports being very concerned about

1731      the "neurological symptoms that I am experiencing." Pt. c/o seeing movement in "slow

1732      motion." Pt. c/o "hearing and vision amplified"--pt. clarified by stating that he

1733      is sensitive to light and sound. Pt. c/o confusion, dizziness, diaphoresis, numbness in fingers

1734      bilaterally, and cramping in RLE. Pt. reports not "feeling like eating" d/t

1735      symptoms. Pt. states these are the same symptoms that they were seen for last week. Pt.

1736      reports symptoms worsening after taking 500 mg of Tylenol this evening.

1737

1738    02-02-2021 2:09 pm - Clive, MD, S. : the patient has increasing symptoms. His primary

1739    concerns are regarding changes to his vision. The patient is already

1740    scheduled with ophthalmology. I do not feel that the description of his problem is consistent

1741    with a mechanical issue related to his previously noted pituitary mass,

1742    however it will be valuable to have their insight. Depending on their recommendations, it

1743    may be prudent to schedule the patient with neurology. I will wait and see

1744    their recommendations before scheduling this.

1745

1746    02-09-2021 11:09 am - Clive, MD, S. : dizziness and visual changes Per IRF: Pt requesting

1747    medical attn for pituitary and thyroid issues. Reports Cimetidine does help

1748    sometimes. per IRF - The antacid pills help alleviate some of my vision problems but have

1749    noticed spells of dizziness! Again I'm very miserable and medical need to

1750    address these issues! Dr Clive said it would take a long long timemt get me into a

1751    neurologist! This is unexceptionable especially given the fact its been known that

1752    I've had an oversized gland for month and I've been experiencing these neurological issues

1753    since I had COVID-19! Over three months! Maybe a connection I don't

1754    know I just know I'm miserable and need medical attention that I can't get because I'm

1755    incarcerated! If I was on the streets I'd go to the emergency room!per IRF - I

1756    having a hard time processing thoughts became my ears ringing so loud and my eyes are

1757    out of focus! Dizzy and confused from systemsm! Just miserable and

1758    Tuesday to see Dr Clive in the condition I'm in is unreasonable! The patient is again seen for

1759    his persistent complaints of dizziness and tinnitus and visual changes.

1760    The patient reports that his symptoms are profound enough that it causes him to get

1761    distracted at times. The patient reports that his symptoms are worse at night. He

1762    attributes the symptoms to his pituitary mass. He denies any fevers or chills. He denies any

1763    numbness or weakness of the extremities. He denies any true confusion

1764    or disorientation

1765

1766    02-09-2021 11:09 am - Clive, MD, S. : vertiginous symptoms which have been pronounced

1767    since his episode of Covid. however the patient does also have a history

1768    of a pituitary mass, therefore I do feel that it is prudent to refer him to see neurology to

1769    confirm that there is no sign of a central disorder causing this.

1770

1771    02-11-2021 3:02 pm - Clive, MD, S. : IRF"I need to have shoes sent in because I can't walk

1772    with the ACJ issued worker shoes! They are too heavy and have a

1773    heal! I've lost almost all my muscle in my legs and if its not too late already I'll never get out

1774    of this wheel chair! I heed to have some light weight scare border

1775    shoes sent in! Vans or DCs! I have a pair of DCs on property and if they make an acception! "

1776

1777    02-11-2021 3:02 pm - Clive, MD, S. : please inform the patient that we only have the two

1778    shoe options in the jail. He can only use one of those unless he has

1779    prescription footwear from outside.

1780    02-11-2021 4:02 pm - Heath , RN, C. : --noted, C. Heath

1781

1782    02-12-2021 4:28 pm - Bigford, NP, B. : f/u code call yesterday for dizziness and fall The

1783    patient presents for follow-up For a fall from yesterday. Patient states he

1784    was in his bed and fell out of it because he was so dizzy. Patient was moved down to HSU

1785    but demanded to leave as "they don't do anything for me there". Patient's

| 1786 | current complaints are related to his chronic issues of dizziness. He recently seen an |
| 1787 | ophthalmologist and is waiting to see a neurologist. He requests the Ada |
| 1788 | County Jail Goes on to Amazon or vans websites and purchase him skater shoes with a |
| 1789 | Velcro top or a referral to be fitted for orthotics shoes. He states "I don't |
| 1790 | want special treatment, I just want better shoes." |
| 1791 | |
| 1792 | 02-12-2021 4:28 pm - Bigford, NP, B. : After recent reviews of long term COVID issues, and |
| 1793 | speaking with a local pathologist, there may be some evidence to low |
| 1794 | levels of Vitamin D, Zinc, B-12 and other vitamin deficiencies. I'll draw these labs as a |
| 1795 | workup to the pt's dizziness. I've discussed with him if his dizziness continues |
| 1796 | to the point he is falling and codes are required to activate, then he will need to be housed |
| 1797 | for an extended period of time in HSU. |
| 1798 | |
| 1799 | 03-02-2021 2:03 pm - Clive, MD, S. : I do not feel that there is any significant likelihood that |
| 1800 | his lightheadedness is secondary to any cardiac pathology. The patient |
| 1801 | is scheduled for MRI. The patient reports that he wants to start walking and exercising. He |
| 1802 | however does not want to use any of the shoes that have been provided |
| 1803 | for him. He became rude and antagonistic when I reported that he would have to choose |
| 1804 | from the different shoes options that he already has. The deputy ended the |
| 1805 | discussion. I later was informed that the patient told the provider at his outside |
| 1806 | appointment today that he had injured his back before he came into the jail. |
| 1807 | |
| 1808 | 03-02-2021 2:03 pm - Clive, MD, S. : please released to the general population Please give |
| 1809 | him his next dose of Humira |

1810    03-03-2021 7:26 am - Conn, NP, J. : ADALIMUMAB 40mg/0.4mL One injection SQ once

1811    weekly x 90 days.

1812    Discussed with J Conn- will order 1 dose for now/2021-03-03 10:08:22/Dean, L., RN, CCHP,

1813    L

1814    03-23-2021 11:31 am - Clive, MD, S. : Please meet with patient to assess need for special

1815    shoes, second mattress and forearm crutches. Thank you. per IRF - I'm

1816    experiencing vision problems eyes open, closed, in both eyes! Circular blurry crystal like

1817    shape! Started out small and has grown but hasn't gone away like of has in

1818    the past! In the past its seemed to get lager and move from the left to the right! Very

1819    concerning but like my other problems I don't expect medical to do anything

1820    about I I explained to the patient that I am referring him to neurology for his visual

1821    problems. We then started to speak about his orthopedic issues. The patient again

1822    is pressing to have different shoes provided for him. The patient then started talking about

1823    how he had been moved out of his previous dorm and then back again

1824    and was very angry about this. He then simply set "are we done"

1825

1826    03-23-2021 11:31 am - Clive, MD, S. : the patient's condition does not seem to have changed

1827    significantly. His neuro complaints are somewhat concerning, hence I

1828    am hoping that he can get in to see neurology. I tried to again discuss her options regarding

1829    foot wear. The patient was rude and short with me.

1830

1831    03-04-2021 2:00 pm - Pickren, LCSW, S. : Follow up after Dorm 6 debrief to assess for

1832    additional needs. Pt. seen in the clinic. He explains that he feels he is not

1833    getting the help he needs in the jail. He says he has post Covid sxs and would like to be

1834    transferred to a post Covid community clinic. He is extremely upset about his

1835      perception of not getting help. Pt. proceeds to describe multiple health issues and sxs he is

1836      having. He reports he had injections in his back two days and describes

1837      how frustrating the process was to get the injections approved. His emotional distress is

1838      validated and normalized as being upset when you disagree with a medical

1839      decision can be frustrating. Pt. presents as loud and angry. He is offered brief supportive

1840      therapy and encouragement. Discussed coping skills he may want to use in

1841      the jail but pt. is quite resistant to this conversation. His chart indicates that he has been

1842      seen by medical staff frequently, including regular appointments with Dr.

1843      Clive, and several visits to outside providers. Encouraged pt. to continue to discuss his

1844      medical issues with the medical staff. He denies SI.

1845

1846

1847      The Plaintiff started evaluation on back injury for his fall February 1, 2021, at the Spine

1848 Institute of Idaho. He was scheduled to receive a steroid injection into his back on March 3;

1849 however, he was adamant that he was not going to the procedure because any medication he

1850 ingested agitated his Long Covid symptoms. RN Leishman, RN told the Plaintiff that Dr. Clive is not

1851 going to be open to any treatment if you refuse to go. Prior to the procedure, he voiced his concerns

1852 to the physician performing the procedure and he was assured that the steroid he was receiving

1853 would not agitate any symptoms stemming from Covid, if anything, it would help that they were

1854 using it to treat some of the patients suffering from Covid.

1855

1856      Leishman, RN - Pt. states he is refusing the injection and will not take any new medications

1857 until he knows why he continues to "eyes are out of focus, ears ringing, and all of the other

1858 symptoms that I have complained about for several months now."

1859

1860   Because of treatment from medical staff and more pacifically Dr. Clive, and all the mental

1861 anguish of helplessness and physical pain the Plaintiff had suffered, he had resulted to reaching out

1862 to the medical professions he was seeing to get a referral to the Covid Clinic. The Plaintiff had a

1863 follow up visit stemming from the procedure to his back, and after covering his back procedure, he

1864 asked the physician if it was possible to give him a referral to the Covid Clinic and he said no

1865 problem. The plaintiff was taken to medical where he was placed into the coldest cell in the jail for a

1866 test where his urine is collected for 24 hours to check his pituitary gland. When he was transferred

1867 to medical none of his long johns or extra clothing, he had acquired from commissary made the trip

1868 and consequently he suffered from freezing temperatures the whole time in that cell. Sometime

1869 afterwards, the Plaintiff was speaking with medical personal, he was told that the test where he was

1870 transferred to North Medical could have been performed in his dorm, the only requirement is that

1871 his urine had to be kept on ice, and they could have put a die in it, so inmates did not utilize the ice

1872 being used. The Plaintiff sees this as retaliation and cannot think of any other reason he was

1873 subjected to this kind of treatment. When the Plaintiff met with a neurologist to discuss his thyroid

1874 and pituitary gland, and the results of several tests, the doctor concluded neither the pituitary gland

1875 nor thyroid tests results were of concern and agreed, he was suffering from post-Covid symptoms.

1876 The Plaintiff then asked the neurologist for a referral to the Covid Clinic, and he said no problem.

1877

1878   Medical staff started to document the Plaintiff's issues as if trying to protect themselves

1879 from future lawsuits and his complaints had not deviated. These notes were significantly different

1880 in what he was reporting and communicated in his kites to medical. His requests for shoes, COVID

1881 symptoms, back injury, and his fall are all charted, depending on the medical staff entering

1882 information in his charts, but misrepresenting what transpired or the documentation would be out

1883 of place and act as if his requests were not medical related. For instance, the Plaintiff fell

1884 unconscious and woke up on the floor causing him a goose egg on his head and medical staff was in

1885    his tier already on a code, they took his vitals and everything was fine so they escorted him to

1886    medical dorm but he insisted he go back to his dorm. In fact, he filed a grievance because he knew

1887    the inmates deep cleaned the dorm cell he was in every four days but he noticed the toilet was

1888    yellow with urine and it smelled horrific. He asked how long the longest person had been in there

1889    and he got seven days. He then stated that meant this place has not been deep cleaned in over seven

1890    days?  He filed a grievance when he got back to the dorm. Medical was indifferent to everyone's

1891    medical needs, unless an inmate was in a seizure or heart attack.

1892

1893

1894

1895    02-12-2021 NP, B. Bigford-"f/u code call yesterday for dizziness and fall The patient

1896    presents for follow-up For a fall from yesterday. Patient states he was in his bed and fell out of it

1897    because he was so dizzy. Patient was moved down to HSU but demanded to leave as "they don't do

1898    anything for me there". Patient's current complaints are related to his chronic issues of dizziness.

1899    He recently seen an ophthalmologist and is waiting to see a neurologist. He requests the Ada County

1900    Jail Goes on to Amazon or vans websites and purchase him skater shoes with a Velcro top or a

1901    referral to be fitted for orthotics shoes. He states "I don't want special treatment, I just want better

1902    shoes."

1903

1904    02-12-2021 Bigford, NP, B. - "After recent reviews of long term COVID issues, and speaking

1905    with a local pathologist, there may be some evidence to low evels of Vitamin D, Zinc, B-12 and other

1906    vitamin deficiencies"

1907

1908    03-02-2021 Dr. Clive – "The patient reports that the problem was actually not from his

1909    chest, but rather the same issues with lightheadedness that he has had for some time. He

1910  cknowledges that these episodes are likely panic attacks that worsen his symptoms. The patient

1911  reports that the symptoms are worse later in the day and particularly after a meal. The patient's

1912  second issue is that he would like to get his next dose of Humira. He reports that his arthritic pain is

1913  such that he understands the risks of it and still wants medication. the patient's final issue is that he

1914  still insists that he be given other shoes."

1915

1916  03-02-2021 Dr. Clive – "The patient reports that he wants to start walking and exercising.

1917  He however does not want to use any of the shoes that have been provided for him. He

1918  became rude and antagonistic when I reported that he would have to choose from the

1919  different shoes options that he already has. The deputy ended the

1920  discussion. I later was informed that the patient told the provider at his outside

1921  appointment today that he had injured his back before he came into the jail."

1922

1923

1924

1925  The Plaintiff went to medical on February 7, 2020; Super Bowl Sunday. That's when the

1926  nurse told him she had reviewed his charts, and she had the exact symptoms he had been struggling

1927  with and that she was advocating for him to go to the COVID clinic. Yet Dr. Clive and other head

1928  nurses disregarded her advocating to go to the clinic and purposely were charting his symptoms as

1929  other issues. Further, as the charting states, "He states, "I don't want special treatment, I just want

1930  better shoes." This could not be further from the truth. The Plaintiff was specific that he could not

1931  utilize the shoes they issue inmates. The slip-on shoes would not stay on his feet and the diabetic

1932  shoes have big heals and he cannot use any shoes with heals because his foot turns to the side;

1933  further, they were too heavy. Then in Dr. Clive's charts he states, "The patient reports that he wants

1934  to start walking and exercising. He however does not want to use any of the shoes that have been

1935     provided for him. He became rude and antagonistic when I reported that he would have to choose

1936     from the different shoes options that he already has." He states the Plaintiff was "rude and

1937     antagonistic." For months he had been reporting his disabling symptoms and then he was trying to

1938     get shoes to exercise but he was being lied to, put off, ignored, and treated like a nuisance.

1939

1940         Sometimes the Plaintiff resulted in focusing on seconds at a time to endure his medical

1941     tribulations of Long Covid symptoms. Doing this in jail when medical staff would not listen, were

1942     bias, symptoms were unknown, and fighting a case where the jailers adorned the same uniforms as

1943     Defendants was torture. When in person; medical staffs' conversations and responses were

1944     degrading, dehumanizing, distain, and only one time did the Plaintiff perceive he was going to

1945     receive medical attention for Long Covid; however, her advocating for a real doctor were ignored.

1946     Lower positioned medical staffs were resulting in desperation to help the Plaintiff in finding some

1947     relief and while being escorted to medical a deputy informed the Plaintiff; he was prescribed a

1948     medication that helped relieve some of his Covid symptoms.  The Plaintiff received a prescription

1949     the next day, but unfortunately, no relief was found. The Plaintiff communicated his symptoms

1950     repeatedly but the doctor, medical staff, jail administration, and the Courts were indifferent to his

1951     medical needs. The Plaintiff's resolve from Ada County Medical ignoring his begging and pleadings

1952     was to develop a coping mechanism that suppressed all of hate, anger, frustration, and dislike; his

1953     sanity was tested, and communication was one sided and useless.

1954

1955         "After a better day yesterday today my symptoms are really bad! I am having a hard time

1956     filling out this kite! Vision is blurry, ears are ringing, confusion dizzy and am sick to my stomach

1957     along with being disoriented! I'm a mess, I am having a very difficult time trying to communicate

1958     how miserable I am. Because I was crying the deputy told me the nurse had had covid that she

1959     understands what I was going Throughand had hoped I felt a little better after the nurse

1960    communicated that she had and has the same symptoms and that she believed it was post covid

1961    symytoms! I've begged and pleaded for medical to address my issues!I keep getting the runaround!

1962    I need help! I am miserable!I am Requesting to go to a post covid clinic as the nurse was advocating!

1963    Again please help me I'm miserable! When seeing Dr Clive he said it was going to be a long long long

1964    time to see the neurologist!! He didn't even mention the post covid clinic! Just another attempt to

1965    avoid getting me help! Especially after the nurse telling me she was advocating a reasonable

1966    aremedy for this issue! But still no follow up or through all words no action!"

1967

1968        Reply:

1969

1970        "Mr. Marlor I cam going to refer you to the grievance system about this matter. It seems this

1971        has been addressed many times with Dr. Clive already.

1972

1973        Her response claims his issues had been addressed when in fact the tactics used by Ada

1974    County Jail Medical directly eluded a solution, one proffered by a managing nurse, and were content

1975    that nothing needed to be addressed if his vitals were deemed good. The Plaintiff's ability to

1976    process critical information, or act upon information, did not happen as in being told to go to the

1977    grievance system. He could not process that any further action needed to be taken; he eventually

1978    shut down communication with the medical and started taking out his frustration on this mother

1979    and lawyer. Ada County Jail Medical did not want to address the Plaintiff's medical issues because of

1980    cost. They were cognizant that treatment would set a precedent for treating those who had

1981    contracted Covid in jail. Even with medical staff advocating and wanting to treat the Plaintiff's Long

1982    Covid symptoms, they could not because administration and Dr. Clive was not going to endure

1983    unknown and unprecedented treatment costs. As with the Plaintiff's arthritis injections, Dr. Clive

1984    had him apply for a discount from the manufacturer and after receiving a denial; he approved his

1985    injections. Taking any kind of medication or eating meals that were high in protein exacerbated his

1986    symptoms. The Plaintiff was told several times that if he were unhappy with the medical care he

1987    was receiving, that he could get a furlough and seek medical attention outside of Ada County Jail

1988    Medical. This was a meaningless option because when the Plaintiff's mother tried to schedule an

1989    appointment with his provider, she was told they were not seeing patients in person, that all visits

1990    were conducted virtually. She then scheduled an appointment, and the Plaintiff immediately

1991    informed the Dorm 6 Deputy of the appointment and asked him if he could get with his sergeant to

1992    fulfill the virtual video visit that was scheduled in two days. The deputy told the Plaintiff that he

1993    would confer with his sergeant but instructed him to send medical a kite asking them to facilitate

1994    the visit. The next day the deputy informed the Plaintiff that security was not going to facilitate the

1995    video visit and later that night he received an answer from medical denying the video visit with his

1996    provider and had his mom cancel the appointment. The day after the appointment, he received a

1997    written response from medical stating they had called his provider on the day of appointment, but

1998    the visit had been canceled. The Plaintiff constantly worried about his debilitating symptoms and

1999    Ada County Jail Medical continued neglecting and treating him, consequently causing him PTSD;

2000    deemed cruel and unusual punishment.

2001

2002      Submitted Date: 11/08/20 22:19 Name: GREGORY MARLOR

2003      When I visited the PA last week she looked up the release of info for my back study. This

2004      was never received by Dr. Clive and I want to know how Dr. Clive gave a referral to admin

2005      when he hasn't even seen the back study in the first place? I need to see a neurologist and

2006      an orthopedic surgeon as per the Dr. from primary health due to pain and nerve damage.

2007      You people need to do something its been months and you are willfully neglecting my

2008      physical health needs!

2009

2010          11/10/20 00:47 Elma Calara Staff Response Your request has been forwarded to our

2011          Provider for review.

2012

2013

2014          Submitted Date: 11/25/20 14:51 Name: GREGORY MARLOR How long is ACJM going to

2015          ignore my health issues when it comes to my back and taking care of the referrals that were

2016          issued last April! I'm in pain and have nerve damage but medical continues to ignore

2017          requests for help!

2018

2019          11/25/20 14:58 Michael Brewer Staff Response You already have a referral to the Spine

2020          Institute of Idaho. However, you must understand that the world outside has delays now

2021          due to COVID. Even the Spine Institute is closed on some days and not seeing as many

2022          patients. Sue to the pandemic many testing procedures are put on hold or delayed. So, we

2023          are not purposely doing anything to hinder you however we cannot force an outside agency

2024          to see patients. faster.

2025

2026

2027          On Super Bowl Sunday after an inmate committed suicide and a deputy the Plaintiff had not

2028  had in his dorm saw that the Plaintiff was in obvious distress; she had worked for the jail for a long

2029  time. She took him medical and finally he spoke to someone that reviewed his charts and knew he

2030  was suffering from post-COVID symptoms. The Plaintiff was in tears while the managing nurse

2031  shared her story filled with mystery symptoms parallel to his and the lengths she went to trying to

2032  find the cause; spending over $12,000.  The managing nurse said that she had a thorough review of

2033  his charts, that the mystery symptoms he had been communicating to medical mirrored her

2034  symptoms, that knowing the battle she had been through and endured, she could not imagine being

in jail and going through what he was enduring. She informed the Plaintiff she contracted the disease twice, had spent $12,000 trying to figure out a treatment to address her symptoms, and finally found relief at the Covid Clinic; she told the Plaintiff she was advocating for him to go receive treatment at the Clinic.

The Plaintiff was in constant medical denial of medical service while in custody at Ada County Sheriff's Jail. While sitting on his bunk he fell unconscious and hit his head and not treated, contracted Covid twice when he had requested to go back to medical HSU where it was safer, medical would not acknowledge his "Long" Covid, contracted strep, months denied RX Rheumatoid Arthritis injections, even after giving medial documentation of his injury to medical in June 2020, he did not receive treatment until the first of February, his requests for an extra mattress and blanket were denied, was treated for chemical eye burns/irritation, and worried while complaining daily from unknown, agonizing, and debilitating post Covid "Long" symptoms. Even after a managing nurse reviewed the Plaintiff's charts and recognized Covid signs from her experiences, her advocating for treatment at a Post Covid Clinic, his treatment and begging for help was ignored; even communicating, "I have trouble moving a peg playing crib." His continued suffering and fighting and enduring the symptoms of Long Covid was a battle, especially knowing how much he begged and pleaded with medical, with his lawyer, and the obvious distress the Dorm 6 deputies witnessed every day, all equating to cruel and unusual punishment; a standard set for those convicted of a crime, not a pretrial detainee.

**Plaintiff was ROR at a Motion for a Furlough Hearing**

At a motion for a furlough hearing, Judge Hippler informed the Plaintiff that he found granted the Plaintiff a release on his own recognizance on May 4, 2021, ending 11 months and 1 day

2060   in Ada County Jail. He was given his crutches that had been in property the entire time and the

2061   forearm crutches his mother had shipped in due to "All medical equipment the jail is donated." As

2062   the Deputy was wheeling the Plaintiff from the Jail, he asked the deputy to call medical to get his

2063   three remaining RX shots for arthritis and Medical Jane Doe said, "No!" As he was wheeled out to

2064   the curb he was overwhelmed with emotions of relief, gratitude, excitement, and joy. However, as

2065   he waited for his friend to pick him up in his car, he realized his car was the only thing he had left.

2066   Now faced with the reality of his situation, in the span of five minutes, those good feelings were

2067   replaced with anger, apprehension, fear, confusion, anxiety, and an unsettling uneasiness. He

2068   suffered a whole array of psychological issues including PTSD, loss of empathy, isolation, anxiety

2069   with law enforcement and doctors, family relationships, female relationships, self-worth, and still

2070   fighting the symptoms of what he had known for a long time, Long Covid. Not only was the Plaintiff

2071   fighting symptoms of Long Covid and an extensive list of physiological problems, but he is also

2072   faced with a new and unfamiliar stage of a disability. When his car arrived, he transferred into the

2073   passenger seat and left the wheelchair Ada County Jail Medical had confined him for his entire stay.

2074

2075          Plagued with the effects of Long Covid, suffering from rheumatoid arthritis symptoms due

2076   to ACJM's refusing to dispense the three remaining RX injections, his health status not allowing him

2077   to make an appointment with his Rheumatologist, homelessness, and deplorable pulmonary and

2078   energy inhibitions; paved the way for the Plaintiff to call 911. The ER doctor ordered imaging and

2079   blood tests resulting in blood clots in the Plaintiff's left leg and right lung. The doctor said by

2080   contracting Covid and confined to a wheelchair the Plaintiff was "predestined" for blood clots.

2081   Pulmonary embolism results in diminishing oxygen throughout the body and therefore rendering

2082   one wanting and can even cause one to lose consciousness. After a week in the hospital, he was

2083   transferred to in-patient recovery/physical therapy. The Covid Clinic cancelled the Plaintiff's

2084   appointment because his status as "resident" meant an ambulance would have to transfer him and

2085    he would be in a bed for the appointment. The appointment with the COVID clinic was cancelled, a

2086    few weeks later he was released from rehab, and even though he was free, he now faced

2087    homelessness. Even though his friend was letting the Plaintiff sleep on his couch, he had to sleep in

2088    his car because of his pain level being so high. When it was tolerable, his friend had to carry him

2089    into their motor home because he had lost all the strength in his legs. The Plaintiff had missed an

2090    appointment with his Rheumatologist not long after his release due to his deplorable health

2091    conditions but scheduled an appointment for the day after his release from physical therapy;

2092    however, while being discharged he noticed some arm and hand dysfunction. He did not think much

2093    about it until around midnight when he had difficulty holding a cup and with signs of a stroke, he

2094    took another trip to the ER where they ran another battery of tests but did not find anything; the

2095    consensus was he was suffering from a pinched nerve in his shoulder and was referred to a

2096    neurologist. When he met with his neurologist, he was informed that he did in fact suffer from

2097    strokes. In fact, the doctor informed him to have blood clots in his left leg and right lung, concluding

2098    he has a hole in his heart.

2099

2100        Since 1985, the Plaintiff lived life with a disability that he was so accustomed to it was

2101    second nature to him. The Plaintiff owned a couple of businesses and after becoming certified for

2102    piloting and wide load flagging, he planned to start another business but now those plans were not

2103    conceivable; at least soon. Due to Ada County Sheriff's Deputies and Jail Medical, Boise County

2104    Sheriff's Deputies, Idaho State Police, and several judicial officials and or lawyers licensed by the

2105    State of Idaho; he might as well be stepping back to 1985 and discovering he was paralyzed. The

2106    Plaintiff has no knowledge of living life in a wheelchair and has no means of transportation to

2107    accommodate a wheelchair. The Plaintiff is now homeless, with no transportation, no

2108    independence, struggling with family relations, battling Long Covid, psychological instability, and to

2109    make matters worse his next older sibling suddenly passed, his sister Deon.

2110

2111          The death of his sister is the first loss of his immediate family and if the loss of a sibling is

2112  not hard enough to deal with, the Plaintiff's inability to travel to Eastern Idaho to attend the funeral

2113  brings guilt and shame and exacerbates an already troubled and fractured relationship with family.

2114  The Plaintiff's two best friends of over 35 years passed while in Ada County Jail and consequently

2115  missed their funerals. Further, his rheumatologist separated him as a patient because of missed

2116  appointments; one after he turned himself into jail, one when he first was released, and the third

2117  when he was in the ER with symptoms of stroke. When the Plaintiff was first released, he visited his

2118  long-time provider and told him that he had not cut his goatee the entire time he was incarcerated

2119  so he could finally get a hair test done to prove he was being drugged by his longtime friend. His

2120  provider said, "I don't even know how to write the order to have that kind of test done." Another

2121  failed attempt to get the evidence he needed to prove that he was being drugged. The Plaintiff's

2122  believes this order needs to come from law enforcement, but Boise County Sherriff's Office was not

2123  going to help the Plaintiff.  His provider gave him one bridge RX for his arthritis but put a hold on

2124  the second and said that when he was able to get an appointment with a rheumatologist, he would

2125  then give him another bridge RX. The Plaintiff tried to secure another rheumatologist in the area

2126  but could not and was even told because he had a history of incarceration, that the doctor refused

2127  to take him on as a patient. The Plaintiff could not find a new rheumatologist and even with his

2128  insurance team working and advocating for him, his old rheumatologist would not take him back. It

2129  was not until 2022 that he was able to find a new rheumatologist in Eastern Idaho; even then, he

2130  was prescribed a steroid and not the RX inhibitor he needed and had been taking since 2014. The

2131  Plaintiff's discomfort prompted another 911 call, and he was taken to the ER because he had spent

2132  hours trying to get into his motor home due to the severe pain he was suffering. He spent

2133  Thanksgiving and Christmas in his rented motor home with no visits from family and truly little

2134  interaction from friends.

2135

2136    The Plaintiff was battling numerous consequences and barriers that derived and manifested

2137    due to his unlawful arrest and imprisonment; most devastating is being enshrouded with the

2138    symptoms of Long COVID and trying to adapt and overcome the barriers he now faced from being

2139    in a wheelchair. Trying to establish a home during COVID was extremely difficult and further

2140    exacerbating those difficulties was the stigma formulated by being in jail and facing drug charges.

2141

2142    **Ada County Sheriff's Office IA and Idaho State Bar**

2143

2144    By the middle of July 2021, the Plaintiff's living situation changed, and he was no longer

2145    homeless and somewhere towards the end of July he filed an online complaint with Ada County

2146    Sheriff's office against the seven deputies that arrested him. The form asks several questions, and it

2147    states that the individual will be contacted by phone or email with the disposition of the complaint.

2148    After a few weeks and no word, he called and filed a complaint with DOJ, who referred him to the

2149    State Attorney's Office, who referred him to Ada County Commissioners, who referred him back to

2150    Ada County Internal Affairs. The Plaintiff left a message, and the next day received a call from

2151    Detective Chip Morgan. Detective Morgan stated that he could not find a complaint and wanted to

2152    know if it was done online or in person. A few more questions and answers, including a case

2153    number, and was told he would call back; twenty minutes later the Plaintiff received a call back. He

2154    said something like asking him to have his lawyer contact the prosecutor so they could, "Talk

2155    lawyer to lawyer stuff..." and then went on to inform him that he would investigate the complaint

2156    and be in touch. The Plaintiff had no idea of how profound his statement, "Talk lawyer to lawyer

2157    stuff" was and the implications it would have for years to come. The Plaintiff remembered

2158    something the next day and called Detective Morgan and he said he was just getting ready to call.

2159

2160        Detective Morgan continued with the Judge suppressed the evidence due to an illegal

2161   extension of the stop, that there were no issues with deputies purging themselves. The Plaintiff

2162   asked if he reviewed the Court's orders for both hearings and he said, "Yes, the Judge found them to

2163   be credible and reliable." The Plaintiff asked him about the other allegations and Detective Morgan

2164   stated, "Sometimes bad things happen. I'm done with my investigation, but the prosecutor said if

2165   you don't like the results, then sue them." He knew that Detective Morgan made no inquiries into

2166   his accusations, other than speak to a prosecutor and read the biased statements in the Court's

2167   findings from the first hearing to suppress; or something would have been done about the blatant

2168   misconduct. He left several messages asking for the disposition in writing, but the Plaintiff never

2169   received a call back on his complaint. On September 27, 2021, he requested the Incident Detail

2170   Report for January 13, 2019, from Ada County Records Department and a few more questions and

2171   implications were made.

2172

2173        The Plaintiff used Idaho State Bar's referral to find representation for filing a tort claim

2174   against Ada County Sheriff's Office. He had misconduct and the State's official dismissal and paid the

2175   $30 dollars and his first referral, Amber Dressler, wanted and received $500 to research his case for

2176   ADA violations against the jail and misconduct by law enforcement. The Plaintiff was in the hospital

2177   with blood clots and then transferred to inpatient rehab due to the terrible health condition due to

2178   the jail's indifferent medical treatment. It was almost two months before Amber spoke to the

2179   Plaintiff about taking his case and the only part, she was willing to take on was the ADA against the

2180   jail. She said his case was time bared and when she said she wanted 30% if there was no trial and

2181   40% if there was a trial; when he informed her that if we were successful then lawyers in the

2182   Federal awarded attorney fees, she said she wanted both. The Plaintiff gave her examples that there

2183   cannot be a criminal case and a civil in litigation at the same time because of conflicting outcomes,

2184   among other case law but at the time he did not have any Idaho case law to reference. He had given

2185  Johnathan Baldauf permission to share his case with Amber and she never saw any of the

2186  misconduct he had on law enforcement. The Plaintiff did not want to separate the lawsuits and

2187  decided he would get another referral and Amber said she would send the referral back to the

2188  Idaho State Bar.

2189

2190       The Plaintiff's next referral was Desiree A. Martin. In actuality he was given another name

2191  but when he called the firm, they said he did not work there anymore, and Desiree handled his

2192  referral. Like Amber, he gave permission to Baldauf to speak to Desiree and disclose his case and

2193  after two months the Plaintiff was in his car and on the way to meet with Desiree and a managing

2194  partner when he received an email saying that she felt the case was not winnable and she did not

2195  want to waste his money and time with a case that she could not win. The Plaintiff emailed her back

2196  stating that a civil and criminal cannot be in the court system at the same time because of different

2197  outcomes and that his case ended in his favor, but she replied that she had made her decision; she

2198  said she would send the referral back to Idaho State Bar.

2199

2200       The next referral agreed that he had a malicious prosecution case, but it would be hard one

2201  to win. He had also given Baldauf permission to speak with her about his case but in the end, she

2202  said she had a conflict of interest with the jail, and she reminded him of the six-month statue to give

2203  notice and said she would send the referral back to Idaho State Bar.  The Plaintiff applied for

2204  another referral, and he was denied. After calling for weeks and leaving several messages he finally

2205  received a response to his email:

2206

2207       Mr. Marlor,

89

2208    We show that you have received multiple referrals for this area of law and therefore we are

2209    no longer able to offer you additional listings. You will need to continue your search using the

2210    internet or other means.

2211    Sincerely,

2212    **LRS Coordinator**

2213

2214

2215    The Plaintiff' was told by his referrals they were referring him back to the Idaho State Bar

2216    and for the LRS Coordinator to proffer that "...received multiple referrals for this area of law..."

2217    should be caused to not allow another referral and does not fall within the Idaho State Bar Lawyer

2218    Referral Policies and Procedures. In fact, denying him another referral on that basis is not listed in

2219    their Policies and Procedures; especially after explaining his referrals had all referred him back to

2220    the Idaho State Bar and the last one could not take the case because of a conflict of interest. It states

2221    several ways and reasons to contact them and get another referral and the coordinator would not

2222    take his calls, return his calls, and in the end her reason is not logical or aligns their Policies and

2223    Procedures. It is inconceivable and is another attempt to deny him access to the courts, due process.

2224

2225    When he was denied access to the referral system, he was denied public service and access

2226    to Idaho's pool of lawyers. Further, the $35.00 fee not only generates a lawyer based on input

2227    criteria and a free 30-minute consultation, but it also guarantees the lawyer is in good standings

2228    with the Idaho State Bar, that they are licensed to practice in Idaho, and carries valid insurance.

2229    California and Oregon have civil centers established to assist pro se citizens in accessing the Courts.

2230    They provide a public service to access the courts for someone who has been injured, as in the

2231    Plaintiff's case, a state agent, acting under color of law injured him. All the Idaho State Bar's

2232    referrals were sent back to the Bar and the last referral agreed with the Plaintiff he had a case for

2233    prosecutorial misconduct, but the State Bar denied him another referral. He left messages, tried to

2234    get help, and was denied access to legal counsel offered to the public. At no time did Idaho State Bar

2235    try to elaborate why he was being denied another referral other than "...received multiple referrals

2236    for this area of law..." Plaintiff believes these tactics and results by Johnathan Baldauf directly

2237    violate the "IDAHO RULES OF PROFESSIONAL CONDUCT" that they are governed to fallow.

2238    Considering that two of the referrals, a law firm, and several other attorneys and legal officials

2239    licensed by the Idaho State Bar desecrated Idaho Rules of Professional Conduct, it comes as no

2240    surprise to the Plaintiff.

2241

2242

2243        These individuals acted in concert to deprive the Plaintiff of his rights found in the

2244    constitution. Even though they might not have known all of the details or may not have entered into

2245    collusion from the beginning, or even been directly involved, at some point they individually signed

2246    on to collectively engaged in the unlawful planning; illegal execution of stopping, seizing, arresting,

2247    and prosecuting of the Plaintiff. When the futility of the Plaintiff pleading guilty is realized, and with

2248    the aid of legal officials Judge Steven Hippler, Anthony Clinger, Johnathan Baldauf, David Lorello,

2249    and Mitchell Aguilar; the conspirators continued with the suppression of law enforcements

2250    misconduct and settled with suppressing the evidence for, "unlawfully extending the stop."

2251

2252        Idaho State Bar's last referral reminded him he had six months to give notice, with that and

2253    even though the notice was not as he envisioned, he gave Ada County Sheriff's Office legal notice of

2254    his intentions to sue. Writing the notice to sue was complicated by Judge Hippler's reason for

2255    suppressing the evidence, that and discovered later, a disposition shielding law enforcements'

2256    misconduct. Because of Mitchell Aguilar, Johnathan Baldauf, Tony Clinger, Judge Hippler and the

2257    Defendants' conspiracy and collusion, the legal officials' involvement was not evident until much

2258    longer down the road. However, as the Plaintiff was writing the notice of intent, he was discovering

2259    more, albeit just scrapping the surface; he added several discoveries to the notice. The Plaintiff's

2260    inability to articulate or process cognitive information and formulate it in writing directly stems

2261    from his Long COVID symptoms. In his notice to sue that he submitted to Ada County Sheriff's Office

2262    covered a good portion of his lawsuit; however, it was lacking several Defendants, the injuries they

2263    caused, critical fundamental issues, and was based on Judge Hippler's findings; "Unlawfully

2264    extended the stop." Further, it did not include law enforcement's conspiracy, dispatcher's

2265    participation, legal officials' involvement, and Boise County Sheriff's lack of investigating or

2266    collaborating in the initial stop. Fighting through symptoms of Long Covid and pressing forward

2267    without legal advice or direction, he continued to search for answers and piece together a colluded

2268    puzzle. While in Ada County Jail the Plaintiff's access to Officer Body Video (OBV) was limited, that

2269    and coupled with his health issues, obscured him from retaining, and evaluating the available OBVs.

2270

2271        The Defendants meticulously planned on two separate occasions to unlawfully arrest the

2272    Plaintiff without probable cause, to prosecute him, and then maintained an influential and powerful

2273    law enforcement backed cover-up that has brought unmanageable, relentless, and damaging effects.

2274    This is evident while searching for representation and establishing a foundation for a case that

2275    focused on the State's dismissed charges that are skewed by the Defendants' conspiracy and

2276    ongoing cover-up and furthered by Court's order following the hearing for Motion to Reconsider.

2277    Two of the State Bar's referrals were not forth coming and did not follow, "IDAHO RULES OF

2278    PROFESSIONAL CONDUCT" when saying he was time barred and did not have a case without

2279    evaluating his evidence. It would have been acceptable to be told they were not interested but

2280    another to be told that he was time barred and or the case did not end in his favor; therefore,

2281    breaking the rules they swore to practice under. The Plaintiff gave several references of case law

2282    showing he was not time-barred and included that the criminal proceedings had to end in his favor

2283 before a civil case can commence; further, criminal, and civil proceedings cannot be litigated at the

2284 same time due to possible conflicting outcomes. Even with the Plaintiff explaining he had damning

2285 evidence of misconduct; he could not get any of the referrals to meet in person so he could go over

2286 the evidence; all three declined an in person meeting. The Plaintiff believes that if he met in person

2287 and they reviewed his evidence then it would be harder for the referrals to deny, he had a valid

2288 lawsuit; they already knew he had a valid lawsuit but for them to represent him would be in direct

2289 conflict with the wishes and interests of their peers.  The Defendants' deep-rooted and powerful

2290 connections seem to surface when he submits his case for representation. He gave permission to

2291 Johnathan Baldauf to discuss his case and the results were the same; either time-barred or your

2292 case did not end in your favor.  He was met with the same results as he continued searching for

2293 legal representation. In order to maintain some sanity, the Plaintiff unknowingly suppressed the

2294 troubling and colluding misconduct the Defendants enacted upon him; he could not function

2295 without some kind of separation. Sometime in early 2022, he met with his new provider and even

2296 though she knew of his medical issues, the eleven months in Ada County Jail, all of the issues he had

2297 with his previous provider, and not being able to find a rheumatologist in the area; her focus was on

2298 his current medical needs, and he unknowingly suppressed his haunting passed.

2299

2300                         **Pieces of the Puzzle Start to Add Up**

2301

2302          Prior to discovering a substantial amount of the Plaintiff's injuries and their causes, though

2303 there were strong indications pointing to collusion and injuries inflicted; they were confusing, and

2304 the bulk of the Plaintiff's injuries remained elusive. The elusiveness was because of not only law

2305 enforcement credentials and assistance by other departments within Ada County Sheriff's Office,

2306 aided in the initial misconduct and cover-up, but more specifically, the involvement of law

2307 enforcement's legal consultants. Further, tactics employed by his legal team Aguilar, Lorello,

93

2308    Baldauf, and in concert with the DA, Anthony Clinger and Judge Hippler; left the Plaintiff in a state of

2309    psychosis and trying to communicate his case left others confused and unsure about his mental

2310    capacity. His little victories turned out to be catastrophic for the Defendants and left an undeniable

2311    course of action where Judge Hippler granted both of his Motions to Suppress and Reconsider and

2312    the eventual dismissal by the State. They would have prevailed if it were not for the Plaintiff's

2313    steadfast determination and unrelenting dedication to endure what the Defendants enacted upon

2314    him; further, rendering the Plaintiff insane from Long Covid and in all sense of the word, giving him

2315    another disability.

2316

2317        In 2023 the Plaintiff slowly started to feel some of his brain fog diminish and improvement

2318    in cognitive abilities. With his reasoning, intuition, perception, and a reduction of brain fog

2319    improving his cognitive abilities; a gradual and steady unveiling of the last few years was

2320    resonating. Not a revelation of a whole event or events but more like an non-systematic assembly of

2321    memories of one thing triggering another memory; an event's clarity helped focus on what another

2322    person said; one after another, this was said then he did that; this happened because of that; why

2323    did he ask him that and that was missed; and even how a discovery or discoveries changed a

2324    person's disposition in the whole scheme of things. The Plaintiff's brain fog was diminishing and

2325    what was suppressed to cope was resurfacing and he started exhibiting other psychological

2326    symptoms; Marlor's PTSD was manifesting and more prominent.

2327

2328        The Courts failed him, prosecution was malicious and indifferent, his lawyers failed him, the

2329    State Bar failed him, Ada County Sheriff's Office IA failed him, Ada County Sheriff's Jail Medical

2330    failed him, State's dismissal failed him, and even the judicial oversight and its process failed him.

2331    The only success in the Plaintiff's life had been the Defendants' cover-up, which included the Idaho

2332    State Bar, and several of their licensees detouring and barring him from accessing the Courts. The

94

2333    Plaintiff was not aware how much he had suppressed to cope and the extent his mental state had

2334    diminished until the beginning of July 2023, when he started having severe headaches. He had

2335    started physical therapy several times but physical injuries, and transportation barriers always

2336    complicated and postponed progress, causing a state of regression; the last time was reinjuring his

2337    back and debilitating headaches. His headaches were so debilitating that all he could do was hold

2338    his head. Imaging was ordered and the only thing found was a small enlargement of his pituitary

2339    gland. This was not the cause of his severe headaches and the only other thing the Plaintiff can

2340    contribute is his brain fog was diminishing and everything he had suppressed to cope was

2341    surfacing. He was reliving a time of unknown symptoms, psychological torture of from the cause of

2342    his symptoms, helplessness, constant pain, and could not get medical to issue extra blankets or

2343    mattress, being denied and lied to by medical staff, constant regression of his physical strength

2344    from being in a wheel chair, standing firm and not taking a guilty plea, and because of COVID, Ada

2345    County Jail was trying to implement exposure by limiting dayroom access; thus, restricted to the

2346    tier with twenty-four inmates, two hour shifts, every day. Further, going through the mental stress

2347    of not seeing family, losing his dog, and the whole time fighting a case where his defense lawyers

2348    were colluding with the judge and prosecutor to get him to plead guilty, added to his troubling

2349    mental state. Moreover, as events surfaced, there was so much that remained an elusive puzzle; it

2350    all became overwhelming and too much and he had to shut and slowly the headaches diminished

2351    until they were gone.

2352

2353        The Plaintiff was thinking over a conversation that took place months before when his

2354    friend had mentioned a lawyer's name, and it dawned on him that he had completed the firm's

2355    screening to represent him in pursuing a lawsuit against the Defendants. Herein lies the problem:

2356    for illegally extending the stop? He could not articulate the charges the State had dismissed and the

2357    confusing connection of the Defendants' misconduct. However, things started to change while

2358   searching his emails from Baldauf for an attachment. The Plaintiff discovers an email, and it

2359   contained the same lawyer his friend mentioned. His friend said Susan Mimura is representing a

2360   guy he knows and is expecting a big payout for misconduct. The Plaintiff reads the email and has no

2361   recollection of ever reading it and his reply is a tantrum about all the things that has gone wrong

2362   with his case. The email from is dated November 29, 2021, and it states:

2363

2364          Hey! Susan Mimura's assistant reached out asking if they could speak to you about the case.

2365          I have zero issue with that, but wanted to check-in with you first before letting them know

2366          that.

2367          Any issue with me letting them know they can talk with you?

2368

2369          There are several concerning factors about this email and the Plaintiff did not have the

2370   capacity to understand or recognize the implications of this email and did not remember it. First,

2371   the Plaintiff contacted the firm and initiated the relationship in hopes of representing him in the

2372   case against Ada County Sheriff's Office. Second, Baldauf was the Plaintiff's defense attorney, and he

2373   needs to have the Plaintiff's permission to disclose any information about his case. As with the three

2374   referrals from Idaho State Bar, the Plaintiff gave permission to Baldauf to speak and disclose his

2375   case file. Last, when the Plaintiff contacted Susann Mimura's office, he answered their intake

2376   questions and after two weeks, he called them back. The receptionist put him on a brief hold and

2377   then told him that the notes on case, say he is time barred. The Plaintiff informed him that was not

2378   possible because he was released from jail May 4, 2021, and again was put on hold. When he got

2379   back on the phone, he said he had talked to someone and yes in fact, she said he was time barred.

2380   He then asked to talk to that individual and the line clicked dead, he had been disconnected.

2381   Thinking he had accidentally been disconnected he called back and as soon as he said who he was

2382   the phone went dead again. The Plaintiff never spoke with anyone other than the intake person and

2383  the receptionist that hung up on him. The email content he received from Baldauf granting

2384  permission to speak to Susann Mimura's assistant was not revisited until the end of the year of

2385  2023, when he was looking for an attachment email. This is when the Plaintiff was able to

2386  cognitively process information because the lingering effects of his brain fog had finally receded,

2387  not completely but enough... The Plaintiff breaks down the email and is at a total loss as to what the

2388  assistant and Baldauf were trying to accomplish by the assistant asking Baldauf if they could speak

2389  to the Plaintiff, then him stating he does not have a problem with it, but wanted to make sure the

2390  Plaintiff is okay with him telling the assistant it is okay to speak with the Plaintiff; especially, when

2391  the Plaintiff never speaks to the assistant and is told he is time barred and hung up on twice.

2392

2393       The Plaintiff set aside law enforcements' vicarious and egregious acts to focus on the legal

2394  officials' strategies, tactics, proceedings, and analogous events and or outcomes since the onset of

2395  his charges. Albeit less conspicuous and resonating from unlikely sources, these legal officials have

2396  controlled almost every facet of his life. Recent discoveries coupled with the Plaintiff's cognitive

2397  abilities returning have allowed him to conclude he had been up against a legal collusion in efforts

2398  to assist and or protect law enforcement. It is hard to ascertain that law enforcement, excluding

2399  Idaho State Police, and legal officials collaborated with each other; but without question, there are

2400  undeniable synchronized legal strategies that were employed throughout the Plaintiff's legal

2401  proceedings. Therefore, one can determine from the results of inactions and actions, various legal

2402  officials had, "a meeting of the minds," and one only needs to review the various aspects of the case

2403  to conclude there cannot be an alternate conclusion. Sometime after entering the judicial system on

2404  charges erected without probable cause, legal officials wanted a guilty plea and were aiding the

2405  suppression of law enforcement misconduct.

2406

2407        When Mitchell Aguilar failed to get the Plaintiff to plead guilty, Judge Hippler granted his

2408    motion to withdraw as counsel. There are valid reasons why judges are reluctant to allow a legal

2409    representative to withdraw as counsel, especially when the hearing being held was for the Plaintiff

2410    to waive his rights to a speedy trial; wasted resources. Because Aguilar failed at numerous attempts

2411    in getting the Plaintiff to buckle and plead guilty to the Defendants' trumped-up charges, he was

2412    replaced by a public defender, David Lorello. This move was win, win, for the Defendants and

2413    showed a clear advantage because the Plaintiff's resources had been sufficiently depleted and

2414    Lorello could stage a good defense while abiding and working towards an end goal of his client

2415    pleading guilty. As soon as Aguilar left the proceeding the Plaintiff asked if it was possible to confer

2416    with his attorney and Judge Hippler said out in the hall where Lorello informed him he had to waive

2417    his rights to a speedy trial. The Plaintiff waived his rights under duress and did not understand why

2418    Judge Hippler gave all of three minutes with his new attorney, before he was made to waive his

2419    constitutional rights. At the next hearing, Lorello informed Judge Hippler that there were good

2420    grounds for suppression and a status hearing was scheduled, three days before Christmas. Later

2421    Lorello informed the Plaintiff that after reviewing the videos, his grounds for suppression were not

2422    as strong as he originally thought. Unfortunately, he missed the next hearing, as the Plaintiff was

2423    rendered incapacitated by his longtime friend. Even after attending all hearings, pleading not guilty

2424    in district court, waiving his rights to a speedy trial, Judge Hippler issues a warrant. Why would a

2425    defendant that is fighting his charges at every juncture miss court on purpose? Before court, he met

2426    with Lorello and gave the reason he had missed court; his friend had drugged him. Lorello stated,

2427    "I'm not telling the judge that!" Even after writing a letter to Judge Hippler and turning himself into

2428    the jail, Judge Hippler orders an additional bond of $45,000, a curfew from 9:00 PM to 8:00 AM,

2429    ankle monitoring at the cost of $230 per month, and UAs that required traveling seventy miles

2430    round trip. Bond is put into place to ensure the defendant makes it to court, is not a threat to

2431    witnesses or the community, and as per the U.S. Constitution, not be excessive; the Plaintiff turned

2432    himself into the jail and missing court was not willful. The Plaintiff missed one UA, he was required

2433    to be back in court, and it took one phone call by Lorello to inform him he had to be in court, and he

2434    was in court.

2435

2436           Judge Hippler, Anthony Clinger, and David Lorello collectively and purposely created and

2437    held court where the Plaintiff's bond would be revoked, and he would have to go back to jail. This is

2438    in efforts to gain a guilty plea and law enforcements' misconduct would be suppressed. The Plaintiff

2439    was in contact with Lorello, he had communicated the issues with Idaho Ankle Monitoring and the

2440    owner wanting to violate him, and he was facing eviction from a landlord who was goal orientated

2441    with Boise County Sheriff's Office to get him to move out of Horseshoe Bend by evicting him. Lorello

2442    communicated to the Plaintiff that it was going to be two months before court was going to be held,

2443    that he was going to have to work things out with his landlord and ankle monitoring. He spoke to

2444    Lorello the first of April and according to iCourt, on April 8th Anthony Clinger submitted a "Motion

2445    to Revoked and Increase Bond." iCourt shows on May 1, 2020, under Miscellaneous: Notice Re:

2446    Zoom/WebEx hearings." Meaning, a notice was sent out by the administrating judge, Judge Hippler,

2447    that court was going to be held on Monday. These three judicial officials colluded and the first

2448    chance they could hold Court, the Monday following Mandated Home Isolation; and as planned,

2449    Lorello did not contact the Plaintiff and video court was held, and the Plaintiff's bond is revoked, for

2450    failure to appear and not complying with community monitoring.

2451

2452           With the Plaintiff's cognitive abilities restored and his severe headaches gone, he could

2453    focus on some concerning facts that surfaced. The file that Johnathan Baldauf gave him with his case

2454    files contained the "Amended Second Supplemental Discovery Request" that was filed with the

2455    Court on January 27, 2021, and then an identical one filed February 10, 2021, that was the same.

2456    However, the second one-filed states, "...more properly align with the requirements of ICR 16 as the

2457    original request was only served in the interests of maintaining the confidentiality of those involved

2458    with this case." The Plaintiff cannot see any difference between the two and is unaware of whom it

2459    is referencing when it states, "confidentiality of those involved with this case." Nevertheless, these

2460    two ICR 16 requests are significantly different from the one the Plaintiff has, and received while in

2461    jail, discussed with Baldauf, and expected to be filed. One must ask why the Plaintiff never saw an

2462    ICR 16 that contained the confidentiality section found in the one submitted to the Court. This one

2463    is distinctly different and includes items that the Plaintiff specifically requested and includes:

2464

2465        #6. Any and all GPS logs of any vehicle responding to that address or any events taking

2466        place at that address on both January 23, 2019 and January 24, 2019.

2467        #7. Any and all logs or recoding of radio conversations/chatter from 11:30 PM on January

2468        23, 2019 to 1:00 AM on January 24, 2019.

2469

2470        If the Plaintiff had received #6 and #7 it would have ended the State's prosecution and the

2471    Defendants' collusion would be evident; legal officials' involvement may have remained oblivious.

2472    When the Plaintiff gave notice to Ada County, he stated that, "Requests by the Defense for Radio

2473    Chatter and Vehicle Position History of the night have produced nothing. Defense's initial request of

2474    all video and audio recording only resulted in obtaining Kastler's, Livas's, and Hessing's OBV's and

2475    Hessing's OBV starts just prior to the Plaintiff exiting his car." In the end, the Plaintiff recognizes the

2476    Defendants' tactics, and they seem small, but in all actuality are huge; and if not enacted, a

2477    conclusion resulting in less damages.

2478

2479        Preceding the Plaintiff's unlawful arrest and the beginning of the State's malicious

2480    prosecution, charges against Taeserae Cavaness, "Taz," were filed in Ada County on March 5, 2018,

2481    for misdemeanor paraphernalia and a felony possession of controlled substance. She had 4 failures

2482  to appear, 3 bond-setting dates, was allowed to posts a $25.00 bond on October 2, 2018; because

2483  she had charges filed on September 27, 2018, in Canyon County for Burglary and Theft-Petit. On

2484  these charges she had 5 bond-setting dates and 5 FTA. On December 28, 2018, her prelim being

2485  waived resulted in bond a reduction and Pretrial Release was ordered for December 31, 2018. On

2486  January 9, 2019, she was arraigned in District Court and jury trial was set for February 25-26. A

2487  plea bargain was reached and resulted in a guilty plea for Theft-Petit with misdemeanor probation;

2488  it was violated on August 30, 2019. In Ada County a status conference hearing was held on February

2489  25, 2019; charges were dismissed by the prosecutor on November 25, 2019. One of the prosecutors

2490  listed is Anthony Clinger, the same prosecutor as the Plaintiff and Taz's first defense attorneys are

2491  listed as public defenders. However, the last three attorneys are listed as private, and this may be

2492  due to the Courts having to go outside the public defender's office because of conflict of interest.

2493  The path the Plaintiff took through the judicial system was in vast contrast to Taz's experience. Taz

2494  testified at the Plaintiff's motion to reconsider, and her testimony was that she had never spoken to

2495  law enforcement, and she sent the Plaintiff to Aloha Gardens to pick up her sister who was without

2496  "heat and electricity" and give her a ride. Her sister had passed before the hearing, so none of her

2497  testimony can be discredited. However, the Plaintiff has given a plethora of information that

2498  implicates she aided the collusion by sending him to Aloha Gardens. Including, she was struggling

2499  judicially, knew the Plaintiff from a mutual friend, even though they had not spoken for over a year,

2500  was able to entice him to a location where law enforcement was waiting for him. To remove her

2501  from the equation would render the actions by law enforcement implausible.

2502

2503    The Plaintiff is able deduce and extrapolate the lengths Ada County Sheriff's legal officials

2504  went in aiding and abetting to conceal law enforcement's misconduct. Further, the Plaintiff is also

2505  able to recognize the relationship and results of Judge Hippler, Johnathan Baldauf, Mitchell Aguilar,

2506  David Lorello, and Anthony Clinger's collaboration that took place throughout the proceedings. For

instance, on page 1 in the subsection #2 of the Judge Hippler's "MEMORANDUM DECISION AND ORDER" it states, "Additionally, Defendant argued the evidence in the case was tainted based on inconsistencies in the dispatch report entries and Property Invoice. However, he conceded that this was not a proper basis for suppression or dismissal." This is an example of Judge Hippler, Anthony Clinger, and Baldauf's relationship to shield and suppress law enforcements' misconduct. Knowing that Baldauf eluded from questioning the Defendants on this subject while Judge Hippler concludes the Plaintiff, "... conceded this was not a proper basis for suppression or dismissal.", is not coherent or align with the Plaintiff's defensive strategy in the case. Further, the property deputy informing the Plaintiff when evidence is submitted, there is documentation known to the prosecutor on their side, that would invalidate the time and date Deputy Kastler submitted the evidence. Those logs were not in the Plaintiff's Discovery and never have been disclosed to the Plaintiff. It is not conceivable that the Plaintiff would remove such damming evidence such as time of entries that provide a timeline that makes it impossible for the Property Invoice to be correct. On page 5 in the subsection in the ORDER he writes:

> "Deputy Kastler testified that at the time Defendant was ordered out of his car, he was
> approximately ten to fifteen feet from the car."

> "At the initial suppression hearing, Deputy Kastler denied that the exit order—or any other
> part of the investigation up until the exit order—was drug related. Rather, he stated that
> they asked Defendant to step out of the car because, "Basically because the information that
> he provided with him not knowing who was there or know of anyone of that nature, that
> person's name, the time of night, we wanted to identify him and pull him out of the vehicle."
> The Court interpreted Deputy Kastler's statement "with him not knowing who was there or

2531        know of anyone of that nature, the person's name. . .," to mean the owner of the property,

2532        who allegedly told officers he did not know anyone named TJ."

2533

2534            The Court wants to interpret Deputy Kastler's statement to imply he was talking about the

2535    property owner telling law enforcement that he did not know anyone with the name of TJ. Deputy

2536    Kastler was asked why they got the "Defendant" out of the car; his response can only be referencing

2537    the "Defendant". Deputy Kastler would have had to specifically mention property owner, otherwise

2538    his statement would not make sense. Deputy Kastler was asked about the "Defendant" and his

2539    answer never deviates, "Basically because the information that he provided", "with him", "wanted to

2540    identify him", "pull him out", and if at any time Deputy Kastler changed from talking about

2541    "Defendant" he could not use a pronoun without first establishing the "property owner." The Court

2542    also omits other important content included in the motion; however, to mention them, law

2543    enforcement's collusion would surface. For example, Sergeant Piccola covering up his camera as a

2544    figure appears by the open door cannot be swept away with, "... was not a proper basis for

2545    suppression or dismissal." Further, Baldauf was content in omitting or never addressing it in the

2546    proceedings. Sergeant Piccola writes in his report, "Deputy Kastler and I were patrolling south Ada

2547    County. We observed a vehicle parked in a closed nursery business, located at 4291 S. Cloverdale in

2548    Boise, Ada County, Idaho. I observed as the passenger door was open and there was a male standing

2549    outside of the car. We turned into the parking lot and contacted the subjects." Baldauf avoids

2550    pinpointing Sergeant Piccola on this statement in his report, because like the Property Invoice and

2551    entries in the dispatch report, once there has been a direct question as to why he did not follow up

2552    with someone being outside the car, there can be no answers given without uncovering the

2553    Defendants' blatant misconduct. Misconduct omitted includes a figure appearing just before and

2554    just after Sergeant Piccola covers up his OBV. Baldauf, even though this is covered in the motion to

2555    reconsider, avoids questioning him about this blatant and crucial misconduct. Baldauf also fails to

2556  ask Sergeant Piccola about the camera he shines his flashlight on and seconds later shines his

2557  flashlight in the storefront window at a sign that reads, "24 HOUR VIDEO SURVAILLANCE." The

2558  Defendants did not want the Plaintiff to know about the available video at the arrest site and that

2559  directly correlates with Sergeant Piccola writing "none" in the field below "Attachments" at the end

2560  of his written report. In addition, Baldauf failed to question Sergeant Piccola on the exculpatory

2561  videos that helped establish and open the door for the motion to reconsider, and was omitted from

2562  the hearing; specifically, Sergeant Piccola and Deputy Porter were not questioned why they did not

2563  disclose their OBVs.

2564

2565       The Plaintiff does not have a copy of the finding from the first hearing but the exit order in

2566  the Baldauf's Motion to suppress cover the exit order for a dog sniff that is disregarded by Judge

2567  Hippler even though it takes place over thirty minutes after the stop. Like the second hearing, none

2568  of the misconduct is covered that the Plaintiff found and what covered, very little was questioning

2569  by Baldauf took place. As the Plaintiff discovered more misconduct he would send an email to

2570  Baldauf but never received an answer; in fact, after the e-mail concerning the assistant, there has

2571  been no communication.

2572

2573       The plethora of misconduct, if not all, is eventually uncovered by the Plaintiff, including the

2574  dispatchers' involvement. A portion of the misconduct became available once the exculpatory

2575  videos were handed over to the Plaintiff, but again, Baldauf failed to acknowledge the misconduct

2576  or question law enforcement during the hearings. From the onset of the Defendants' collusion a

2577  disposition of the Plaintiff pleading guilty was sought after. However, the exact moment Baldauf

2578  decides to shield and suppress law enforcement's misconduct is unknown; but when futility of the

2579  Plaintiff pleading guilty is recognized, legal officials focus on a technicality of his arrest, "Unlawfully

2580  extending the stop," and collectively omits law enforcements misconduct. When Marlor's expert

2581   witness was being questioned by Anthony Clinger, he was getting his information by someone on

2582   his computer, most likely Vincent Montoya. Anthony Clinger instructed Vincent Montoya to not only

2583   produce a partial data dump, but also to testify that he could confirm that Marlor's phone was not

2584   compromised. If this happened, Anthony Clinger would step out of his immunity and holds the same

2585   immunity as law enforcement.

2586

2587        The Plaintiff was enduring pain from a new back injury, an old back injury, medical was not

2588   caring for his chronic needs, suffering from arthritis due to not taking his RX because it acerbated

2589   his Long-COVID symptoms, and his Long-COVID symptoms were so debilitating that he could not do

2590   the math to move and place the peg playing Cribbage; yet out of three lawyers, he is the only one

2591   that discovered any of law enforcements misconduct. Misconduct included; finding missing OBVs,

2592   Sergeant Piccola covering up his camera, deputies falsifying a plethora of evidence, the property

2593   owner not being contacted by law enforcement, and the sign that said "24 HOUR VIDEO

2594   SERVAILANCE," and more.  Even though the Plaintiff had blatant and undisputable misconduct, he

2595   could not find an attorney to represent him in a tort; more, he could not find an attorney to review

2596   of the misconduct.

2597

2598        Judge Hippler states, "Indeed, the Court finds as a matter of law that there was no evidence

2599   that Defendant's cell phone was ever tampered with by law enforcement." The Plaintiff points out

2600   that any information requested or received, existed, or was not destroyed is questionable because

2601   Baldauf and the State's actions are not credible. Detective Montoya testifies that he only received a

2602   partial data dump from the Plaintiff's phone and both Baldauf and the Court cannot grasp how

2603   fundamentally unsound it is for anyone to conclude a computer, "was not accessed" without all the

2604   data. In Anthony Armfield's Declaration to the Court he states, "The data provided seems to be

2605   incomplete. My understanding of GrayKey after researching it is that it should show exactly what is

2606    accessed and what was changed. I am sure that the phone was accessed, but because of the limited

2607    data available...", and then goes on to finish with, "If I had the full download from GrayKey, I believe

2608    I could know exactly what changes were made to the phone..."

2609

2610         If Detective Montoya only received a partial data dump, then his testimony should not be

2611    conclusive and the Court should not state, "Indeed, the Court finds as a matter of law that there was

2612    no evidence that Defendant's cell phone was ever tampered with by law enforcement." At no time

2613    did Baldauf question the validity of the State's witnesses. Especially when the Plaintiff's expert

2614    witness explains, "I am sure that the phone was accessed..." In the files the Plaintiff received from

2615    Baldauf, was Detective Montoya's narrative of the data dump. His narrative explains, "I was able to

2616    conduct a partial file system data extraction from the iPhone." Even though the Plaintiff was able to

2617    find proof his phone was compromised on January 31, 2019; Detective Montoya testified that the

2618    Plaintiff's phone had not been accessed. The Plaintiff can directly disprove Detective Montoya

2619    testimony and has undeniable proof the iPhone, it had only been logged out of the Ada County

2620    Sheriff's Evidence Room by Detective Montoya, had been compromised. When he picked the phone

2621    up from Ada County Sheriff's Evidence Room, the phone was in airplane mode, just as Detective

2622    Montoya stated, however, messages in Messenger had updated to January 31, 2019.  Detective

2623    Montoya also testified, there are only two devices that those messages could exist on due to

2624    encryption messaging used in Messenger by Taz and the Plaintiff; one is the iPhone he examined.

2625    The Plaintiff's phone was in Ada County Sheriff's evidence room and was compromised by law

2626    enforcement on January 31, 2019. If the Plaintiff's phone is so easily compromised under the

2627    control of Ada County Sheriff's Office, then what other evidence has fallen to the will of those

2628    individuals willing to cross the line. The Defendants' storyline in their reports and on the stand

2629    under oath have changed and evolved throughout this case and includes testimony at both

2630    hearings.

2631

2632       Judge Hippler's administrative duties and policies he set before and during COVID, aided in

2633  the furthering of the Defendants' collusion and suppressing their misconduct, while violating the

2634  Plaintiff's rights to a fair judicial process. Judge Hippler's bond and added conditions that were

2635  excessive, violated the Plaintiff's Eight Amendment, and directly caused him to injure his back.

2636  Three days after COVID's home isolation ended, and without notifying the Plaintiff, Judge Hippler

2637  held a virtual hearing and revoked the Plaintiff's bond. The Plaintiff had spoken to Lorello at the

2638  beginning of April, and he said the courts would not be opened up for a couple of months. When the

2639  Plaintiff called his lawyer, Lorello, and asked him why he had a warrant for a FTA, he said he

2640  informed the Court twice, "Marlor had not been notified," but a warrant was issued anyway. The

2641  Plaintiff then asked Lorello why he did not at least let him know he had a warrant, and he said, "I'm

2642  not your f#%$ing secretary!" He then hung up the phone. Judge Hippler, Anthony Clinger, and

2643  David Lorello collectively violated the Plaintiff's due process when conducting judicial proceedings

2644  without notifying the Plaintiff and then willfully disregarded the Plaintiff's medical documentation

2645  of his injury and forced him to relinquish his freedom and subjected him to conditions that were life

2646  threatening; more, disregarding his disabilities that made him susceptible to a deadly disease.

2647  Further, when Ada County Jail Medical's Dr. Clive and managing team recommended the Plaintiff's

2648  release due health risks associated with rheumatoid arthritis and an RX inhibitor that suppressed

2649  his immune system, Judge Hippler, Anthony Clinger, and Jail Administration ignored their medical

2650  recommendations. After testing positive for COVID, the Plaintiff requested a bond reduction and a

2651  hearing ensued. The Plaintiff submitted text messages that showed he was not messing with the

2652  ankle monitor charger, again supplied medical documentation of his new back injury, and Judge

2653  Hippler and DA Anthony Clinger had medical's recommendations for his release but again the

2654  proffered way to get the Plaintiff to change his plea was to keep him in jail; even so much as Judge

2655  Hippler to say, "This is on him."

2656

2657    The Plaintiff was at Ada County Jail, Baldauf was in his office, Anthony Clinger was in his

2658    office, Judge Hippler was in his office, and the witnesses called in on their telephone or joined in on

2659    their home computer for the hearing on the Motion to Reconsider. This format was biased to the

2660    Plaintiff and Judge Hippler is the administrative judge and is responsible, as all judicial officials are,

2661    for ensuring the hearings do not violate the Plaintiff's constitutional rights. After Deputy Kastler

2662    was done testifying it was Sergeant Piccola's turn and when law enforcement is called to testify, has

2663    a subpoena, they are not to be out on patrol and keep the Court waiting, in this instance; he had to

2664    find a safe place to pull over and then called into the video conference. When at any hearing

2665    witnesses are not allowed in the courtroom and able to hear the testimony of other witnesses, and

2666    in this instance, questions that Deputy Kastler was unable to answer, Sergeant Piccola answered.

2667    For instance, Deputy Kastler was unable to answer why his OBV did not catch a person out of the

2668    car, as he told Deputy Livas when she arrived; he said he did not know. Sergeant Piccola was able to

2669    answer the question, why his camera did not catch the passenger outside the car, "We turned

2670    around." However, in his report he writes, "I observed as the passenger door was open and there

2671    was a male standing outside of the car. We turned into the parking lot and contacted the subjects."

2672    Even though the answer met only the standard of possible, as he did with other witnesses, Baldauf

2673    failed to further question Sergeant Piccola on the validity of his answer to avoid a problematic and

2674    contradicting answer; that is, if not omitting a whole subject matter. The Plaintiff believes that

2675    Sergeant Piccola was at the same location as Deputy Kastler and he heard his testimony and as soon

2676    as Deputy Kastler finished, he left and joined the hearing on his phone where he purged himself and

2677    the reason for Baldauf's scaled back questioning.

2678

2679

2680

**42 U.S.C. § 1983**

2681

2682

2683    The Plaintiff believed that equitable estoppel is available due to the Defendants' planned,

2684    acted, and resulted in an unlawful arrest of the Plaintiff, then maliciously prosecuted him all under

2685    collusion and color of law while maintaining a lawful arrest. The Plaintiff's malicious prosecution

2686    may have initiated with individually motivated sheriff deputies from boarding counties; but evolved

2687    to include several deputies, detectives, dispatchers, prosecuting attorneys, and included county

2688    interoffice legal support members. When the Plaintiff did not waver from fighting his charges, an

2689    elaborate, clandestine, legal campaign evolved and operated autonomously but goal orientated; to

2690    oppress, subjugate, tyrannize, and place him harm's way of a disease that was killing millions. These

2691    legal Defendants proffered to maintain law enforcements' covert actions and thus legal officials

2692    licensed by the Idaho State Bar and law enforcement merged. Collectively the Defendants were

2693    willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable and

2694    deliberately indifferent to Plaintiff's rights and liberties, to include his physical well-being. Further,

2695    agencies supporting Ada County Sheriff's Office and the Courts, and profit off defendants; in the

2696    end, appease the courts and were deliberately indifferent to the Plaintiff's rights and liberties.

2697

2698    If the Court finds equitable estoppel is not available, then the Plaintiff points to Idaho Code

2699    5-230 2. Insane: "...that the time limited for the commencement of an action shall not be tolled for a

2700    period of more than six (6) years." In every sense of the word the Plaintiff was rendered "Insane"

2701    and unable to bring forth civil actions against the Defendants and therefore he should retain his

2702    rights to bring action and thus is timely. Further, if there are questions in the Plaintiff's capacity

2703    relating to "Insane", then the Plaintiff relies on Idaho Code 5-236 – Coexisting Disabilities: "When

2704    two (2) or more disabilities coexist at the time the right of action accrues the limitation does not

2705    attach until they are removed." The Plaintiff has documented disabilities, one with incomplete

2706  paralysis of the lower extremities and rheumatoid arthritis, Long Covid and PTSD are three and

2707  four; and therefore, he should retain his rights to bring action and thus is timely.

2708

2709        In the beginning of 2023, the Plaintiff's brain fog started lifting and had some improvement

2710  in his memory but had setbacks through the summer with headaches and PTSD, but by the end of

2711  fall he had made substantial progress in his cognitive processing and memory. During that period,

2712  he was able to discover legal officials licensed by the Idaho State Bar had sought to suppress law

2713  enforcement's misconduct. He discovered the lawyers defending him had signed on to the collusion

2714  and the Defendants utilized the dispatchers to establish and construct an Incident Detail Reports to

2715  produce an end report that looked legal but as the Plaintiff broke down the reports, a collusion's

2716  events are revealed; in addition, he was able to deduce this without the Incident Detail Report

2717  including "Activities" portion of the report from the incident that occurred on January 13, 2019. The

2718  deputies planned to fabricate evidence and unlawfully arrest the Plaintiff in Ada County and to

2719  initiate the stop under the guise of failure to display current tags. The deputies ran his name a

2720  minimum of three times before having the Plaintiff exit his vehicle and then fabricated evidence by

2721  signaling the dog to sit and giving a false positive hit for drugs; they found nothing and the k9

2722  deputy stating before the Plaintiff was arrested eleven days later, "...dog didn't hit on anything."

2723  This discovery prompted a closer look into the Incident Detail Report for January 24, 2019, and he

2724  discovered several occurrences where the dispatcher aided in the collusion to conceal law

2725  enforcement's actions and to further his unlawful arrest. This includes building landmarks or

2726  address reference points in CAD, so the IDR depicts a dispatched unit, K-91 and K-97, at the location

2727  or arriving at the built address and or referencing a cross street, while working this information

2728  into CAD and building the information for the IDR. Specifically, K-91's address when first reporting

2729  the incident and K-97 was already at the incident location when dispatched, but the IDR shows an

2730  address that the dispatcher built in CAD, as to depict K-97 arriving at that location. The unit's

2731    location is filtered into the CAD automatically, unless the dispatcher builds the addresses and then

2732    dispatches the unit, and then the system will default to the address built by the dispatcher.

2733

2734        Not only were Ada and Boise County Sheriff's deputies' acting outside written department

2735    policy and protocol, but blatantly conducting and training new law enforcement deputies and staff

2736    to adhere and conform to unwritten guidelines that include fabricate and maintain unlawful

2737    detentions, illegal searches and seizures to unlawfully arrest defendants; if needed, to purge and

2738    omit critical exculpatory evidence without worrying about reprimand or consequences. If their

2739    proven tactics fail, willing legal officials licensed by the Idaho State Bar, aided in extracting a guilty

2740    plea and covering up any law enforcement misconduct. These unlawful tactics are department to

2741    department wide within Ada County Sheriff's Office and include Idaho State Police and neighboring

2742    Boise County Sheriff's Office and State political agencies and assisting businesses. A complaint filed

2743    with Ada County Sheriff's Office is investigated by their own Internal Affairs Department, that

2744    stands by a code of silence and is protected by unwritten policies found within law enforcement.

2745    Like Ada County Sheriff's Office, Boise Police Department's complaints are investigated by Internal

2746    Affairs but have an Office of Accountability and are implemented to ensure complaints are heard,

2747    investigated fairly, and results are unbiased.  Defendants are a tight nit group and collectively aid in

2748    shielding the collusions and barring individuals, like the Plaintiff, who seek the courts to voice and

2749    address their complaints in effort to make whole, from the injuries caused by those acting under the

2750    color of law. Because of the Defendants' collective arrogance and past success, they mistakenly

2751    underestimated the Plaintiff's willpower and determination to persevere and endure the damages

2752    and hardships of their powerful and far-reaching collusion. The Plaintiff prays to hold all

2753    accountable for their illegal collusion to arrest, prosecute, incarcerate, cover-up, and deny access to

2754    the courts; including the Idaho State Bar, legal officials licensed by the Idaho State Bar, medical

2755    officials, Idaho State Police, and both Ada and Boise County Sheriff's Office. May the Plaintiff's

2756    injuries be not only made whole, but also unknowingly appreciated by the community as an

2757    individual residing or traveling through Idaho, innocent or guilty, charged or not charged, that they

2758    may not endure the Defendants' unconstitutional acts found within this lawsuit.

2759