1  GREGORY R. MARLOR
   528 W. Grove St. Apt 407
2  Boise, ID, 83702
   208-608-0009
3  Marlor1983ada@gmail.com

U.S. COURTS

MAY 2 0 2025

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

4                    UNITED STATES DISTRICT COURT

5                         DISTRICT OF IDAHO

6                        SOUTHERN DIVIDSION

7  PLAINTIFF'S NAME,                    Case No.: 1:25-CV-3-BLW

8          GREGORY R. MARLOR

9  vs.                                  MEMORANDUM TO SHOW UNTIMELINESS IS
                                        IS EXCUSED
10 DEFENDANT'S NAME,

11         ADA COUNTY

12

13         The Plaintiff was released from jail on May 4, 2021, and his charges were dismissed on June 9,

14 2021, and he suffered from severe Long-COVID. In addition to his debilitating Long-COVID, Ada County Jail

15 Medical's neglected his disability of incomplete paralysis and upon release he was wheelchair bound; he had also

16 just had a procedure done at the Spine Institute of Idaho for an injury to his back that occurred in April 2020, just

17 before he turned himself into jail. Further, the jail did not give him his needed shots for rheumatoid arthritis when he

18 was released. The Plaintiff had lost everything except his car while in jail and it became his primary place to live. In

19 June 2021, the Plaintiff was checking into+ a motel and because of his medical issues, he had to contact emergency

20 services where blood clots were discovered in his left leg and right lung. He missed an appointment with his

21 rheumatologist shortly after checking into jail on June 5, 2021, and another appointment after his release from jail.

22 After spending a few days in the hospital to treat his blood clots he was transferred to rehabilitation where he could

23 work on strengthening his legs and trying to manage being in a wheelchair. The Plaintiff made an appointment with

24 the COVID Clinic but because he would have to remain in bed for the visit the appointment was cancelled. After

25 three weeks of rehabilitation, he was released, and he had made another appointment with his rheumatologist for the

26 following day. However, while being discharged he noticed his hand and arm were acting a little strange but did not

27 think much about it until that night when he had problems holding a cup. With stroke-like symptoms he rushed to

28                                          1

the emergency room and after a battery of tests the consensus was that he had a pinched nerve, and an appointment was made with a neurologist. Consequently, he missed another appointment with his rheumatologist, and he was released as a patient. The clinic had been managing The Plaintiff's arthritis since 2015 when the doctor accepted his rheumatologist's referral out of Provo, UT.

It was the first of July when the Plaintiff was able to rent a motor home from a friend but until then he had been living in his car and when his health permitted it his friend carried him into their motor home, and he slept on their couch. He had met with his primary physician and reported his ongoing battle with Long-COVID and that his rheumatologist had released him as a patient. At first, he seemed understanding and even issued Marlor a one-month bridge RX and said that he would give him one more as soon he found a rheumatologist. The Plaintiff's cognitive abilities and memory were a constant struggle, and he asked his insurance company for a case manager to help with appointments and assisting is securing a rheumatologist. The Plaintiff had to go to the ER again with signs of a stroke but again it was determined that his shoulder had a pinched nerve. He finally met with his neurologist, and he was informed that he did suffer from a couple strokes. He also informed him that having blood clots in his left leg and right lung meant that he had a hole in his heart. His search for a rheumatologist did not yield any positive results. He was denied by one doctor on the premises that he had a history of incarceration. His case manager had him meet with a panel of nurses and doctors and a doctor contacted his old rheumatologist to advocate and see if he would accept the Plaintiff as a patient, but the doctor said no. The Plaintiff ran out of his bridge RX and could not find a doctor in the valley that would take him. He had medical care coming to his motor home to treat a wound on his foot, and as it was the trailer had steps and once, he was in the motor home he could get into his wheelchair, but that only made it as far as the hall where he had ten feet length he had to traverse on crutches. It was during one of these trips that he injured his toe, and it took several weeks of nurses to address his injury before it healed up.

The Plaintiff's sister suddenly passed and because of his living conditions and the need to travel across the state he was unable to make the trip to the funeral. His sister Deon was the first in his immediate family to pass and with his inability to repair the relationships with his family, the missed funeral further fractured and

hindered repairing it anytime soon. In fact, he missed the funerals of two of his best friends while being incarcerated and weighs on his conscience, but missing his older sister's funeral brough on shame, disappointment, resentment, confusion, and furthered his already troubled mental state. The Plaintiff's mother was the last person in his life to be treated adversely but her being the only family member communicating with him, she was at the receiving end of his yelling and screaming outbursts. The Plaintiff was unknowingly unleashing all his anger, frustration, and confusion on the only family member that would have anything to do with him. As soon as he was released from jail, he filed a complaint with ACLU, DOJ, and Ada County Internal Affairs, and it was only with the help of two friends that he was able to submit a somewhat coherent dialog of what transpired. His memory was not good and what information that was there, he had a hard time articulating subject matter from his mind and putting it on paper. He also gave notice to Ada County Sheriff's Office with his intent to sue; however, even with his friends' assistance, what he submitted was confusing and incomplete. The Plaintiff's brain fog, confusion, and memory issues were a part of the notice's deficiencies. Another part rests with Judge Hippler's Order to suppress the evidence on the premises of an illegal extension of the stop. Also related to the Court Order so suppress is that a good part of the Plaintiff's injuries and the cause were still not known. This is due to the Defendant's actions to remain conspiratorial and the legal officials aiding in keeping those actions from surfacing.

As with the Plaintiff's notice of intent being convoluted with Judge Hippler's bias Order and saturated with Long-Covid deficiencies, his communication with potential law firms to represent him in a lawsuit against Ada County contained the same flawed defects. However, the law firms' rejections were not based on valid state and federal case law and when the Plaintiff tried communicated that a criminal case and civil case cannot be litigated at the same time and or that his case ended in his favor, their decision to represent him did change. He did not have any case law, and he could not articulate law enforcements misconduct, Judge Hippler's Order that was based on illegally extending the stop, and the States dismissal. The Plaintiff received three referrals from the Idaho State Bar and two ended as previously stated; however, the third agreed with him but had a conflict of interest. The first two referrals milled over representing him for two months each before he received their denial, and they referred him back to the Idaho State Bar. The third referral did what the first two did, and referred him back to the Idaho State Bar, and agreed he had a case for malicious prosecution, but it would be a hard case to win;

3

nevertheless, she had a conflict of interest and could not take the case. Further, she informed the Plaintiff of the strict

six-month statute to give notice of intent to sue before referring his case back to the Idaho State Bar. All three of the

State Bar referrals had permission to speak to John Baldauff to disclose his criminal case to aid him in deciding to

represent him. John Baldauff did not have Plaintiff's interest in mind while representing him before the State's

charges were dismissed, in fact, just the opposite. When the Plaintiff submitted another referral, he was denied even

though his last referral agreed he had a case for prosecutorial misconduct. The reason given; he already had several

referrals in that area of law. The State Bars Lawyer Referral's policies list several reasons why someone could be

denied another referral, and it also lists why one could receive another one and not be charged a fee; the reason he

was denied another referral was not listed, but a conflict of interest was. The Plaintiff left messages, voicemail, and

sent emails but they went unanswered; he could only ask why because none of it made sense. Nothing had made

sense since the onset of his case; his charges, defending his charges, and after his charges were dismissed. In fact, it

would be four years before the Plaintiff was confident in recognizing all the Defendants and fully understanding

their actions and the injuries caused.


The Defendants' conspiratorial and colluded actions to stop, seize, arrest, charge, and convict the

Plaintiff without probable cause was the goal; and while maintaining the stop was lawful, evolved into suppressing

their misconduct and is prevalent from January 13, 2019, to May 9, 2021. Furthermore, and not as obvious, is the

judicial official's clandestine actions to aid in the Plaintiff's conviction while suppressing law enforcement's

misconduct. The Plaintiff was being defended by his third attorney during the first hearing to suppress and had

contracted COVID for the second time when he received Judge Hippler's Order denying our motion. The Plaintiff's

memory of the hearing is limited but he knows out of the three attorneys, he is the only one that discovered law

enforcement's misconduct. Furthermore, he discovered the missing OBVs and after watching the missing OBVs,

and the property contradicting the statement in the report about being contacted the night of the Plaintiff's arrest,

was enough to get another hearing. When the Plaintiff brought forward enough misconduct legal officials changed

their wanted disposition of a guilty plea to the new course of action was damage control and settling with an illegal

extension of the stop. In the hearing to dismiss or suppress, though not obvious but undeniable; the judge,

prosecution, and the Plaintiff's lawyer followed a format where questions that led to misconduct or conflict with

4

their storyline were avoided. Further, in Judge Hippler Order to Suppress he states: "Additionally, Defendant argued the evidence in the case was tainted based on inconsistencies in the dispatch report entries and Property Invoice." Further he states, "However, he conceded that this was not a proper basis for suppression or dismissal." This is a prime example of legal officials conceding to gaining a guilty plea and settling for an illegal procedure as a reason to suppress and keep as much of law enforcements' misconduct from surfacing; Plaintiff would not have conceded to let damaging evidence from being used. Further, the inconsistencies of the dispatch report entries and Property Invoice proved that the evidence was not turned in and kept for over 24 hours. The very reason the video of the booking deputy finding bath salt while processing Osterhout into the jail, did not contain an identifying label or contents; only marked with "no redacts." The Plaintiff's cognitive ability did not allow him to discover, process, and articulate a good percentage the Defendants' covert and colluded actions found throughout his case; not until his brain fog started subsiding and other cognitive functions started returning to normal.

Throughout the incident of the night of the Plaintiff's arrest deputies muted their OBVs, destroyed evidence, and utilized other departments and willing participants. The Defendants made every effort to keep the stop on January 13, 2019, from being known or part of the Plaintiff's prosecution. Especially that a Boise County Sheriff's deputy initiated or participated in the stop and that a dog was utilized and did "hit" on anything. Deputy's messages were fabricated to conceal and make it look as if the messages originated from Boise County Sheriff's dispatch, and Ada County dispatch sent the message out. These tactics were not for law enforcement purposes, they were interjected for the purpose of the Incident Detail Report and any concerning parties, as in judges, prosecutors, and defendants. The Defendants went to great lengths to format and build a critical part of the case that will be utilized while being judicated; dispatchers and the critical information they are entering as evidence.

Almost every aspect of a case relates back to the information that dispatchers supply into the Dispatch CAD and in both Incident Detail Reports, information is interjected, manipulated, omitted, obscured, or coded and available for law enforcement only. When the Incident Detail Reports are requested, the QUERY ran omitted pertinent sections and therefore critical and revealing information is missing. Further, when Plaintiff requests the omitted information, he is told the information has been purged and is no longer available. True or not,

the missing information is unavailable and therefore biased to his civil case and the Defendants, original or new

willing co-conspirators control the narrative and critical evidence held or gone. Moreover, because the Plaintiff

discovered exculpatory OBV, a motion was submitted for an additional ICR-16 and it listed specific items included

any outstanding OBVs, a chain of evidence, any confidential informants, and how and who accessed the iPhone. In

addition, the Plaintiff specifically requested the Vehicle Position History (VPH) of all the vehicles, and

corresponding deputies dispatched to the Plaintiff's arrest location. Furthermore, his lawyer gave a copy and

received the Plaintiff's approval to file the ICR-16 with the Court. However, while reviewing the files of his case he

received from his lawyer finds two copies of the ICR-16. Both copies that were filed with the Court did not contain

the requests for VPH and radio chatter; VPH and radio chatter would have ended the State's case and removed any

doubt about the Defendants' misconduct. Even though the Plaintiff specifically requested those two items be

included and were included in the copy he had given to him while in jail but omitted prior to filing them twice with

the Court. By the time the additional evidence was turned over to the Plaintiff, legal officials were in the mode of

damage control and settled on a procedure violation for "illegally extended the stop." This disposition kept law

enforcement's misconduct suppressed and the State's charges were dismissed.


        The Plaintiff wanted a data dump performed on his phone and his lawyer could not get him to

plead guilty, so he motioned the Courts to recuse himself from the case. The judge allowed the Plaintiff's lawyer to

recuse himself after defending him for nine months and at a hearing where the Plaintiff had to waive his rights to a

speedy trial. When the Plaintiff said he would like to confer with his lawyer before waving his rights, the judge gave

them three minutes out in the hall. After the Plaintiff had plead not guilty, waved his rights to a speedy trial, and had

been fighting his case for eleven months, he misses Court and after writing an apology letter to the Court, he turns

himself into jail and the judge gives him an additional bond amount of $45,000, a curfew from eight to eight, UAs,

ankle monitoring at the cost of $230 a month, and cannot leave Ada or Boise counties. The Plaintiff's was not only

fighting the States cases against him, but he was also fighting a judge and prosecutor to remain free. The Plaintiff's

efforts to be free while against his charges, and for reasons that he had no control over, kept draining his limited and

fixed income. After not accepting the State's offer to accept a plea bargain, and wanting a data dump on his phone,

his lawyer submitted a motion to withdraw from the case, after nine months of fighting his case and at the hearing to

waive his rights to a speedy trial, the judge allowed him to withdraw, and he was assigned a public defender. Eleven months into his case the Plaintiff's missed court and he wrote a letter to the judge apologizing and turned himself into jail. To get out of jail he had to post another and higher bond and agree with pretrial release stipulations, he missed one UA and was called back into Court, threatened to have his bond revoked by the owner of the business overseeing his ankle monitor, tried for months to help figure out why his ankle monitor would not charge, traveled almost seventy miles to take a UA during home isolation for COVID, had problems producing for UAs because of his disability, fell and hurt his back because his leg got tangled with his ankle monitor and received medical care that ordered home convalesces and referrals, had trouble fulfilling referrals because provider was not meeting in person because of COVID, Court being held without being notified and was conducted by video and warrants were issued, requested and sent medical excuses and referrals to ankle monitor owner and told they would be submitted to the appropriate department, and to get his medical excuses for not making his UAs to the judge, he sent it to the judge's clerk. One would believe that medical documentation that excused the individual from complying would be sufficient, not in the Plaintiff's predicament.

The first time the Plaintiff contracted COVID-19 the test resulted in a false negative. He had been to the jail medical several times and complained about unknown symptoms that seemled to be affecting his eyes, ears, and some other issues; all were new to him and hard to explain. When he finally was tested, and the results were a false negative; the Plaintiff's anxiety elevated because he did not know what was causing his symptoms and medical believed he was creating a narrative to get him out of jail. Within two months the Plaintiff contracted COVID again, but this time he had more common symptoms and after they faded his other symptoms evolved and were more defined. For the next seven months he jail's medical did everything but treat him for COVID-19. Even after a managing nurse shared her story of contracting COVID-19 and her struggles and communicated that after reviewing the Defendant's charts, she was advocating that he be seen at the COVID Clinic where after spending $12,000 trying to find out what she was suffering from, she found help. Her assessment was on Super Bowl Sunday and for three more months the doctor or any other medical staff acknowledged the nurse's assessment and that she was advocating him being seen by the COVID clinic. The Plaintiff believes that the doctor and administration did not want to set a precedence where inmates with post COVID symptoms were evaluated outside of jail medical. It

7

was a calculated and acceptable expenditure for the jail to take the Plaintiff to three eye specialists than set a precedence of unknown number of inmates being evaluated by the COVID-19 clinic and potentially responsible for a staggering number of medical charges. Therefore, the Plaintiff's debilitating Long-COVID went ignored and unassessed even though he begs and pleads for medical help; even so as describing his inability to move a peg while playing with cribbage. Spanning from when he first arrived at the jail through when he contracted COVID to when he got out, the Plaintiff's medical kites changed and reflected his cognitive abilities, concerns, helplessness, and to when physically and mentally gave up. This is evident as his spelling and sentence structure digressed in his barrage of medical kites; that is if he was unable, and another inmate assisted. Due to medical seeking other avenues to address his obvious COVID symptoms because of cost, the Plaintiff's frustration had peaked and his physical and mental had deteriorated and to save what was left he succumbs to withdrawing and mentally shutting down by forming a protective mental blockade. The last hearing was to get a medical furlough to visit his primary physician, but Judge Hippler had made a decision and agreed with the Plaintiff and gave him a release on own recognition.

With the direction of his last referral and the help of a couple friends he gave notice of intent to Ada County Sheriff, and he met with a new provider that focused on a referral to a rheumatologist for his arthritis and getting him vaccinated for COVID so he could visit his parents that were both in their mid-eighties of age. His provider and himself talked had conversations about his Long-COVID symptoms, but the consensus of healing and recovery would come with time, but most concerning was memory and diminished cognitive abilities. With the trauma extracted on him from medical professionals, the Plaintiff's trust was limited. His mental state and his cognitive processing and abilities started improving at the beginning of 2023; however, the fullness and the realization of how far his mental state had regressed was not known until June and July of 2023. With his memory starting to come back, his body reacted adversely, and he started having severe headaches, the cause was unknown. He couldn't sleep, anxiety elevated, and fear because he had never endured headaches like these in the past. The Plaintiff had several conversations about his Long-Covid lingering symptoms, and they included isolation, anger, leg cramps, anxiety, tiredness, loss of empathy, and one of the more concerning was memory loss and cognitive processing; however, headaches were one of them but not this severe and not in the frontal lobe. His provider ordered a study, and the results were a small enlargement of his pituitary gland, not the cause of his migraines. The

only conclusion the Plaintiff could reason is with his brain fog diminishing and his memory of the last four years returning, his body was adversely reacting. He stopped working on his case and the headaches slowly diminished until they were gone. However, another ailment from the trauma started so coming to light. Symptoms of Post Traumatic Stress Disorder were surfacing and even though there had been signs they were now front and center. The Plaintiff was dealing with anger, isolation, night sweats, paranoia, and tantrums reliving traumatic events filled with endless begging and pleading and in return he was mocked and ignored.

Law enforcements' misconduct may have erected the Plaintiff's illegal charges, but it was the Plaintiff's unwillingness to accept those charges and plead guilty that spawned the need and addition of legal officials and judicial oversight, that employed illegal strategies and misconduct to steer the Plaintiff's case to a needed outcome. The misconduct in the Plaintiff's case is an introductory to a much broader and more significant issue and if not eliminated, would expose a critical functioning job of Ada County Sheriff's Office, and that is to collect, secure, maintain, document, and transport evidence back and forth from the Courts Evidence comes from throughout Ada County and can include trials that have been moved to Ada County for judication. When the Plaintiff looks at the totality of his case, how it evolved, who was involved, when they signed on, why they signed up, and what happened before and after the charges were dismissed; he determines that his case and the adverse implications for not only Ada County Sheriff's departments within, but the State of Idaho and the Ada County Judicial system; was the core cause and the reason for extraordinary tactics and extreme acts of judicial oversight and misconduct. It was in simplicity that compounded and complicated; and it was all because the Plaintiff, at every juncture did the opposite of what the Defendants needed for past and present concerns to disappear. In fact, the Plaintiff's actions not only complicated law enforcements illegal acts of misconduct that constructed the State's case, but his actions were also on the brink of a damn breaking and causing Ada County Sheriff's and the State's Judicial system from imploding; "Extraordinary times require extraordinary measures." The problem for the Plaintiff, he was unaware his actions of none-compliance was the driving force behind "extraordinary measures" of misconduct, and while trying to meet the unreasonable demands and illegal conditions of the Court, he was enduring more injuries, and it would be years before discovering confusing snippets of misconduct. Further, with the Plaintiff being judicated by a judge that aligned with law enforcement's goal of having him plead guilty; and him not

9

changing his course, was causing the Defendants to inflict more injuries, and even more years of not knowing his injuries and their cause. This sought after ending kept law enforcements' misconduct from surfacing, but also the misconduct connected to more significant problems of misconduct, in several departments within the Ada County Sheriff's Office. If discovered, it could result in potentially having thousands of pasts judicated cases and the evidence utilized; reviewed, questioned, and consequently lead to the dismissal of an insurmountable number of cases; in addition, grounds for defendants to appeal their case and reviewed by the higher courts. Therefore, it is unknown by the Plaintiff where law enforcement's misconduct ends or where judicial official's misconduct starts, for that matter, whether the illegal acts of misconduct by law enforcement or judicial officials have ended.

        Mitchell Aguilar laughed when the Plaintiff said, "What they did was entrapment." He then said that he did not think there had ever been a case judicated in Idaho with accusations of entrapment. He missed two court dates and received a DUI while representing the Plaintiff. He tried extensively to get the Plaintiff to change his plea and even though the Plaintiff wanted to hold his preliminary hearing, he decided to go along with his lawyer and waived it. Then it was time to enter a plea in District Court, and the Plaintiff was adamant that he was not going to accept the State's plea bargain and plead guilty. After leaving Court Michell was giggling and the Plaintiff wanted to know what was going on, he sat down on the bench and informed him, "I think you pleading not guilty was the right thing to do." He said he received an email from the prosecution this morning and it said, "Its highly suggested that Marlor accepts the plea deal." The Plaintiff informed Mitchell that he was sent to Aloha Gardens so they could do what they did to him and he wants a data dump performed on his phone. Also, he wants him to contact both Taz and her sister TJ; he believes TJ was never at Aloha Gardens and was only a ruse to get him to the location, they were waiting for him. He also informs him that Taz had requested him to give her and JT a ride as they were walking somewhere in Caldwell.  From this point on Mitchell did nothing for the Plaintiff and in the end, did nothing for the Plaintiff but appear in Court, especially after not pleading not guilty and giving him a list of things he needed done. The Plaintiff was frustrated with Mitchell because he was unable to contact Taz or her sister and implies the cost of a data dump and trial would be high. He said that if that is the path he wanted to take, then he would submit a motion to the judge to recuse himself from the case. The Plaintiff explained that money was not an issue here, but he wanted to be represented, but if he recused himself from the case, he would be given a public

defender and then the state could pay for the data dump. The Plaintiff never thought Judge Hippler would let him recuse himself, not nine months into a case and at a hearing that was for the Plaintiff to waive his rights to a speedy trial; wasted resources.

In retrospect, the State had Plaintiff's phone and when the Plaintiff had John Baldauff request a data dump, the State performed the data dump and therefore the Plaintiff was not charged. However, the Plaintiff's expert witness only received a partial data dump, and he now questions the procedural and ethical and legal standards in place for when a data dump is performed and the need for an independent extract of data, especially when law enforcement possesses the only means possible to extract data from an iPhone.

\Letting Mitchell Aguilar recuse himself from a case where he had been representing a client for nine months was the first questionable decision that Judge Hippler made and literally confused the Plaintiff, it was like flushing time and money down the toilet. In retrospect, it was made for reasons and was the perfect move for the Defendants' because Mitchell was not getting the Plaintiff to plead guilty, valuable resources had been utilized, and now he was represented by a public defender that could steer the Plaintiff in the direction of pleading guilty while playing the role of defending him. The next hearing David Lorello played his part by informing the Judge that there were good grounds for suppression hearing, it was status hearing. Nothing happened in the Plaintiff's case and another hearing was scheduled three days before Christmas, almost eleven months after being charged, and it was another status hearing. Not one call, not one conversation about what was happening, a direction, complete silence from his new defense attorney.

The Plaintiff had been out all night looking for his new puppy that had ran away the night before Court and arrived at his place in Horseshoe Bend at eight in the morning and ate a cube steak his roommate had cooked the night before and about ten minutes after he laid down and informed his roommate he had Court at 4:00, he remembers saying he did not feel good, he did not feel good at all. She woke him up at 4:30 and she had made sure that there was not time to call anyone and that he would have a warrant. The Plaintiff looks back and knows that she was working with Ada County Sheriff's detectives, and missing his Court would surely put him in jail and

would be an incentive to plead guilty. The first person he called was his bondsman, the next was his public defender and he did not answer so he left a message. The Plaintiff knows that he was drugged, would shortly have a warrant, communicated to his family, close friends, and his bondsman that he was drugged. The Plaintiff wrote a letter to Judge Hippler and apologized for wasting the Court's time. Nevertheless, Lorello said the only way to resolve the matter was to turn himself into the jail and he met with his bondsman, and she took him to the jail and dropped him off. The plaintiff ran his phone dead while waiting for a guard, finally a guard showed up and escorted him through a back door and into the receiving port and into a wheelchair. He was then processed and the last thing he requested was an iPhone charger so he could charge his phone enough to retrieve some numbers. He sat in jail for three weeks before going before Judge Hippler, and after being transported to the courthouse, and while waiting for Court, David Lorello met with him and he explained that he had been drugged by his roommate and by the time she woke him up, he had missed Court, it was too late. David said, "I'm not telling the Judge that." Judge Hippler ordered the Plaintiff to pay an additional higher bond of $45,000, a curfew from 8pm to 8am, community monitoring consisting of UAs, GPS monitoring costing $230 per month, and at first could not leave Ada Count until the Plaintiff informed Judge Hippler he lived in Boise County, and it was added. Judge Hippler was trying to ensure that the Plaintiff remained in jail and if he did post bond, he would not be retaining a new lawyer and if he did, the Plaintiff was going to have issues staying in compliance.

The Plaintiff missed a UA by one minute and David Lorello called him and informed him that Court was being held because of the UA he missed. Judge Hippler informed him that unless he followed the conditions of his bond, he would be sitting in jail through the COVID pandemic. The Plaintiff's spinal cord injury hindered his ability to produce an on spot sample and he explained this to the tech, and he said that one or two is not going to make a difference and that there was no way to communicate why that the judge and prosecutor would see missed UA. Then the Plaintiff was having issues with his ankle monitor and getting it to charge. He went through several chargers, several GPS units, and worked extensively trying to figure out the root cause; all this while being threatened that they were going to submit to have his bond pulled. After driving down to Boise to meet Angela he txt her and she replied that they would have to meet the next day she was in Nampa. The Plaintiff was frustrated and then to complicate an already burdensome relationship his leg got caught with the ankle monitor and caused him to

fall backwards into a chair. Because of COVID, and information to stay away from ERs, the Plaintiff finally makes it down to Boise to receive treatment. After imaging, the doctor at Urgent Care orders home convalescence and referrals to a neurologist and orthopedic surgeon. Fulfilling the doctor's orders was the fact that Urgent Care was out of the market so his provider and the doctor at Urgent Care had to convers and the Plaintiff's doctor would have to order referrals. With the problems with Idaho Ankle Monitoring, his landlord, Judge Hippler, and him having a public defender he knew he had better retain another lawyer and one call the lawyer said he had warrants for missing Court and not complying with pretrial services. The Plaintiff had no case manager, so he asked Idaho Ankle Monitoring to submit his doctor's order to the Court, she said her mom would submit them to the appropriate department. He waits a week and then contacts the clerk, but the warrants were still active and far as she knows there has been no documentation submitted. He then emails the doctors' referrals and other documents, and she informs him that the judge, prosecutor, and his lawyer would receive a copy.

The Plaintiff waited over five days and called the clerk again and she informed him that the warrants were still valid. The Plaintiff had to turn himself into jail again. When the jailers were assisting him out of the car because they were not going to remove the handcuffs, they aggravated his back injury and caused him severe pain and he was unable to get out of bed and had to use a urinal; he also missed court due to pain and not getting out of bed. After showing symptoms for COVID he was tested and resulted in a false negative and this started a vicious cycle of unknown symptoms and the cause. Then in September he had symptoms of COVID and this time the results were positive. The plaintiff was sick but after the COVID signs had subsided he was left with post COVID symptoms that were debilitating and changed his life and has yet to fully recover. The Plaintiff's symptoms include brain fog, confusion, memory, cognitive processing, critical thinking, headaches, loss of empathy, taste, smell, leg aches, loss of energy, and others. The Plaintiff believes his symptoms and their severity are linked to an RX for Enbrel, and the medication's reactions to his body. Five different jail medical professionals sent recommendations to administration and Judge Hippler for his release; even mentioning Enbrel and it is making him more susceptible to infection and complicating treatment if he contracted the disease. Medical informed the Plaintiff that if he was not happy with the medical treatment, he was receiving at the jail then he could get furlough to see his provider. These tactics were no more than to further the Plaintiff's helplessness because even after trying to make an appointment

13

with his provider he was told they were not meeting anyone in person and then when his mother made a virtual appointment with his provider jail security and medical denied facilitating the visit.

Judge Hippler, Anthony Klinger, and David Lorello held court without notifying the Plaintiff and a month and a half prior notified him of court when he missed one UA. They collectively and purposely did not notify the Plaintiff because they wanted him in jail where they could get him to change his pleading to guilty. COVID home isolation ended on Friday and the following Monday the hearing was held to revoke his bond. Further, court was facilitated by video and the Plaintiff could have attended Court while at home and explained that he had a fall that injured his back and after the doctor reviewed images, ordered referrals and home convalesce. The Plaintiff made sure they received the doctor's documentation, but his path had already been decided. The Plaintiff's health was of no concern to these legal officials before or after checking into jail. In fact, the Plaintiff was made to go where COVID thrived, and he was sure to contract the deadly and debilitating disease; him losing his life would be an uneventful ending to case containing a link between the misconduct in his case and the evidence room and its contents being compromised. If it is known that the Plaintiff's evidence was and can be compromised, then what other evidence has or was compromised to those individuals willing to break the law. The implications and consequences could affect thousands of cases, and the very reason Judge Hippler is at the forefront of suppressing the misconduct and driving the Plaintiff to a colluded disposition of changing his pleading to guilty. As the Plaintiff actions have not waivered and remained steadfast to fight the charges, the Defendants' strategies and tactics become more sinister and desperate; even more so when the judicial officials get involved.

When Mitchell Aguilar's efforts to get the Plaintiff to plead guilty failed and it is known that he wants to have a data dump performed on his phone, the Defendants knew their best position was to take away his freedom. The detectives utilized a confidential informant to drug the Plaintiff, and he missed court. Judge Hippler, even though the Plaintiff had been fighting his case for 11 months and surrendered himself to jail, gave him an additional $45,000 higher bond, and ankle GPS monitor at $230 a month. Who knows, with the tactics already employed, maybe the GPS monitor not charging was an additional strategy because even after turning himself into jail and providing text messages proving he was going over and beyond trying to get the GPS unit working and

supplied documentation for his injury, his bond hearing was denied. The motion to suppress was coming up and so was an opportunity do away with the discovery of misconduct, and that was an offer to plead guilty to a misdemeanor, possession of paraphernalia and receive two years of supervised probation and follow the recommendations of a drug assessment. The Plaintiff was adamant in his answer and said no, we are having the hearing. Then the prosecution gave their answer to the motion to suppress on Monday and Johnathan came into the jail to visit the Plaintiff just before midnight, the hearing was scheduled for the following day. The prosecutor said something to the effect the front door to the business was open and a straw on the driver's side floorboard opened the scope to a drug investigation. Further, the State had made another offer and was now offering the same thing but two years of unsupervised probation. The Plaintiff said no because he felt the case he had for the suppression was solid and the evidence would be suppressed.

The Plaintiff felt the manner in how the proceedings were conducted during COVID violated his rights to due process and even at that felt things went well. However, when everyone is on the State's side and suppressing the evidence did not earn the prosecution a win, even though at this point the misconduct would not have occurred if the evidence had been suppressed, Judge Hippler did not find suppressing the evidence was warranted. No question Johnathan Baldauff had signed on to the other side by then because in the motion it covered Deputy Hessing giving the order for the Plaintiff to out of the car for a dog sniff, and that was over thirty minutes into the stop. Conveniently, he did not start his OBV until after the conversation that led to the exit order and the order had taken place. Further, the conversation was on Deputy Levis's OBV, but Baldauff did not submit her OBV for review and Judge Hippler ignored the whole conversation. Of course, the Plaintiff had been relying on a defense lawyer that did not have his best interests in mind and would later discover two videos that had not been turned over to the Plaintiff. By the time the hearing had concluded the Plaintiff had contracted COVID twice and was having a difficult time dealing with new symptoms from an unknown source. This is when the Plaintiff wanted to come out and say they planted the evidence, but Baldauff was adamant that he may have to plead guilty to the charges and if he went down that path then Judge Hippler would hand down a stiffer sentence. It took Judge Hippler three months to give his finding that suppression was not warranted. With no one on the Plaintiff's side and everyone making little adjustments of omission, a couple of videos not turned over, a line of questions not pursued, and someone else

15

1   would feel the futility of pushing forward and folding was the only option. However, the Plaintiff delved into his

2   Discovery and discovered two OBVs that the Defendants had kept from him. With that and him knowing that the

3   Defendants had constructed everything that led to him being charged he advised his lawyer to contact the property

4   owner and contradict Deputy Kastler statement that the property owner had been contacted after midnight the

5   morning of his arrest. Then he reviewed Deputy Piccola's OBV, and he found him covering up his OBV when a

6   figure appeared by the shop that they later report had an open door and the reason for expanding the stop for a

7   burglary investigation. He found the sign that read Warning 24-hour video surveillance, and that the pictures did not

8   add up to when the pictures of evidence were taken and the time the dispatch logged them off scene and arriving not

9   at the jail, but at dispatch in Meridian. Further, the bath salt found on Osterhout was on the same evidence sheet that

10  was submitted and logged into evidence at 1:35 but Levis was taking pictures of at 4:43 am.

11

12          With all the evidence being discovered by the Plaintiff, Badauff was gearing up for the

13  Plaintiff to change his pleading and be sentenced and move forward and appeal the case. The Plaintiff was frustrated

14  with him and was speaking to another lawyer but because of COVID he was unwilling to come to jail and take him

15  on as a client. He asked the lawyer what he needed to do and was told that due to new evidence, submit a motion to

16  reconsider. He communicated this to Baldauff and said he wanted a data dump performed on his phone. At every

17  juncture in the case and move the Plaintiff wanted to make or made, it was countered, or the outcome fell

18  incomplete, if not omitted in its entirety. The Plaintiff was up against a collusion of law enforcement and legal

19  judicial officials but for all the efforts the Defendants put forward, he held his ground and withstood the jail's

20  medical's discriminatory actions and medical ineptness; even so as a managing nurse advocating for him be seen by

21  the COVID Clinic. The Plaintiff's Discovery was missing several pages, and he never received the sheet of evidence

22  and property that was submitted to the evidence room; illegally, the evidence went home with the Defendants. At the

23  hearing to reconsider the deputies purged themselves on the stand and even though Detective Montoya testified he

24  was only able to get a partial data dump, he was firm no one accessed his phone. For Judge Hippler to take the

25  position and say that by law, there was no evidence presented that any law enforcement illegally accessed the

26  Plaintiff's phone; the Plaintiff received his phone and found evidence that his phone was accessed on January 31,

27  2019. The Plaintiff also discovers his expert witness states that he knows that the iPhone was accessed, but he would

28                                                      16

need the full data dump to know what was done after it was accessed. Baldauff, Anthony Clinger, Detective Montoya, and Judge Hippler controlled the narrative and nothing that came out in the hearing was valid. In fact, Anthoney Clinger was on his computer communicating with someone, most likely Detective Montoya, that was feeding him technical questions and making the expert witness's testimony seem insignificant and minor league. Moreover, with Baldauff in collusion with the Defendants, there were no meaningful questions asked that would add credibility or substantiate to the Plaintiff's expert witness or discredit Detective Montoya dialog; a pertinent question would have been how he can conclude the iPhone was not accessed with only a partial data dump? Another significant move was for Baldauff to remove two items from the second supplemental discovery request that the Plaintiff requested; the VPH for all the units and deputies radio chatter that was dispatched to the Plaintiff's arrest location.

The Plaintiff cannot emphasize how much control the Defendants possessed in controlling the narrative, the evidence, the testimony, and how biased Judge Hippler was when writing his order that suppression was not warranted, and the order to suppress that concluded the second hearing, where he had to go back and suppress the results from the first hearing. Where the Defendants had most of the control, the Plaintiff possessed very little, but it is what he did with it that imploded the Defendants' collusion and exposes Ada County Sheriff's department wide illegal, unethical, and procedure inefficiencies. With law enforcement's far reaching, tightly united, goal orientated, knowledgeable, and available resources; and combining legal officials' influential, powerful, and long-established history they become an almost indestructible. However, even when up against the Defendants' combined and powerful collusion; the U.S. Constitution and the power it grants We the People, will not be denied. For the Plaintiff, and because of his inalienable rights, he was able to retain and withstand the unconscionable, wanton, tyranny driven, and outrageous acts that were committed against him while tasseled in the color of law.

While the Plaintiff was lying in bed and thinking about completing the Court's request, he was milling over the people involved and how things transpired, the lawyers that represented him and the lawyers that would not look at the misconduct or sign up to represent him in a civil case against the Defendants; the whole case suddenly made sense. And in a moment of clarity, the whole thing, everything made sense, everything happened for

a reason, the Plaintiff just happened to do everything that nobody thought he would do. The Plaintiff thought that it was all about covering up the misconduct that took place before and after his arrest. It may have started out that way, but with all the things that Judge Hippler did, some unconstitutional, some questionable, but to disregard the Plaintiff's life to extract a guilty plea, is too much and another reason the Plaintiff could not get anyone but his friends to see the injustice he faced while fighting the State's charges for 28 months. In fact, until the Plaintiff stopped talking about the 28 months of injustice, people questioned his sanity. The Plaintiff questioned his own sanity because of the Defendant's collusion and the tactics employed were only known to them, with a common outcome, that was the Plaintiff pleading guilty. Meaning; all three defense lawyers, the prosecutors, the judge, law enforcement, and even his friends were participating with law enforcement's collusion to charge him and eventually with legal officials help, to take his freedom to push him to change his pleading to guilty, because he was in jail.

Further, three defense lawyers not only did they not find any of the misconduct, but they also sought out the prosecution's goal, and that was for him to plead guilty. In Johnathan Baldauf's case, the Plaintiff can now see why he said the things that he said, did the things he did and did not do, and was adamant when the Plaintiff said that the methamphetamines was planted, "You don't want to piss Hippler off, if you have to plead guilty, he will make the sentence harsher." There is no doubt now that Baldauff was communicating to the Plaintiff's referrals and other law firms that were screening him to potentially take his case. Even the last referral from the Bar now is suspicious because she would have checked for a conflict of interest from the start not after weeks of deciding whether to take the case or not. The Plaintiff's believes his case will never be decided by a jury because there is too much blatant misconduct, unless the jury decided how much to award him. The Defendants or Ada County will ever want this case to be fully disclosed to the public. However, the Plaintiff knows that there is a need for the public to know the fullness of the Defendant's actions of misconduct. He also knows that there needs to be an accountability office established within Ada County Sheriff's Office so there is some oversight so when someone files a complaint that it is not handled only by Ada County Sheriff's Internal Affairs. The Plaintiff also believes there is a need to establish civil centers throughout Idaho so someone that has been injured by State actors that they do not have to seek out referrals from the Idaho State Bar because it is a conflict of interest and in the Plaintiff's predicament, he was trying to get help from the very individuals that had injured him, or that they had licensed. The Plaintiff feels

18

there is a need to file this memorandum under seal due to his safety and who the Defendants are and available resources. He already knows the lengths they have gone and looking back at the only person that could say she was never at Aloha Gardens and that is Taz's sister TJ. Around the time the Plaintiff had Baldauff trying to contact TJ it came to light she had died in an automobile accident with her fiancé. He had also heard some statements what she was doing when they wrecked but the timing is suspicious and for the Defendants to have Taz testify that she never had contact with law enforcement and that it was her sister was the reason why she sent the Plaintiff to Aloha Gardens; just is not possible especially when Taz lied about her sister going to prison when he cannot find any record of her ever being in trouble with the law. The Plaintiff knows that his ability to recognize the Defendants' injuries and then articulate them is very difficult; especially trying to do it in a format for the courts. Plaintiff requests that he be allowed to submit an edited and final complaint and that he appointed legal counsel to ensure he has covered all his needed charges against they defendants.

The Plaintiff also believes the Defendant's played a huge role in the discrimination that has afflicted him since February 16, 2022, when he was illegally denied federally funded housing in Boise Idaho. In fact, the same time he was dealing with the repercussions of Ada County Sheriff's Medical and diminished cognitive abilities from COVID, The Housing Company felt the need to deny him housing and when he produced documentation that they could have easily procured on their own, they used unlawful tactics and recertified him replaced his one-bedroom with a studio and charged him $620 a month where he originally certified for $520. With his cognitive ability not processing like it should, he could not see the discriminatory narrative he was living until they kept denying him a transfer to a one-bedroom, and if there was going to be a transfer, he would be charged hundreds of dollars more a month. Also, he was unable to articulate that it was not his criminal past that caused The Housing Company to deny him housing, it was acts of discrimination against him of not wanting him to live at Thomas Loga apartments or give him reasonable accommodation that was behind the acts of discrimination. He has found no help from Idaho Legal Aid, Intermountain Fair Housing Council, HUD, Idaho Human Rights Commission, and other disability advocating rights establishments and it stems from him not being able to articulate the discrimination due to his Long-COVID and or they are biased and again, were at first motivated by the Defendants in his Ada County Sheriff's Office lawsuit. Even though the Plaintiff has lived in a non-ADA studio apartment for

over 3 years, the compliant he submitted with Idaho Human Rights Commission concluded and denied any

discrimination by The Housing Company, the Plaintiff filed a lawsuit, and it is pending review by the same courts.

        From 2021 to present, the Plaintiff's provider has and is addressing his Long-COVID symptoms

that include memory, cognitive processing, critical thinking, and other related symptoms. She also gave him a

referral to a mental health professional to address his PTSD and associated symptoms. The Plaintiff's sees the notice

he gave Ada County, he had to email it 7 times before he got it right, marked what little was known of the

Defendants' injuries and how truly his COVID symptoms hindered him or rendered him incompetent, therefore the

time would be paused until the fullness of his injuries and their cause is known or tolled for a period of more than

six years. Even with the Defendants interfering with the Plaintiff's due process, he believes he is excused and or is

timely:

        Under Statute 5-230

           2.      Insane. [;]

        … tolled for a period of more than six (6) years on account of minority, incompetency, a

defendant's absence from the jurisdiction, any legal disability or for other cause or reason…

May 20, 2025

GREGORY R. MARLOR

20